UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
AIR CHINA LIMITED,

|  |  |
|---|---|
|  | : **Case No.** |
|  | 07 CV 11128 |
| Plaintiff, | (LTS)(DFE) |
|  | : |
| -against- |  |
|  | : **AFFIDAVIT** |
| NELSON LI (a/k/a SHENG LI), | : |
| JOHN A. VARACCHI (a/k/a JOHN A. DAVIS), |  |
| GEORGE F. DONOHUE, JAY KOPF | : |
| (a/k/a JACOB M. KOPF) CHRISTIAN M. DEUTSCH, |  |
| WBM-JMK DEVELOPMENT LLC | : |
| (d/b/a WBM INTERNATIONAL DEVELOPMENT), JMK |  |
| CONSTRUCTION GROUP LTD., | : |
| TCC INTERIORS, LTD., GMAC REAL ESTATE LLC, |  |
| GMAC REAL ESTATE IPG NEW YORK, | : |
|  |  |
| Defendants. | : |

------------------------------------------------X

STATE OF NEW JERSEY )
                                      ) ss:
COUNTY OF MORRIS      )

SUSAN DANIEL, being duly sworn, deposes and says:

1.    I am the Manager, Franchise Contract Administration of defendant GMAC Real Estate, LLC ("GRE"). I submit this Affidavit in support of the instant application to dismiss this action as to GRE.

2.    GRE is a limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business in Oak Brook, Illinois.  GRE is a franchisor which operates a national real estate brokerage franchise system. One of our franchisees is

International Property Group, Inc., d/b/a GMAC Real Estate IPG New York, also named as a party defendant.

3.    International Property Group, Inc. is an independently owned and operated business.  It makes use of the name "GMAC Real Estate" by virtue of a license contained in a franchise agreement with GRE.  The franchise agreement does not permit GRE to own, operate, manage, or control the daily business affairs or transactions of a given franchisee brokerage. Individuals employed at the brokerage, or associated with the brokerage, are employees or independent contractors of the brokerage; they are not employees or agents of GRE.

3.    As we read the complaint in this action, it involves a dispute regarding the renovation of a building or facility owned by the plaintiff, in Long Beach, New York.  From what we read, a dispute arose and a lawsuit has ensued.

4.    I can state of my own knowledge and without any equivocation that GRE had no knowledge of or involvement, participation or investment in the subject project.  We made no phone calls, wrote no letters and sent no e-mails relative to the project.  The first we learned of the dispute was with the service of the Summons and Complaint.

5.    A copy of the Franchise Agreement between GRE and GMAC Real Estate IPG New York is annexed hereto.  It serves to define our relationship with the franchisee.

2

6.    It is respectfully requested that the instant application for an Order dismissing the action as to GRE be granted.

Susan Daniel
Manager, Franchise Contract
Administration

Sworn to before me this
21st day of July, 2008

Notary Public

**SHANNON CASEY**
**NOTARY PUBLIC OF NEW JERSEY**
**MY COMMISSION EXPIRES AUG. 25, 2008**

P:\COMPANY SHARED\WEISSMAN\YG\CLIENTS\JMK CONSTRUCTION(KOPP)\AIR CHINA\CHINA.V.LI.ET.AL.AFFIDAVIT.OF.GMAC.RRAL.ESTATE.LLC..DOC

**GMAC REAL ESTATE, LLC**

**REAL ESTATE FRANCHISE AGREEMENT**

3-2005 Reg. Fran. Agmt
CHGO1/30557830.2

D 0001

## TABLE OF CONTENTS

|   |   | Page |
|---|---|---|
| 1. | THE FRANCHISE. | 1 |
| 2. | RELATIONSHIP OF THE PARTIES. | 2 |
| 3. | THE MARKS. | 2 |
| 4. | MATERIALS. | 4 |
| 5. | TRAINING. | 5 |
| 6. | GRANT OF THE LICENSE. | 5 |
| 7. | CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE. | 7 |
| 8. | NO CONFLICTING LICENSE / INTEREST. | 7 |
| 9. | GROSS COMMISSION INCOME AND FEES / REAL PROPERTY. | 7 |
| 10. | FEES. | 8 |
| 11. | PAYMENT OF FEES/REPORTING. | 9 |
| 12. | LATE PAYMENT. | 10 |
| 13. | VERIFICATION RIGHTS. | 10 |
| 14. | ADVERTISING FUND. | 11 |
| 15. | REFERRALS. | 12 |
| 16. | PREMIER SERVICE*; BUSINESS PLANNING; PERFORMANCE STANDARDS. | 13 |
| 17. | ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL. | 14 |
| 18. | TERMINATION; DEFAULT; CROSS-DEFAULT. | 17 |
| 19. | OBLIGATIONS UPON TERMINATION. | 20 |
| 20. | REPRESENTATIONS AND WARRANTIES. | 21 |
| 21. | ENTIRE AGREEMENT. | 22 |
| 22. | INDEMNIFICATION AND INSURANCE. | 22 |
| 23. | CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS. | 23 |
| 24. | MODIFICATION OF AGREEMENT. | 25 |
| 25. | SEVERABILITY. | 25 |
| 26. | NON-WAIVER. | 25 |
| 27. | NOTICES; FACSIMILE AND ELECTRONIC MAIL. | 25 |

D 0002

28.    TERM AND RENEWAL. ........................................................................................26

29.    EFFECTIVE DATE. ..............................................................................................26

30.    FRANCHISE DEVELOPMENT COSTS LOAN
       26

31.    LIMITATION OF DAMAGES.................................................................................27

32.    CONFIDENTIALITY OF AGREEMENT. .............................................................27

## **EXHIBITS**

Endorsement of Principals / Ownership Interest Holders

A    -    Royalty / Advertising Fees
B    -    Licensed Territory
C    -    Franchise Development Costs Note
D    -    Loan & Security Agreement

D 0003

## REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("**GMAC Real Estate**"); and

| | |
|---|---|
| International Properties Group, Inc. ("IPG") and William B. May Commercial, Inc. ("May"), jointly and severally Exact name under which real estate license is held (collectively,"**Strategic-Partner**"), whose principal place of business is located at 505 8th Ave., 8th Floor, New York, NY 10018 | Trade Name: _____ |
| FEDERAL ID#20-3659330_____ | GMAC Real Estate International Properties and William B. May Commercial GMAC Real Estate (initial selection of and any modification of Trade Name requires prior written approval of GMAC Real Estate. However, Strategic-Partner is solely responsible for ensuring that its choice of Trade Name complies with applicable law and does not infringe on the rights of any third parties.) |

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "**Franchise**") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.C.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2.  RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage.  Neither this Real Estate Franchise Agreement (this "**Agreement**"), nor the use of the term "Strategic-Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties.  The GMAC Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate.  Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3.  THE MARKS.

A.  **Ownership and Modification of the Marks**.  GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the "Marks"). Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement.  Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.D.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks.  GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required.  All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate.  All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner.  The term "Marks" shall include any marks developed and/or registered in the future.

D 0005

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner for any goodwill related to the discontinued or modified Mark. Notwithstanding the foregoing, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words, GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

B. **Use of Marks**. To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site (as described in Section 6) during the term of this Agreement, and will not use the Marks except in conjunction with permanent real estate sales offices approved by GMAC Real Estate. The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate, Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

The Marks may be used only in the form and style authorized by GMAC Real Estate, as outlined from time to time in this Agreement and its manuals and other communications. Any departure from the restrictions set forth in this Agreement or the manuals or any use of the Marks on printed materials not outlined in this Agreement or the manuals must be approved in advance, in writing, by GMAC Real Estate.

If Strategic-Partner is an entity, it shall not use the GMAC Real Estate name or any other Mark as part of its legal name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. Throughout the Term of this Agreement, Strategic-Partner will operate exclusively under the Trade Name indicated at the beginning of this Agreement with regard to all advertising, promotions and communications. In no event may Strategic-Partner use the names "GMAC" or "GMAC Real Estate" alone or in any abbreviated form when identifying Strategic-Partner and/or its operations at the Licensed Site. Strategic-Partner may use the GMAC Real Estate name (but not "GMAC" alone or any other Mark) as part of an Internet (or other computer network) domain name, provided that (i) such use complies with the standards set forth in the manuals or other communications supplied by GMAC Real Estate from time to time; (ii) prior written approval of the domain name is obtained from GMAC Real Estate; and (iii) upon termination of this Agreement for any reason, Strategic-Partner will comply with the terms of Section 19.A. (1) with regard to terminating its use of the GMAC Real Estate name as part of its domain name.

D 0006

GMAC Real Estate reserves the right to approve any and all public use of the Marks, other than on materials produced by GMAC Real Estate for use by its strategic-partners. Use of the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate. Strategic-Partner will not enter into any agreement providing for the publication or display of any advertisement (including any telephone directory listing) incorporating the Marks, which agreement would result in the publication or display of such advertisement beyond the expiration of the Term of this Agreement.

GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

Notwithstanding anything in this Agreement or any manuals or other communications which may be to the contrary, Strategic-Partner acknowledges and agrees that it may not use the service mark "Elegant Homes" in Rockland and Westchester Counties in the State of New York.

## 4. MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials) is restricted to use by Strategic-Partner in its own business. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, GMAC Real Estate materials or programs, or adapt and use, or permit any of its sales associates or employees to adapt and use, any GMAC Real Estate materials or programs on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the "**Specifications**") set forth in the manuals or other communications supplied by GMAC Real Estate from time to time.   No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such departure shall be considered a Default of this Agreement.   Strategic-Partner's Licensed Site shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date.   If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards) disseminated to the public and used in Strategic-Partner's business

D 0007

shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner.

## 5. TRAINING.

A. **Getting Connected Session.** For New Strategic-Partners: GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate. Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the GCS within 12 months after the Effective Date. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners: Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate. The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction. Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

B. **Accountability in Management.** For both new and renewing Strategic-Partners, following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete "Accountability in Management" training. Upon any subsequent changes in key management personnel at the Licensed Site, at least one key management representative must satisfactorily complete Accountability in Management training. Accountability in Management training is a week-long management training class currently provided by a third-party vendor. Strategic-Partner must pay the Accountability in Management training registration fee for each attendee.

C. **Premier Service**®. Strategic-Partner and each of its managers and sales associates must satisfactorily complete Premier Service training within six (6) months following the later to occur of (i) the Effective Date or (ii) such individual first becoming associated with Strategic-Partner. Strategic-Partner must pay the registration fee for each attendee.

D. **Costs.** Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending the training programs described in Sections A, B, and C above and all other training programs.

## 6. GRANT OF THE LICENSE.

A. **Current Office.** Strategic-Partner represents that it presently operates, or will by the Effective Date operate, an office at the following location:

D 0008

Location    505 8th Ave., 8th Floor, New York, NY 10018_____

GMAC Real Estate grants to Strategic-Partner an exclusive license to establish and/or operate a real estate brokerage office displaying the Marks at its existing office location, as set forth above (the "**Licensed Site**") and, for the one (1) year period beginning on the Effective Date and ending on November 30, 2007 (the "**Exclusivity Period**"), within the Licensed Territory as described in Exhibit B, attached to this Agreement (the "**Licensed Territory**").

After the expiration of the Exclusivity Period, the parties contemplate that offices bearing the Marks may be opened in the Licensed Territory by third parties. However, during the one (1) year period (the "**Approval Period**") following the expiration of the Exclusivity Period, provided that Strategic-Partner has not been and is not in Default under the terms of this Agreement, GMAC Real Estate agrees that it may enter into franchise agreements licensing the Marks to third parties within the Licensed Territory only with the prior written consent of Strategic-Partner, which consent will not be unreasonably withheld, conditioned or delayed. After the expiration of the Approval Period, Strategic-Partner will have no further approval rights within the Licensed Territory, and GMAC Real Estate may enter into franchise agreements with respect to the Licensed Territory in its sole discretion. However, in the event any such third party is granted a GMAC Real Estate franchise within the Licensed Territory (whether during the Approval Period or afterwards), then, for so long as both this Agreement and such third-party's franchise agreement shall remain in effect, GMAC Real Estate will credit to Strategic-Partner's account against fees and charges then-owing or later becoming due from Strategic-Partner to GMAC Real Estate, an amount equal to fifteen (15%) percent of the net Royalty Fees (Royalty Fees less any Award amounts) paid by such third party, if, and as long as, Strategic-Partner is current in its reporting and payment obligations to GMAC Real Estate.

**B. Additional Offices.** If Strategic-Partner desires to expand its real estate brokerage business, by opening an additional office or otherwise, it shall apply to GMAC Real Estate for approval to do so, by submitting a written application at least ninety (90) days prior to the planned date for opening. Approval of such expansion shall be within GMAC Real Estate's sole discretion and, if granted, shall be in writing. If approved, Strategic-Partner and GMAC Real Estate will enter into a separate agreement, on the form then being offered by GMAC Real Estate, with regard to the new office. Strategic-Partner's application must be accompanied by payment of the applicable Joining Fee for the additional franchise. If the office expansion is not approved by GMAC Real Estate, the Joining Fee will be refunded.

**C. Sublicensing Prohibited.** Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

D 0009

## 7. CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE.

Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable. GMAC Real Estate reserves the right: (i) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site, including areas adjacent to, or in proximity with, the Licensed Site; (ii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site under the Marks or other marks; and (iii) for GMAC and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels of distribution, selling or leasing similar products or services under a different mark. Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution: (x) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (y) offering dissimilar products or services under the Marks.

## 8. NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, "**Owners**"), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; or (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate, provided that an independent commercial real estate business established in accordance with the Commercial Exclusion Requirements of Section 9(b) will not be deemed to violate this provision. The provisions of this Section 8: (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate.

## 9. GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.

A. Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

B. "**Gross Commission Income**" ("**GCI**") includes all commissions and fees received by Strategic-Partner from the sale, lease, transfer or other disposition (including mergers and similar transactions) (each a "**Disposition**") of Real Property (as defined below), including (i) any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, and (ii) all commissions and fees received by Strategic-Partner from

D 0010

property management, the Disposition of commercial real estate, which for purposes of this Agreement shall include residential housing of greater then five (5) dwelling units, or the non-residential portion of farm properties and any other brokerage or similar activity, (collectively, "**Commercial Activities**"). Specifically: (X) GCI includes any selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include referral payments made by GMAC Real Estate to Strategic-Partner; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

C. "**Real Property**" includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

**10. FEES.**

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

A. **Joining Fee.** Simultaneously with the execution of this Agreement (if this Agreement is not being executed upon the expiration of a similar contract between Strategic-Partner and GMAC Real Estate or its predecessor), a Joining Fee in an amount equal to $20,000 if the Licensed Site is Strategic-Partner's first GMAC Real Estate office within a particular market area, or $7,500 if the Licensed Site is located within the same market area, as determined by GMAC Real Estate, as another GMAC Real Estate office owned by Strategic-Partner. Notwithstanding the foregoing, if Strategic-Partner qualifies for the Classic Market Program (as described hereinafter), the Joining Fee will be $7,500, regardless of the number of GMAC Real Estate offices Strategic-Partner operates. For purposes of this Agreement, the "Classic Market Program" is a reduced-Joining Fee program open to strategic-partners that (i) earned $499,999 or less of GCI in the twelve (12) calendar months immediately preceding the Effective Date and (ii) are not located within any Metropolitan Statistical Area, as determined in accordance with the then-current standards of the United States Office of Management and Budget.

B. **Royalty Fees.** In accordance with the provisions of Exhibit A, attached.

C. **Referral Office Fee.** A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof). Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

D. **Referral Fee.** A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

D 0011

E. **Advertising Fee**.   In accordance with the provisions of Exhibit A, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement

F. **Business Conference Registration Fee**.   Each attendee must pay the then-current registration fee.

## 11. PAYMENT OF FEES/REPORTING.

A. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future.

B. GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards – as defined in Exhibit A, if applicable) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an "**Affiliate**" of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation). Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system ("**BRS**") approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system ("**EFT**") approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all required hardware and software. Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents. In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate.

C. Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of

D 0012

association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

## 12. LATE PAYMENT.

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; "**prime**" is defined as the interest rate published in The Wall Street Journal (the "**WSJ**") in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, "prime" shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A, if applicable). In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13. VERIFICATION RIGHTS.

A.     No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate. Strategic-Partner shall prepare and maintain its accounting books and records in accordance with generally accepted accounting principles consistently applied. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations.

B.     During the Term, and for three years after the expiration of the Term or earlier termination of this Agreement, Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages. If it is determined that Strategic-Partner has reported to GMAC Real Estate any fees due under this Agreement which are 3% or more lower than the fees actually due hereunder, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. If Strategic-Partner wishes to dispute the results of the audit, it may do so by providing GMAC Real Estate, no later than ninety (90) days following Strategic-Partner's receipt of the audit results, with written notice of the dispute, which notice must be accompanied by evidence, reasonably

D 0013

satisfactory to GMAC Real Estate, supporting Strategic-Partner's position with regard to the disputed items. If Strategic-Partner fails to provide written notice of a dispute as provided herein within such 90 day period, Strategic-Partner will be deemed to have waived its right to dispute the audit results.

C.    GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time. GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

**14. ADVERTISING FUND.**

A.    Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the "**Advertising Fund**" or the "**Fund**") for the purpose of providing marketing and advertising relative to the Marks. The Advertising Fund shall consist of monies paid to GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, "**Programs**"); and (B) present and promote a national business conference.

B.    The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

C.    GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

D.    In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and

D 0014

costs) to the Advertising Fund.  GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

E.  Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate.  On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request.  Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

F.  GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

G.  GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

H.  GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement.  In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

A.  **Broker to Broker Referrals**.  With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner shall make each such referral to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "Authorized Alternative Broker").  All such referrals shall be made either by contacting GMAC Real Estate to have GMAC Real Estate facilitate the referral or by directly contacting such strategic-partner.  The strategic-partner who places the referral must register the transaction with GMAC Real Estate.  To register a referral, Strategic-Partner must submit the required referral form to include complete contact information as provided at the time that the referral is accepted by the destination broker.  This referral form is required regardless of whether the destination broker is

D 0015

a strategic-partner of GMAC Real Estate or is an Authorized Alternative Broker. Strategic-Partner shall pay referral fees and royalties as set forth below.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner as the destination company will, within 10 days after it receives any GCI from that referred transaction, pay to the originating strategic-partner a fee equal to 25% of the GCI that Strategic-Partner earned from the referred transaction. Strategic-Partner then will pay Royalty Fees based on the net GCI from the referred transaction.

Likewise, if Strategic-Partner refers an outgoing transaction to another strategic-partner or Authorized Alternative Broker, that other broker will pay to Strategic-Partner a fee equal to 25% of the GCI it earned from the referred transaction. In that instance, Strategic-Partner as the originating broker then will pay GMAC Real Estate a fee equal to 2.5% of the GCI that the other broker earned from the referred transaction (which may also be stated as 10% of the amount that Strategic-Partner received from the other broker).

B. In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

C. Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PREMIER SERVICE*; BUSINESS PLANNING; PERFORMANCE STANDARDS.

A. Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Of primary importance is Strategic-Partner's full engagement in the process of Premier Service*, a systematic and measurable way to conduct business. In addition to satisfying the Premier Service training requirements described in Section 5.C. above, Strategic-Partner agrees to participate in the Premier Service survey process by registering the Licensed Site and requesting every buyer and seller represented by Strategic-Partner to complete a Premier Service survey upon completion of a transaction. Strategic-Partner is responsible to pay a one-time registration fee for the Licensed-Site and a fee for each survey sent to a buyer or seller. Furthermore, Strategic-Partner agrees that it will offer Full-Service Brokerage (as defined below) to every one of its customers. In addition, Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

For purposes of this Agreement, "Full-Service Brokerage" means providing the following minimal level of service:

Strategic-Partner must:

D 0016

(1)    accept delivery of and present to the customer all offers and counteroffers to buy, sell or lease the customer's property or the property the customer seeks to purchase or lease;

(2)    assist the customer in developing, communicating, negotiating, and presenting offers, counteroffers and notices that relate to the offers and counteroffers until a lease or purchase agreement is signed and all contingencies are satisfied or waived; and

(3)    answer the customer's questions relating to the offers, counteroffers, notices and contingencies.

B.    Strategic-Partner, with the assistance of a GMAC Real Estate business development consultant, and using such financial modeling tools as may be designated by GMAC Real Estate from time to time, agrees to prepare and submit annually (no later than 90 days following each anniversary of the Effective Date) to GMAC Real Estate a business plan in a form acceptable to GMAC Real Estate.

C.    Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date (or, if the review period is for the first year after the Effective Date, the last year prior to the Effective Date), or (b) GCI attained during the 1-year period prior to the 1-year period being reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement. Notwithstanding the provisions of this subparagraph (b), if the market area serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the average sales price, by dollar, of residential property sold during the year being reviewed is less than 90% of the average sales price, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the average sales price of the year being reviewed is 90% of the average sales price of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%).

## 17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL.

A. **Assignment by GMAC Real Estate.** GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

B. **Transfer of Agreement, Assets by Strategic-Partner.**    Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Therefore, Strategic-Partner agrees that it shall not, without the prior written consent of GMAC Real Estate, Transfer (as defined in Section 17.E.

D 0017

below) this Agreement, any interest in its licensed business, or all or substantially all of its assets. GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Additionally, any such consent will be conditioned upon the following: (1) the Transfer of this Agreement may occur only in connection with the Transfer of the entire business conducted pursuant to this Agreement; (2) the transferee has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement; (3) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (4) agreement by the transferee (or a principal of the transferee) to attend required training; (5) a copy of all relevant Transfer documentation is delivered to GMAC Real Estate; (6) at least 30-days prior written notice is given to GMAC Real Estate; and (7) the transferee executes a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the Transfer.

  C. **Ownership**.  Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity, Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed).  Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

   (X)   corporation:  organized under the laws of the State or Commonwealth of New York_____(as to both IPG and May)

   (__)   limited liability company:  organized under the laws of the State or Commonwealth of _____

   (__)   partnership (indicate type):  organized under the laws of the State or Commonwealth of _____

      Owners:

      George F. Donohue:  50 % as to IPG and 32% as to May

      Christian M. Deutsch:  50% as to IPG and 48% as to MayJohn Varacchi: 20% as to May
      (Ownership interest holders listed)

      George F. Donohue_____
      (Broker of Record)

  D. **Transfer of Ownership Interests in Strategic-Partner**.  The written consent of GMAC Real Estate shall be required with respect to any Transfer of an ownership interest equal

3/2005 Reg. Fran. Agmt
CHGO1/30557830.2

15

D 0018

to or greater than 10% of the total ownership interests in Strategic-Partner (including Transfers which, over a period of 2 years, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a Transfer of 10% or more of the ownership interests). GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement. Strategic-Partner shall provide at least 60 days prior written notice to GMAC Real Estate of any Transfer of the type described in the first sentence of this Section 17.D. (but, in the case of a Transfer upon the death of an Owner, within 30 days after the date of such death). Within 60 days of its receipt of the notification, GMAC Real Estate shall notify Strategic-Partner or transferee of its consent or refusal to consent to the proposed Transfer.

E. **Definition of a Transfer.** For purposes of Sections 17.B. and 17.D., the term "Transfer" shall mean any sale, lease, assignment, conveyance or other transfer including: (i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those occurring between/among the spouse and/or children of an Owner; and (iii) those occurring through any other voluntary act.

F. **Effect of Unauthorized Transfer.** A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

G. **Right of First Refusal.** As to any Transfer referenced in 17.B. or 17.D. above (except a Transfer of ownership interests between/among the spouse and/or children of an Owner or between/among Owners). GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**"). Prior to a Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the term sheet, letter of intent or contract (the "**Offer Document**") whereby Strategic-Partner has agreed with a third-party to a Transfer, together with a certification from the transferor(s) that the Offer Document accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Offer Document (the Offer Document, the certification and the due diligence materials are sometimes hereinafter referred to, collectively, as the "**Offer Package**"). If, within 10 days of receipt by GMAC Real Estate of the Offer Package (the "10-day Notice Period"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into a contract based on the same terms set forth in the Offer Document and, thereafter, each party shall be bound by its terms, provided the Offer Document provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Offer Document; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to,

D 0019

those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities. If, within the 10-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 10-day Notice Period (the "**180-day Waiver Period**"). If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Offer Document, the Right of First Refusal shall be considered terminated. If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Offer Document or any material term or condition of the Offer Document is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Offer Document that was changed during any 180-day Waiver Period).

## 18. TERMINATION; DEFAULT; CROSS-DEFAULT.

This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

A. **By Strategic-Partner.** If GMAC Real Estate is in Default (as defined in Section D. below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the "**Strategic-Partner's Termination Notice**"), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the "**Strategic-Partner's Default Notice**") which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site and the Licensed Territory and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site and within the Licensed Territory, and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

D 0020

B. **By GMAC Real Estate (Automatic).** Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

    (1)    Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final judgment in an amount of $25,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

    (2)    Strategic-Partner ceases to operate its real estate brokerage business under the Marks or ceases operations generally, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if Strategic-Partner's business premises are damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from GMAC Real Estate to relocate or reconstruct the premises, which approval shall not be unreasonably withheld, delayed or conditioned. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any cessation of its real estate brokerage business or the closure of any of its offices;

    (3)    The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located. Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

    (4)    Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation. Without limiting the generality of the foregoing, any breach of the representations or warranties set forth in Section 20.C. hereof shall result in automatic termination of this Agreement. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

    (5)    Strategic-Partner or any Owner purports to Transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

3/2005 Reg. Tran. Agmt
CHGO1/30557839.2

18

D 0021

(6)     Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7)     Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

C. **By GMAC Real Estate (Right To Cure).**  If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in Section 18.B., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the "**GMAC Real Estate Termination Notice**"), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written notice of such Default (the "**GMAC Real Estate Default Notice**") which specified the nature and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice, or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, Strategic-Partner failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by Strategic-Partner within 90 days of the service of the GMAC Real Estate Default Notice, despite the diligent efforts of Strategic-Partner to do so, GMAC Real Estate shall have the right to serve a GMAC Real Estate Termination Notice at any time thereafter, until the Default is cured).

D. **Default and Event of Default.**  The term "**Default**", as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement.  The term "**Event of Default**", as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

E. **Additional Remedies upon an Event of Default.**  Should Strategic-Partner commit an Event of Default, GMAC Real Estate, without terminating this Agreement, may, at its option, (and in addition to any other remedies available to it under this Agreement), suspend services to Strategic-Partner, remove Strategic-Partner from any GMAC Real Estate websites and other directories, eliminate Strategic-Partner's exclusive territory (if any) under this Agreement, suspend further referrals to Strategic-Partner and remove Strategic-Partner from the authorized referral directory, or take other action deemed appropriate.

F. **Cross-Default.**  Notwithstanding any contrary provision of this Agreement or any other Franchise Agreement between Strategic-Partner (and/or its Owners or affiliates) and GMAC Real Estate (each such other Franchise Agreement being a "**Sister Agreement**"), any occurrence of Strategic-Partner's Default and/or Event of Default under this Agreement shall constitute a Default and/or Event of Default under each Sister Agreement, and any occurrence of Strategic-Partner's Default and/or Event of Default under any Sister Agreement shall constitute a Default and/or Event of Default under this Agreement.

D 0022

**19. OBLIGATIONS UPON TERMINATION.**

A.  Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

(1)   within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate. Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the Marks. In addition, if Strategic-Partner has used the words "GMAC Real Estate" as part of its internet domain name and such use has not terminated within 10 days of termination of this Agreement, Strategic-Partner will be deemed to have assigned its rights in such domain name to GMAC Real Estate, and GMAC Real Estate may take whatever actions it deems appropriate to terminate such domain name and Strategic-Partner's right to use the same;

(2)   on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

(a)   Royalty Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to transactions under contract on or before the date of termination that settle or close after termination (collectively, **"Pendings"**) (on the termination date, Strategic-Partner agrees to provide GMAC Real Estate with a complete and detailed list of all such Pendings); and

(b)   Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

(3)   Surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all signs and documentation bearing the Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like. GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise;

(4)   Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks; and

(5)   Execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site;

(6)   Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to evidence the fact that Strategic-Partner has ceased using the Marks and has no further right to use the Marks.

D 0023

B. Upon termination of this Agreement pursuant to Section 18.B. or 18.C. above, in addition to the obligations set forth in Section 19.A. above:

    (1)    Strategic-Partner shall:

        (a)    pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

        (b)    remain obligated with respect to the provisions of Section 8 of this Agreement; and

    (2)    Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

C. If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20. REPRESENTATIONS AND WARRANTIES.

A. Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in the state in which the Licensed Site is located) licensed to sell real estate in the state in which the Licensed Site is located.

B. Strategic-Partner acknowledges that:

    (1)    GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the Offering Circular concerning this franchise for the state in which the Licensed Site is located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review.

    (2)    GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry.

    (3)    Neither GMAC Real Estate nor any person acting on its behalf has made any oral or written representation or promise to Strategic-Partner that is not written in this Agreement on which Strategic-Partner is relying to enter into this Agreement. Strategic-

D 0024

Partner releases any claim against GMAC Real Estate or its agents based on any oral or written representation or promise not stated in this Agreement.

(4)    There are no express or implied covenants or warranties, oral or written, between GMAC Real Estate and Strategic-Partner, except as expressly stated in this Agreement.

C.    Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures"). GMAC Real Estate therefore requires certain representations and warranties that the parties with whom it deals are not directly or indirectly involved in terrorism. Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

(i)    a person or entity listed in the Annex to the Executive Order; or

(ii)    a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

(iii)    a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

(iv)    owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in clauses (i) – (iv) above.

## 21. ENTIRE AGREEMENT.

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

## 22. INDEMNIFICATION AND INSURANCE.

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate and its corporate parents and affiliates, and their respective directors, officers, agents and employees, (collectively, the "**Indemnitees**"), from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business. This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

D 0025

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain: (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations. For the insurance referenced under clauses (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in clause (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate and the other Indemnitees (as defined above) shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of the state in which the Licensed Site is located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

## 23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.

A. **Choice of Law**. Except as expressly provided otherwise, this Agreement shall be construed in accordance with the laws of the state in which the Licensed Site is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Section. All disputes regarding the validity of the arbitration agreement set forth in Section 23.B shall be governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

B. **Arbitration**. GMAC Real Estate and Strategic-Partner agree that, except for controversies, disputes or claims (together or separately, "Claims") related to the improper use of the Marks, all Claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees)(together, the "**GMAC Real Estate Parties**"), and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees)(together, the "**Strategic-Partner Parties**") arising out of or related to:

    (1)    this Agreement or any other agreement between Strategic-Partner and GMAC Real Estate;

    (2)    GMAC Real Estate's relationship with Strategic-Partner; or

D 0026

(3)    any policy or standard relating to the Franchise or the franchised business;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("AAA"). The arbitration proceedings will be conducted by one arbitrator and, except as this section otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator in the Chicago Metropolitan Area of the State of Illinois and will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided by federal statute, award any punitive or exemplary damages against either party (GMAC Real Estate and Strategic-Partner waive, to the fullest extent permitted by law, except as expressly provided by federal statute, any right to, or claim for, punitive or exemplary damages against the other). The arbitrator shall be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Each party shall be required to submit all Claims against the other or those Claims shall be forever waived. The arbitrator may not consider any settlement discussions that might have been made by either Strategic-Partner or GMAC Real Estate.

GMAC Real Estate and Strategic-Partner agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between any of the GMAC Real Estate Parties and any of the Strategic-Partner Parties may not be consolidated with any other arbitration proceeding between GMAC Real Estate and any other person or between Strategic-Partner and any other person.

Despite GMAC Real Estate's and Strategic-Partner's agreement to arbitrate, GMAC Real Estate and Strategic-Partner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that GMAC Real Estate and Strategic-Partner must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

**C. Waiver of Jury Trial. To the extent permitted by law, Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.**

**D. Time Limitations for Claims.** Any claim by Strategic-Partner against GMAC Real Estate shall be barred unless, within one year from the date that Strategic-Partner knew, or should have known, of the facts upon which the claim is based, Strategic-Partner filed a formal request for arbitration against GMAC Real Estate, as set forth above.

D 0027

**24. MODIFICATION OF AGREEMENT.**

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

**25. SEVERABILITY.**

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

**26. NON-WAIVER.**

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

**27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.**

A. Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served: (a) by personal delivery (which shall be effective upon such personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

B. Although not effective for purposes of giving notice pursuant to Section 27.A. above, each party consents to the other party forwarding facsimile and electronic mail transmissions to the consenting party as follows:

GMAC Real Estate:

To: Contract Administration @ 908-542-5526 (fax) and
susan_daniel@gmachs.com (e-mail)

Strategic Partner:

To: George F. Donohue @ 201-766-3282 (fax) and gdonohue@williambmay.com
(e-mail)

Such consent will continue in effect until modified or terminated by written notice to the other party sent in accordance with subparagraph 27.a. above.

D 0028

**28. TERM AND RENEWAL.**

The term of this Agreement shall be ten (10) years from the Effective Date (as later defined) (the "**Term**").

At the expiration of the Term, Strategic-Partner shall have the right to enter into a new, ten-year agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement at least 180 days prior to the expiration of the Term, and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option, GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and, at the option of GMAC Real Estate but without notice being required, the Royalty Fees shall be increased to an amount equal to 10% of Strategic-Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission. Subject to any contrary applicable state law, GMAC Real Estate also shall have the option to serve Strategic-Partner with a notice of termination, such termination to be effective 30 days following the date Strategic-Partner is served with the notice of termination, unless GMAC Real Estate indicates a later date in such notice.

**29. EFFECTIVE DATE.**

The parties intend that this Agreement be effective as of December 1, 2005 (the "**Effective Date**"). If, prior to the Effective Date, Strategic-Partner identifies the Licensed Site as a GMAC Real Estate office or operates the Licensed Site under the Marks without GMAC Real Estate's express written consent, then, in addition to GMAC Real Estate's other remedies under this Agreement, Strategic-Partner will be obligated to pay all fees under Section 10 beginning on the date that such identification or operation under the Marks actually commenced. The Effective Date is conditioned upon:

1.) Receipt, review and acceptance by GMAC Real Estate of a copy of 2003 and 2004 federal tax return of May; and

2.) Strategic-Partner having submitted to GMAC Real Estate documentation evidencing that both IPG and May are duly formed under the laws of the State of New York; and

3.) Strategic-Partner having submitted to GMAC Real Estate a copy of both IPG's and May's active real estate brokerage licenses issued by the appropriate regulatory agency of the State of New York; and

D 0029

4.) Strategic-Partner having submitted to GMAC Real Estate a copy of both IPG's and May's Broker of Record licenses issued by the appropriate regulatory agency of the State of New York; and

5.) Receipt by GMAC Real Estate of the declaration pages for all insurance policies secured by IPG and May as required under Section 22 of the Franchise Agreement. GMAC Real Estate must be named as an additional insured under all of the insurance policies; and

6.) Strategic-Partner having submitted to GMAC Real Estate evidence satisfactory to GMAC Real Estate that Christian M. Deutsch has divested all ownership shares in Century 21 Kevin B. Brown.

Strategic-Partner will use its best efforts to satisfy each of the foregoing conditions on or before the Effective Date. If the foregoing conditions are not satisfied by the Effective Date, or if GMAC Real Estate has not waived the conditions in writing, then GMAC Real Estate, at its sole option, may agree to amend the Effective Date to a later date or may terminate this Agreement by sending written notice of termination to Strategic-Partner. In the event of termination pursuant to this Section, the Joining Fee or any other amounts paid to GMAC Real Estate by Strategic-Partner, shall in no circumstance be refunded.

## 30. FRANCHISE DEVELOPMENT COSTS LOAN.

Simultaneously with the execution of this Agreement and in consideration of a loan to be made by GMAC Real Estate to Strategic-Partner, Strategic-Partner will execute and deliver to GMAC Real Estate a Franchise Development Costs Note, in the form attached as Exhibit C, subject to the provisions of a Loan & Security Agreement (the "Loan Agreement"), in the form attached as Exhibit D.

## 31. LIMITATION OF DAMAGES.

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

## 32. CONFIDENTIALITY OF AGREEMENT.

Except as may be required by law, Strategic-Partner agrees not to publicize or disclose to any third party, without the prior written consent of GMAC Real Estate, the terms of this Agreement.

**[The remainder of this page has been intentionally left blank.]**

1/2005 Reg. Fran. Agmt
CHGO1/30557830.2

27

D 0030

**IN WITNESS WHEREOF**, the parties have executed this Agreement.

**GMAC REAL ESTATE, LLC**

By: _Gloria Newman_

Print Name: ~~Judith O'Brien~~ Gloria Newman

Title: ~~Executive~~ Senior Vice President

Date: January 5, 2006

**INTERNATIONAL PROPERTIES GROUP, INC.**

By: _G. F. [signature]_

Print Name: George F. Donohue

Title: President

Date: ~~11/20/05~~ 12/27/05

By: _Christian M. [signature]_

Print Name: Christian M. Deutsch

Title: CEO

Date: ~~7/15/05~~ 12/27/05

**WILLIAM B. MAY COMMERCIAL, INC.**

By: _G. F. [signature]_

Print Name: George F. Donohue

Title: President

Date: ~~11/20/05~~ 12/27/05

By: _Christian M. [signature]_

Print Name: Christian M. Deutsch

Title: CEO

Date: ~~7/15/05~~

12/27/05

D 0031

12/27/2005 17:02 FAX 9085425575        GMAC GRS HUB                                         ☒005

### ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.C. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment; Ownership; Transfers; Right of First Refusal), 18.F. (Cross-Default), 19.B. (Financial Obligations after Default) of this Agreement and 23 (Choice of Law and Forum; Arbitration; Waiver of Jury Trial; Time Limitation for Claims).

Date: ~~12/5/05~~ 12/27/05
George F. Donohue

Date: ~~12/05/05~~
12/27/05
Christian M. Deutsch

D 0032

**Exhibit A to the Franchise Agreement**
**Royalty and Advertising Fees**

a.     **Royalty Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Royalty Fees, in accordance with the following:

(1)     Amount. Subject to the terms of the paragraph which follows immediately below, on the 5th day of each calendar month, for each full or partial preceding calendar month covered by this Agreement, a Royalty Fee, in an amount equal to five percent (5%) of the GCI to which Strategic-Partner is entitled from residential transactions ("**Residential GCI**") that closed or settled during such preceding calendar month and in and amount equal to two percent (2%) of the GCI to which Strategic-Partner is entitled from Commercial Activities (as defined in Section 9(B) above) ("**Commercial GCI**") that closed or settled during such preceding calendar month.

In addition, beginning on April 1, 2006 and ending at 11:59PM on March 31, 2007, (the "**First Monthly Minimum Period**") if at the end of each month thereafter during the First Monthly Minimum Period, the total amount of Royalty Fees paid by Strategic-Partner during such monthly period is less than $5,500 (the "**First Monthly Royalty Fee Minimum**"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the First Monthly Royalty Fee Minimum and the total amount of Royalty Fees actually paid. Beginning on April 1, 2007 (the "**Monthly Minimum Fee Change Date**") and at the end of each month thereafter during the Term of this Agreement, if the total amount of Royalty Fees paid by Strategic-Partner during such monthly period is less then $8,250 (the "**Second Monthly Royalty Fee Minimum**"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Second Monthly Royalty Fee Minimum and the total amount of Royalty Fees actually paid.

In addition, if at the end of each twelve-month period following the Effective Date (each, a "**Measurement Period**"), the total amount of Royalty Fees paid by Strategic-Partner during such Measurement Period (after deducting any Award amount pursuant to subsection (2) below) ("Actual Annual Fees") is less than the Annual Royalty Fee Minimum (as set forth in the chart below), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the Actual Annual Fees. However, the first Measurement Period will be sixteen months following the Effective Date of this Agreement, with each subsequent Measurement Period occurring at the twelve-month anniversary of the Effective Date of this Agreement, per the chart below:

| Measurement Period | Dates | Annual Royalty Fee Minimum |
|---|---|---|
| 1st Measurement Period | 12/1/05 – 3/31/07 | $110,000 |
| 2nd Measurement Period | 12/1/06 – 11/30/07 | $165,000 |
| 3rd through 10th Measurement Period | 12/1/07 – 11/30/08<br>12/1/08 – 11/30/09<br>12/1/09 – 11/30/10<br>12/1/10 – 11/30/11<br>12/1/11 – 11/30/12<br>12/1/12 – 11/30/13<br>12/1/13 – 11/30/14<br>12/1/14   11/30/15 | $165,000 per year |

D 0033



However, in the event that , at the end of the First Measurement Period and at the end of each Measurement Period thereafter, the Actual Annual Fees that Strategic-Partner has paid to GMAC Real Estate during such Measurement Period, exceeds the greater of (i) the Annual Royalty Fee Minimum or (ii) 5% of the total GCI which Strategic-Partner has reported during each Measurement Period (the greater of (i) and (ii) being the "Annual Benchmark"), GMAC Real Estate will credit Strategic-Partner's account with an amount equal to the amount by which the Actual Annual Fees paid exceeds the Annual Benchmark.

Notwithstanding the monthly payment schedule described above, in the event GMAC Real Estate requires Strategic-Partner to use a BRS and/or EFT in accordance with Section 11.B. of this Agreement, then Royalty Fees will be due upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI.

If this Agreement is the first contract between GMAC Real Estate and Strategic-Partner, Strategic-Partner shall not be required to pay the Royalty Fees which are based on GCI earned with respect to transactions under contract or in escrow on the Effective Date, provided, however, that such transactions are closed or settled within thirty (30) days after the Effective Date. As to transactions under contract or in escrow on the date of the termination of this Agreement, Strategic-Partner shall be required to pay those Royalty Fees which are based on GCI earned with respect to such transactions.

(2)     Awards. Within 105 days of the end of each calendar-year after the Effective Date, GMAC Real Estate shall pay to Strategic-Partner an award amount ("**Award**") equal to the following percentage of Strategic-Partner's past calendar-year's Residential GCI:

## AWARD CHART

| Award Level | Residential Gross Commission Income Range From | Residential Gross Commission Income Range To | Maximum Range Amount | Award Multiplier Rate | Maximum Award For Range | Cumulative Maximum Award |
|---|---|---|---|---|---|---|
| 1 | 0 | $1,500,000 | $1,500,000 | N/A | $-0- | $-0- |
| 2 | 1,500,001 | 2,000,000 | 499,999 | N/A | 1,000 | 1,000 |
| 3 | 2,000,001 | 4,000,000 | 1,999,999 | 1.00 % | 20,000 | 21,000 |
| 4 | 4,000,001 | 6,000,000 | 1,999,999 | 1.25 % | 25,000 | 46,000 |
| 5 | 6,000,001 | 9,000,000 | 2,999,999 | 1.50 % | 45,000 | 91,000 |
| 6 | 9,000,001 | 12,000,000 | 2,999,999 | 1.75 % | 52,500 | 143,500 |
| 7 | 12,000,001 | 15,000,000 | 2,999,999 | 2.00 % | 60,000 | 203,500 |
| 8 | 15,000,001 | 25,000,000 | 9,999,999 | 2.25 % | 225,000 | 428,500 |
| 9 | 25,000,001 | 35,000,000 | 9,999,999 | 2.50 % | 250,000 | 678,500 |
| 10 | 35,000,001 | and higher | as determined | 3.00% | as calculated | as calculated |

(3)     Conditions of Awards. (a) Notwithstanding the above, Strategic-Partner shall be entitled to no Award in the event that:  (i) at any time during the calendar-year for which the Award is applicable or on the date that the Award is to be given, an Event of Default existed or exists, as applicable, regarding this Agreement or any other contract with GMAC Real Estate or any Affiliate; or (ii) during the calendar-year for which the Award is applicable, Strategic-Partner had been more than 30 days in arrears of any payments required to be made by Strategic-Partner to GMAC Real Estate under this Agreement or under any other contract with GMAC Real Estate or any Affiliate; or

D 0034

(iii) on the date that Strategic-Partner would otherwise have been entitled to payment of an Award, this Agreement had been terminated and no new franchise agreement had been entered into between Strategic-Partner and GMAC Real Estate; and

(b)     For the purpose of calculating GCI with respect to Awards under this Section, Strategic-Partner's Licensed Sites contributing to the GCI shall include the Licensed Site listed in Section 6 as well as those other licensed sites (the "Sister Sites") subject to a Sister Agreement (as defined in Section 18.F), provided (i) each of those Sister Sites is owned by the same persons listed in Section 17.B, as Owners, in the same percentages listed in Section 17.B., and (ii) each of those Sister Sites is located within the same local market area. Strategic-Partner and GMAC Real Estate agree that GCI from the following Sister Sites will be considered together with the Licensed Site for purposes of determining any Award due Strategic-Partner: _____N/A_____.

(c)     The Gross Commission Income Range figures included in the Award Chart may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the figures in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

**b.     Advertising Fees.**

Upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI, Strategic-Partner shall pay to GMAC Real Estate an Advertising Fee, in an amount equal to 2% of the GCI to which Strategic-Partner is entitled, provided, however, the amount of the Advertising Fee in any calendar-month: (i) shall not exceed $893 for that calendar-month; and (ii) shall not be lower than $246 for that calendar-month regardless of transaction count (if this minimum amount has not been received by GMAC Real Estate during any month through payments based on a percentage of GCI for that calendar-month, the difference between this minimum amount and the payments actually received by GMAC Real Estate shall be paid by Strategic-Partner on the first business day after the last day of each calendar-month).

GCI generated by a sales agent shall be attributed to the office location (and/or Licensed Site) at which the sales agent's license is held or registered or, if the applicable state's licensing regulations do not provide for the holding or registration of sales agents' licenses at particular office locations, at the office location (and/or Licensed Site) from which the sales agent principally operates.

Minimum and maximum Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Advertising Fees in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

D 0035

**Exhibit B**

**Licensed Territory**

Strategic-Partner's Name: __International Properties Group, Inc. and William B. May Commercial, Inc.__

**Description of Licensed Territory:**

The licensed Territory shall consist of the the Borough of Manhattan, New York City, New York, as the same exists as of the Effective Date of this Agreement.

(There is _ is not **X** a Map of the Licensed Territory Attached)

D 0036

**Exhibit C**
**Franchise Development Costs Note**

**$100,000**                                                    **December 1, 2005**

For Value Received, International Properties Group, Inc. and William B. May Commercial, Inc., jointly and severally ("**Strategic-Partner**"), each a New York corporation, promises to pay to the order of GMAC Real Estate, LLC or its designee (together or singularly, "**GMAC Real Estate**"), at its office at 2021 Spring Road, Suite 300, Oak Brook, IL 60523, or at such other place as the holder of this Note may from time to time direct, the principal sum of one hundred thousand and 00/100 dollars ($100,000) (the "**Principal Loan Amount**"), together with interest thereon, as follows:

principal and interest payments (the interest payments being at the Interest Rate, as defined below), each being in an amount equal to: (a) 1/120th of the Principal Loan Amount, as to principal, and (b) all accumulated interest, on the 1st day of the month following the date of this Note and on the 1st day of each month thereafter, for a total of 120 months, with all outstanding principal and interest being payable, in full, on the 1st day of the 120th month following the date of this Note.

**Interest Rate.** The Interest Rate, as to each monthly interest payment, shall be the interest rate published in the Wall Street Journal (the "**WSJ**") on the 1st business day of each such month, as the prime or base lending rate (if such interest rate is not so published in the WSJ, the Interest Rate shall be the average prime or base lending rate, as of that date, being offered by the three largest United States banks), plus 2%.

**Principal Reductions.** Notwithstanding any other provision of this Note, so long as Strategic-Partner has not committed an Event of Default under the franchise agreement (the "**Franchise Agreement**") entered into between the Strategic-Partner and GMAC Real Estate (including all Amendments) and so long as an Event of Default (as defined below) under this Note has not occurred, Strategic-Partner shall not be required to pay to GMAC Real Estate the monthly amounts of principal and interest set forth above and the principal and interest due on this Note shall be deemed reduced by an amount equal to each such monthly payment which is not required to be made.

**Use of Funds.** Lender has imposed no requirements as to use of the Loan proceeds.

**Events of Default.** An event of default (an "**Event of Default**") under this Note shall include, but not be limited to: a default by the Strategic-Partner under the Franchise Agreement; a termination of the Franchise Agreement, other than as a result of a default by GMAC Real Estate; a default by Strategic-Partner in the payment of any amount due under this Note or any other document between the Strategic-Partner and GMAC Real Estate or between the Strategic-Partner and any Affiliate (as defined in the Franchise Agreement); the entry of a judgment against the Strategic-Partner in excess of $25,000, which is not discharged within 30 days or is not fully covered by insurance; the institution of bankruptcy or similar proceedings by or against

D 0037

the Strategic-Partner, which are not dismissed within 45 days. Upon the occurrence of an Event of Default, all amounts unpaid under this Note shall immediately become due and payable.

**Strategic-Partner's Waiver.** The Strategic-Partner waives presentment, demand and protest and notice of presentment, protest, default, non-payment or maturity.

**Choice of Law. This Note and the rights and duties of the parties hereunder shall be governed by, and construed in accordance with, the internal laws of the State of Illinois, without regard to principles of conflicts of laws which would require the application of the laws of a different jurisdiction.**

**Arbitration. Strategic-Partner expressly agrees that all controversies, disputes and claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees) and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees) arising out of or related to this Note, or with respect to actions taken pursuant to this Note, must be submitted for binding arbitration in accordance with and subject to the terms of the Arbitration section of the Franchise Agreement, and all such terms are incorporated by reference as if fully set forth herein, provided that all references to the "Agreement" therein shall be deemed to refer this Note as the context so requires.**

**Waiver of Jury Trial. To the extent permitted by law, Strategic-Partner waives its right to a trial by jury in any legal proceeding arising from this Note or from actions taken pursuant to this Note.**

<u>**International Properties Group, Inc.**</u>

By: _____

Name: <u>George F. Donohue</u>

Title: <u>President</u>

Date: _____


By: _____

Name: <u>Christian M. Deutsch</u>

Title: <u>CEO</u>

Date: _____

**William B. May Commercial, Inc.**

By: _____

Name: <u>George F. Donohue</u>

Title: <u>President</u>

Date: _____


By: _____

Name: <u>Christian M. Deutsch</u>

Title: <u>CEO</u>

Date: _____

D 0039

**Exhibit D**
**Loan & Security Agreement**

D 0040

**LOAN AND SECURITY AGREEMENT**

**DATED AS OF**

**DECEMBER 1, 2005**

**BETWEEN**

**INTERNATIONAL PROPERTIES GROUP, INC. AND WILLIAM B. MAY COMMERICAL, INC.,
JOINTLY AND SEVERALLY**

**AND**

**GMAC REAL ESTATE, LLC AND/OR ITS AFFILIATE**

D 0041

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (this **"Agreement"**), dated as of December 1, 2005, between International Properties Group, Inc. and William B. May Commercial, Inc., jointly and severally (each, a **"Company"** and collectively the "Companies"), each a corporation, one doing business as International Properties and the other doing business as William B. May Commercial and GMAC Real Estate, LLC and/or one of its Affiliates (the **"Lender"**). Capitalized terms used in this Agreement shall have the meanings ascribed to such terms in Section 8 of this Agreement.

### WITNESSETH THAT:

**WHEREAS**, concurrently with the execution of this Agreement, the Companies have borrowed from the Lender certain funds for the development of the Companies, as evidenced by that certain Franchise Development Costs Note and/or Term Loan Note (individually and collectively, the **"Note"**), in the form attached to this Agreement as Exhibit A; and

**WHEREAS**, the Companies and the Lender are entering into this Agreement to set forth, in part, the terms and conditions applicable to the Note and the covenants, agreements, representations and warranties of the Companies made in connection with the Note.

**NOW, THEREFORE**, for good and valuable consideration, the parties agree as follows:

SECTION 1.   THE LOAN(S).

*Section 1.1.*   The Lender shall provide to the Companies a franchise development costs loan (the **"Development Loan"**) in an amount $100,000 (with repayment provisions and the rate of interest being as provided in the Note)(the Development Loan is sometimes hereinafter referred to as the "Loan"), as follows:

(a)   $100,000 will be funded as of the date of the execution of the Note (the **"Effective Date"**), conditioned upon: The Companies' satisfaction of all conditions set forth in Section 29 ("Effective Date") of the Franchise Agreement executed simultaneously herewith.

*Section 1.2. Interest Rate.* The Interest Rate shall be as provided in the Note.

*Section 1.3. Use of Loan Funds.* Lender imposes no requirements as to use of Development Loan funds. Any requirements relating to the use of Term Loan funds are as set forth in Section 1.1.

SECTION 2.   REPAYMENT OF THE LOAN AMOUNTS.

*Section 2.1. Payments.* Payments will be as provided in the Note.

*Section 2.2. Voluntary Prepayments.* The Companies shall have the privilege of prepaying the Note, in whole or in part, but, if in part, then in an amount of not less than $10,000. Each prepayment shall be applied, first, to any accrued interest and, thereafter, to

D 0042

Principal. All such prepayments shall be applied to installments in the inverse order of their maturity.

Section 2.3.    *Place and Application of Payments.*    All payments shall be made to the Lender as designated by the Lender, in writing.

SECTION 3.    SECURITY.

Section 3.1.    *Grant of Security Interest.*    As security for the payment of all amounts owing to the Lender and as security for the satisfaction of all other obligations of the Companies to the Lender, the Companies grant to the Lender a security interest in the following property of the Companies, including property presently owned or later acquired (together, the "**Collateral**"): Accounts Receivable, Equipment and Fixtures, Inventory, General Intangibles, Contract Rights and documents of title, Investment Property, all instruments evidencing any obligations to the Companies by third parties, all property of the Companies with the Lender (excluding property of the Companies held by the Lender in escrow for third-parties), all other property of the Companies (including, but not limited to, real estate owned or leased by or to the Companies), all replacements, substitutions, additions, accessions, products or proceeds to or for any of the foregoing:

Section 3.2.    *Accounts Receivable*

(a)    Without the prior written consent of the Lender, after the occurrence of a Default or Event of Default, no credit allowance shall be granted by the Companies to any account debtor.

(b)    The Companies warrant that all of the Accounts Receivable are bona fide existing obligations and all documents furnished to the Lender are genuine.

(c)    The Lender is authorized at any time after the occurrence and during the continuance of an Event of Default:

(i)    To request confirmation of the amount shown by the Accounts Receivable or other Collateral;

(ii)    To endorse in the Companies' respective names and to collect any items of payment received by the Lender in payment of any Account Receivable or other obligation owing to any of the Companies;

(iii)    To notify any entity of the fact of the Lender's lien and of the collateral assignment to the Lender;

(iv)    To direct any entity obligated under any Collateral to make payment directly to the Lender of any amounts due or to become due; and

(v)    To deal with any Collateral in a commercially reasonable manner.

D 0043

The Lender shall not be under any duty to act in regard to any of the foregoing matters.  The costs, including reasonable attorneys' fees, shall be borne solely by the Companies.

Section 3.3.    Inventory.

(a)    Each Company warrants that:  (i) all of the Inventory is, and at all times shall be, owned by the Company free of all liens; and (ii) the Company will not make any further assignment of, or permit to exist any further lien on, the Inventory.

(b)    The Lender shall not be liable for the safekeeping of any Inventory delivered to it, unless a loss of Inventory results from the Lender's gross negligence or willful misconduct.

Section 3.4.    Equipment.

(a)    Each Company shall keep the Equipment in adequate operating condition, ordinary wear and tear excepted, and each Company shall not transfer any Equipment; provided, however, that, without the Lender's consent (but with notice to the Lender), each Company may dispose of Equipment in the ordinary course of business provided (i) the Equipment disposed of in any fiscal year has an aggregate market value of Ten Thousand Dollars ($10,000) or less and (ii) the Company receives fair market value in return.

(b)    Each Company will, upon request of the Lender, submit to the Lender a current listing of all of the Company's Equipment.

Section 3.5.    Supplemental Documentation.    At the Lender's request, each Company shall deliver to the Lender such documentation ("**Supplemental Documentation**") reasonably requested by the Lender to perfect the Lender's security interest in the Collateral. Furthermore, each Company authorizes Lender to file, from time to time, such financing statements, notices and other documents as shall be required or appropriate in the Lender's judgment to perfect, continue the perfection of, or ensure the priority and/or full enforcement of the Lender's security interest in, pledge of, or lien on the Collateral.

Section 3.6.    Collateral for the Benefit of the Lender.    All security interests granted to the Lender and all Collateral shall be deemed to have been granted to the Lender to secure the obligations of the Companies to the Lender under this Agreement and the Note.

SECTION 4.  REPRESENTATIONS AND WARRANTIES.

Each Company represents and warrants, with respect to such Company, to the Lender as follows:

Section 4.1.    Authorization; Enforceability; etc.    The Company is a corporation, duly organized, validly existing and in good standing under the laws of the State or Commonwealth of New York and is duly licensed or qualified and in good standing in all jurisdictions in which the nature of its activities or the property owned or leased by it requires such qualification or licensing. The Company is in compliance with the terms of this Agreement and has the authority

D 0044

to enter into this Agreement and to execute the Note and the Collateral Documents, which actions will not violate any provision of law or of the articles or certificate of incorporation or organization or by-laws of the Company or any agreement affecting the Company or any of its property.

Section 4.2.    *Subsidiaries.*  The Company has no Subsidiaries.

Section 4.3.    *Accuracy of Information.*  All financial statements for the Company previously submitted to the Lender are correct, have been prepared in accordance with generally accepted accounting principles, consistently applied, and accurately reflect the financial condition of the Company and the results of the operations and cash flows for the Company as of the dates of such financial statements and for the periods covered by such financial statements. The Company has no contingent liabilities which are material to it, other than as indicated on such financial statements, and, since the date of the latest of such financial statements, there have been no material adverse changes in the financial condition or in the assets or liabilities of the Company, nor any other changes, except those occurring in the ordinary course of business.

Section 4.4.    *Litigation; Taxes.*  There is no litigation or governmental proceeding pending, nor threatened (to the best knowledge of the Company), against the Company which, if adversely determined, would result in any material adverse change in the financial condition or the properties, business or operations of the Company.  Schedule 4.4 contains a list of all pending litigation and known claims. All tax returns required to be filed by the Company have, in fact, been filed, and all taxes and other charges upon the Company or upon any of its property, income or franchises have been paid.

Section 4.5.    *ERISA.*  The Company is in compliance in all material respects with the Employee Retirement Income Security Act of 1974 and all of its amendments ("**ERISA**").

Section 4.6.    *Title to Property.*  The Company has good title to all of the property encumbered by this Agreement and by the Collateral Documents.  The Lender has a first priority perfected security interest in all of the Collateral.

Section 4.7.    *Compliance With Laws.*  The Company is in compliance in all material respects with all applicable local, state and federal statutes and regulations.

Section 4.8.    *Business and Collateral Locations.*

(a)    The offices where the Company keeps its books and records are located at the addresses so designated on Schedule 4.8.

(b)    Schedule 4.8 contains an accurate list of the locations of all of the Company's Inventory, Equipment and Fixtures.

Section 4.9.    *Real Property.*  Schedule 4.9 contains an accurate list of the address and legal descriptions of any real property owned by the Company or third parties, on which Fixtures are located.

D 0045

*Section 4.10. Patents, Trademarks, etc.* The Company possesses adequate licenses, patents, etc. (which are listed on Schedule 4.10), to continue to conduct its business as previously conducted by it.

## SECTION 5. COVENANTS.

Each Company, with respect to such Company, covenants and agrees with the Lender as follows:

*Section 5.1. Maintenance of Business.* The Company shall keep in force and effect all licenses and permits necessary to the proper conduct of its business.

*Section 5.2. Maintenance.* The Company shall keep its properties and equipment in good working order.

*Section 5.3. Taxes.* The Company shall duly pay all taxes and similar charges against the Company or any of its property before the same become delinquent.

*Section 5.4. Insurance.* The Company shall keep insured all insurable property owned by the Company against loss or damage from fire and such other hazards or risks as are customarily insured against by companies similarly situated and the Company shall similarly insure employers' and public liability risks. The Company shall furnish to Lender a current certificate of such insurance, naming the Lender as an additional insured.

*Section 5.5. Financial Reports and other Information.* The Company shall maintain a method of accounting consistent with generally accepted accounting principles and shall furnish to the Lender such information respecting the business affairs, operations and financial condition of the Company as may be reasonably requested; and without any request shall furnish to the Lender:

    (a)    within 30 days after the last day of each calendar month, an income statement of the Company for the month and the fiscal year-to-date period then ended and a balance sheet of the Company as of such date, in each case prepared by the Company in reasonable detail showing in comparative form (i) the figures for the corresponding date and period in the previous fiscal year and (ii) the budgeted results for such period and certified to by the President or chief financial officer of the Company;

    (b)    within 60 days after the end of each fiscal year, a copy of the balance sheet as of the end of that fiscal year and the statement of stockholders' or ownership interest holders' equity, income statement and statement of cash flows of the Company for the 12-month period then ended for the Company, all as prepared in accordance with generally accepted accounting principles, consistently applied;

    (c)    promptly, after knowledge shall have come to the attention of any officer of the Company, written notice of any threatened or pending litigation or governmental proceeding against the Company which would have a material adverse effect on the business or properties of the Company and/or would trigger the occurrence of any Default or Event of Default;

D 0046

(d)     promptly, of any change in any of the information set forth on the Schedules attached to this Agreement.

The Lender shall, at all reasonable times, have full access to the Company's books, records, files and audits.

Section 5.6.    *Liens.*  The Company shall not permit to be encumbered any property owned by the Company; provided, however, that the foregoing shall not operate to prevent the liens and security interests created by the Collateral Documents and other liens and security interests granted in favor of the Lender.

Section 5.7.    *Additional Borrowings and Guaranties.*  The Company shall not incur any indebtedness for borrowed money or become liable (including a contingent liability) for any obligation of any other entity; provided, however, that this restriction shall not operate to prevent indebtedness of the Company on the Note and other indebtedness of the Company owing to the Lender.

Section 5.8.    *Acquisitions, Investments and Advances.*  The Company shall not make any investments or loans to any other entity or supply funds to any other entity or acquire any substantial part of the assets or business of any other entity, without the written consent of the Lender (which consent shall be within the sole discretion of the Lender).

Section 5.9.    *Dividends and Certain Other Restricted Payments.*  The Company shall not pay any dividends on its ownership interests, except that, with prior notice to the Lender, if the Company is an "S" corporation or general partnership for income tax purposes, it may declare dividends to shareholders/ownership interest holders in amounts equal to the tax liability of each such shareholder or ownership interest holder resulting from the Company's income, which dividends shall be paid not sooner than 15 days prior to the date on which tax payments for such income are required to be paid by each such shareholder or ownership interest holders.

Section 5.10.    *Formation of Subsidiaries.*  The Company shall not form or acquire or permit to exist any Subsidiary.

Section 5.11.    *Mergers, Consolidations and Sales.*  The Company shall not transfer a substantial part of its property and shall not consolidate or be a party to a merger with any other entity. The term "substantial" shall mean the transfer in any fiscal year of five percent (5%) or more of such property.

Section 5.12.    *ERISA.*  The Company shall promptly pay all obligations arising under ERISA.

Section 5.13.    *Contracts With Affiliates.*  The Company shall not enter into, with an entity or person affiliated with it, any contract, agreement or business arrangement.

Section 5.14.    *Franchise Agreement.*  The Company shall take all actions necessary to keep the franchise agreement and any amendment to the franchise agreement (together, the "**Franchise Agreement**"), between Company and GMAC Real Estate LLC, in full force and effect and shall promptly fulfill all of its obligations.

D 0047

Section 5.15. *Issuance of Capital Stock.* The Company shall not issue any additional stock (or other ownership/equity interests).

Section 5.16. *Transfers of Ownership Interests.* One hundred percent of the ownership interests in the Company is currently owned by the Owners. Owners shall be permitted to transfer ownership interests in the Company to third-parties only in accordance with the provisions of the Franchise Agreement.

## SECTION 6. EVENTS OF DEFAULT AND REMEDIES.

Section 6.1. *Events of Default.* Any one or more of the following shall constitute an "*Event of Default*":

(a)    default in any payment when due under the Note or in any obligation referenced or created in this Agreement or in the Guaranties executed by the Owners or default in the payment when due of any other indebtedness of the Companies owing to the Lender;

(b)    default in the observance of any of the Companyies covenants as provided in this Agreement;

(c)    default in the observance of any other provision of this Agreement, which is not remedied within 30 days after notice to the Companies by the Lender or the holder of the Note;

(d)    default under any evidence of indebtedness of the Companies other than as referenced in subparagraphs (a), (b) and (c), above, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such indebtedness;

(e)    any representation or warranty made by the Companies in this Agreement proves untrue in any material respect;

(f)    default under any Collateral Document;

(g)    dissolution or termination of existence of any of the Companies;

(h)    any of the Companies becomes insolvent (i.e., is unable to pay its debts as they become due); or

(i)    default by any of the Companies under the Franchise Agreement; a termination of the Franchise Agreement, other than as a result of a default by Lender; a default by any of the Companies in the payment of any amount due pursuant to any obligation under the loan documents executed in connection with the Loan (including the Note and this Agreement) or any other document between a Company or Companies and Lender or a Company or Companies and any Affiliate of Lender; the entry of a judgment against any of the Companies in excess of $50,000, which is not discharged within 30

D 0048

days or is not fully covered by insurance; the institution of bankruptcy or similar proceedings by or against any of the Companies, which are not dismissed within 45 days.

Section 6.2.    *Non-Bankruptcy Remedies.*  When any Event of Default has occurred and is continuing, then the entire principal balance of the Note, together with all interest and all fees and charges payable under the Note or this Agreement shall immediately become due and payable, without presentment, demand, protest or notice of any kind, unless and until the Lender or any holder of the Note, by written notice to the Companies, shall expressly indicate otherwise.

Section 6.3.    *General Remedies.*  In addition to the foregoing, upon the occurrence of an Event of Default, the Lender may exercise any one of the following remedies, all of which are cumulative and non-exclusive:

(a)    Any remedy contained in this Agreement or in any of the Collateral Documents or available under the UCC or any other law;

(b)    To the extent permitted by applicable law, without notice, demand or legal process of any kind, take possession of any of the Collateral until the Collateral shall be disposed of; and

(c)    Sell any Collateral, at public or private sale, and apply the proceeds of such sale as provided below.

## SECTION 7. ADDITIONAL PROVISIONS REGARDING COLLATERAL AND LENDER'S RIGHTS.

Section 7.1.    *Application of Proceeds of Collateral.*  Any proceeds of any disposition by the Lender of any of the Collateral may be applied by the Lender to the payment of reasonable expenses in connection with the disposition of Collateral, including attorneys' fees and legal expenses, and any balance of such proceeds may be applied by the Lender toward the payment of the Company's obligations under this Agreement and the Note, and in such order of application, as the Lender may from time to time elect.

Section 7.2.    *Lender's Rights.*  The following actions may be taken by the Lender at any time:

(i)    acceptance by the Lender of other property as security for the Companyies obligations under this Agreement and under the Note;

(ii)    release of its lien on any part of the Collateral or any extension or renewal or release, compromise, alteration or exchange, of any obligations of any guarantor or other obligor with respect to any Collateral; or

(iii)    failure by the Lender to resort to other security or pursue any entity liable for any of the Companyiess obligations under this Agreement and under the Note before resorting to the Collateral.

8

D 0049

**SECTION 8. DEFINITIONS.**

The following terms when used in this Agreement shall have the following meanings:

"*Account Receivable*" shall mean any account of any of the Companies and any other right, present or future, of any of the Companies to payment for goods sold or leased or for services rendered, including commissions due, or which may become due, from pending transactions.

"*Affiliate*" shall mean any person or entity (a "*Person*") directly or indirectly controlling or controlled by another Person.

"*Collateral*" is defined in Section 3.1.

"*Collateral Documents*" means the Guaranties, the Pledge Agreements and all other documents as shall secure the Note and the obligations of the Companies under this Agreement, including any Supplemental Documents.

"*Contract Right*" shall mean any right of any of the Companies to payment under a contract for the sale or lease of goods or the rendering of services (including listing agreements and agreements with clients, customers and potential buyers of real estate), which right is not yet earned by performance.

"*Default*" shall mean any condition, which, with the lapse of time, the giving of notice, or both, would constitute an Event of Default.

"*Equipment*" shall mean all equipment of the Companies of every description and any substitutions and replacements.

"*Event of Default*" shall mean any event or condition identified as such in Section 5.1 of this Agreement.

"*Fixtures*" means all fixtures of the Companies and all substitutions and replacements.

"*Franchise Agreement*" shall mean the franchise agreement between the GMAC Real Estate LLC and the Companies, as amended from time to time.

"*General Intangibles*" shall mean all general intangibles now owned or later acquired by any of the Companies.

"*Inventory*" shall mean all of the Companyies goods and all documents of title or other documents representing the same.

"*Investment Property*" shall mean all of the Companyies property that would be included in the term "investment property", as defined in the UCC.

D 0050

"*Pledge Agreement*" shall mean that certain Pledge Agreement (or each Pledge Agreement, if more than one), dated as of the date of this Agreement, between the Lender and the owners of various interests in one or more of the Companies.

"*Subsidiary*" shall mean any entity of which 50% or more of the equity interest is owned by a Company.

"*Supplemental Documentation*" is defined in Section 3.5.

"*Total Liabilities*" shall mean the aggregate of all obligations on the balance sheet of the Company determined on a consolidated basis in accordance with generally accepted accounting principles ("**GAAP**").

"*UCC*" shall mean the Uniform Commercial Code as in effect in the State in which the Company operates its business.

Capitalized terms defined elsewhere in this Agreement shall, unless otherwise specified, have the meanings so ascribed to them in all provisions of this Agreement.

## SECTION 9. MISCELLANEOUS.

*Section 9.1.    Holidays.*  If any payment becomes due on a day which is not a bank business day, the due date of such payment shall be extended to the next succeeding bank business day.

*Section 9.2.    No Waiver, Cumulative Remedies.*  No failure on the part of the Lender in the exercise of any right shall operate as a waiver of those rights.

*Section 9.3.    Amendments, Etc.*  No amendment of any provision of this Agreement or of the Note shall be effective unless it shall be in writing and signed by the Lender.

*Section 9.4    Costs and Expenses.*  The Companies agree to pay, on demand, all reasonable costs of the Lender in connection with a default or the enforcement of this Agreement, the Note and/or the Collateral Documents and in connection with any proceeding brought against the Lender by any person which arises out of the transactions contemplated by this Agreement.

*Section 9.5.    Stamp Taxes.*  The Companies agree to pay on demand any documentary, stamp or similar taxes payable in respect of this Agreement or the Note.

*Section 9.6.    Survival of Representations.*  All representations and warranties made in this Agreement shall survive the execution of this Agreement and of the Note and shall continue in full force and effect with respect to the date as of which they were made, as long as any credit is in use or available under this Agreement.

*Section 9.7.    Payments.*  So long as the Lender is the holder of the Note, the Companies will promptly and punctually make all payments when due, without presentment of the Note and without any notation of any such payment being made on such Note.

D 0051

*Section 9.8.    Addresses for Notices.*    All communications provided for in this Agreement shall be in writing and shall be deemed to have been served (a) on the date when personally delivered, or (b) on the date two days after deposited in the United States mail, certified mail, return receipt requested, postage prepaid, addressed. if to the Companies, at 505 8th Ave., 8th Floor, New York, NY 10018 , Attention: President, or, if to the Lender, at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523, Attention: Chief Operating Officer, with a copy to the Lender at 150 Mount Bethel Rd., Warren, NJ 07059, Attention: General Counsel and a copy to GMAC Mortgage Group, Inc, 100 Witmer Road, Horsham, Pennsylvania, 19044, Attention: General Counsel, or at such other address as shall be designated by any party to this Agreement in a written notice served on the other party pursuant to this Section 8.8.

*Section 9.9.    Company's Waiver.*    Except as otherwise provided for in this Agreement or by law, the Companies waive (a) presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, one or more extensions or renewals of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which the Companies may in any way be liable and ratifys and confirms whatever the Lender may do in this regard; (b) all rights to notice and a hearing prior to the Lender's taking possession or control of the Collateral or prior to the Lender's reply, attachment or levy on the Collateral or any bond or security which might be required by any court prior to allowing the Lender to exercise any of the Lender's remedies; and (c) the benefit of all valuation, appraisement and exemption laws. The Companies acknowledge that they have been advised by counsel of its choice with respect to this Agreement and the transactions evidenced by this Agreement.

*Section 9.10    Power of Attorney.*    The Companies appoint the Lender, or any entity whom the Lender may from time to time designate, as the Companyies attorney and agent-in-fact with power (which appointment and power, being coupled with an interest, is irrevocable until all obligations of the Companies under this Agreement and the Note are paid and performed in full and this Agreement is terminated), without notice to the Companies:

    (a)    after the occurrence and during the continuance of an Event of Default, to endorse each of the Companyies names on any checks or other items of payment and apply such payment to the obligations of the Compaiesy owing under this Agreement and under the Note and to endorse each of the Companyies names on any document relating to Accounts Receivable, Inventory or any other Collateral and do all reasonable acts determined by Lender to be necessary to fulfill the Companyies obligations under this Agreement. and

    (b)    after the occurrence and during the continuance of an Event of Default, to demand payment of the Accounts Receivable and exercise all the Companyies rights with respect to the collection of the Accounts Receivable.

*Section 9.11.    Headings.*    Article and Section headings used in this Agreement are for convenience of reference only and are not a part of this Agreement for any other purpose.

*Section 9.12    Severability of Provisions.*    Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such

D 0052

unenforceability without invalidating the remaining provisions or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 9.13. *Counterparts.*   This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts, and all such counterparts taken together shall be deemed to constitute the same instrument.

Section 9.14. *Binding Nature, Governing Law, Etc.*   This Agreement shall be binding upon the Companies and their respective successors and assigns, and shall inure to the benefit of the Lender and the benefit of its successors and assigns, including any subsequent holder of the Note. The Companies may not assign their respective rights under this Agreement without the written consent of the Lender (which consent shall be within the sole discretion of the Lender). This Agreement constitutes the entire understanding of the parties with respect to the subject matter of this Agreement and any prior agreements, whether written or oral, with respect to the matters covered in this Agreement are superseded by this Agreement. **This Agreement, the Note and the Collateral Documents, and the rights and duties of the parties set forth in those documents, shall be governed by, and construed in accordance with, the internal laws of the State of Illinois, without regard to principles of conflicts of laws which would require the application of the laws of a different jurisdiction.**

Section 9.15. *Arbitration.*   Each of the Companies expressly agrees that all controversies, disputes and claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees) and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees) arising out of or related to this Agreement, the Note and the Collateral Documents, and the rights and duties of the parties set forth in those documents, must be submitted for binding arbitration in accordance with and subject to the terms of the Arbitration section of the Franchise Agreement, and all such terms are incorporated by reference as if fully set forth herein, provided that all references to the "Agreement" therein shall be deemed to refer to this Areement, the Note or the Collateral Documents as the context so requires.

Section 9.16. *Waiver of Jury Trial.*   **EACH COMPANY AND THE LENDER EACH IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE, THE COLLATERAL DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED BY THESE DOCUMENTS.**

Section 9.17. *Further Assurances.*   Each of the Companies agrees to take such actions relating to this Agreement, the Note and the Collateral Documents as the Lender may reasonably request in order to more effectively carry out the terms and provisions of this Agreement.

D 0053

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

**COMPANY:**

**International Properties Group, Inc.**

By: _____

Name: George F. Donohue _____

Title: President _____

Date: _____


By: _____

Name: Christian M. Deutsch _____

Title: CEO _____

Date: _____

**William B. May Commercial, Inc.**


By: _____

Name: George F. Donohue _____

Title: President _____

Date: _____


By: _____

Name: Christian M. Deutsch _____

Title: CEO _____

Date: _____

D 0054

**LENDER:**

By:_____
   Judith O'Brien
Its:  Executive Vice President

D 0055

**Exhibit A To The Loan And Security Agreement**
**Note**

**SCHEDULES**

SCHEDULE 4.4 (LITIGATION):

SCHEDULE 4.8 (LOCATIONS OF OFFICES, BOOKS AND RECORDS, INVENTORY AND EQUIPMENT):

SCHEDULE 4.9 (REAL PROPERTY WHERE FIXTURES ARE LOCATED):

SCHEDULE 4.10 (PATENTS, COPYRIGHTS, ETC.):

D 0056

Standard Contracts

# Franchise Agreement, Amendment 1

As of this 1st day of December, 2005, (the "**Effective Date**"), GMAC Real Estate, LLC ("**GMAC Real Estate**"), having a place of business at 2021 Spring Road, Oak Brook, Illinois 60523, and International Properties Group, Inc. ("IPG") and William B. May Commercial, Inc. ("May"), jointly and severally (collectively, "**Strategic-Partner**"), having a place of business at 505 8th Ave., 8th Floor, New York, NY 10018, agree that the franchise agreement (the "**Franchise Agreement**") between the parties, dated December 1, 2005, the franchise development costs note (the "Note") between the parties, dated December 1, 2005, the development loan and security agreement (the "Development Loan") between the parties, dated December 1, 2005, the pledge agreement (the "Pledge Agreement") between the parties, dated December 1, 2005 and the personal guaranties of note (the "Guaranties") between the parties, dated December 1, 2005,be and are amended as follows:

1. The Effective Date referenced in the Franchise Agreement, the Note, the Development Loan, the Pledge Agreements and the Guaranties ("**Effective Date**") is changed from December 1, 2005 to March 1, 2006.

1. Exhibit A Royalty & Advertising Fees, subsection (1). Amount, is deleted in its entirety and replaced with the following:

   A.    Subject to adjustment in accordance with paragraph B. below, for each twelve month period (each a "**Term Year**") following the Effective Date and each anniversary thereof (e.g. each March 1 – February 28) during the Term, on the 5th day of each calendar month (subject to paragraph F. below), for each full or partial preceding calendar month covered by this Agreement, a Royalty Fee, in an amount equal to the greater of (i) a percentage determined in accordance with paragraph C. below (the "**Flat Rate**") of the GCI to which Strategic-Partner is entitled from residential transactions ("**Residential GCI**") and commercial transactions (as defined in Section 9(B) of this Agreement) ("**Commercial GCI**") (Residential GCI and Commercial GCI are sometimes hereinafter referred to, collectively, as "**Combined GCI**") that closed or settled during such preceding calendar month or (ii) the applicable Monthly Royalty Fee Minimum determined in accordance with paragraph D below.

   B.    The amount calculated in accordance with the paragraph A is hereinafter referred to as the "**Actual Fees Paid**". At the end of each Term Year, GMAC Real Estate will calculate the "**Actual Fees Due**" for such Term Year by separating the Combined GCI reported to GMAC Real Estate for such Term Year into Residential GCI and Commercial GCI, and then adding five percent (5%) of any Residential GCI (less any Award amount pursuant to subsection (2) below) and two percent (2%) of any Commercial GCI to determine the Actual Fees Due for the Term Year at issue. If the Actual Fees Paid exceed the Actual Fees Due, GMAC Real Estate will credit the difference to Strategic-Partner. If, however, the Actual Fees Due exceed the Actual Fees Paid Strategic-Partner shall be obligated to pay the

difference to GMAC Real Estate within thirty-days following Strategic-Partner's receipt of written notice from GMAC Real Estate.

C.    The Flat Rate for the Term Year ending February 28, 2007 is three and a half percent (3.5%). For each subsequent Term Year, at the beginning of such Term Year, GMAC Real Estate will calculate and advise Strategic-Partner of the Flat Rate to be applied, with the applicable Flat Rate to be established such that, when applied to the preceding Term Year's Combined GCI, Actual Fees Paid equal Actual Fees Due.

D.    Beginning on July 1, 2006 and ending at 11:59PM on June 30, 2007, (the "**First Monthly Minimum Period**") for each month during the First Monthly Minimum Period, the total amount of Royalty Fees due from Strategic-Partner shall not be less than $5,500 (the "**First Monthly Royalty Fee Minimum**"). Beginning on July 1, 2007 (the "Monthly Minimum Fee Change Date") and at the end of each month thereafter during the Term of this Agreement, the total amount of Royalty Fees due from Strategic-Partner shall not be less then $8,250 (the "**Second Monthly Royalty Fee Minimum**").

E.    Notwithstanding anything in paragraphs A. through C. above to the contrary, if at the end of each Term Year (each, for purposes of this paragraph, a "**Measurement Period**"), the Actual Fees Due is less than the Annual Royalty Fee Minimum (as set forth in the chart below), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the Actual Fees Due. However, the first Measurement Period will be sixteen months following the Effective Date of this Agreement, with each subsequent Measurement Period occurring at the twelve-month anniversary of the Effective Date of this Agreement, per the chart below:

| Measurement Period | Dates | Annual Royalty Fee Minimum |
|---|---|---|
| 1st Measurement Period | 3/1/06 – 6/30/07 | $110,000 |
| 2nd Measurement Period | 3/1/07 – 2/28/08 | $165,000 |
| 3rd through 10th Measurement Period | 3/1/08 – 2/28/09<br>3/1/09 – 2/28/10<br>3/1/10 – 2/28/11<br>3/1/11 – 2/28/12<br>3/1/12 – 2/28/13<br>3/1/13 – 2/28/14<br>3/1/14 – 2/28/15<br>3/1/15 – 2/28/16 | $165,000 per year |

F.    Notwithstanding the monthly payment schedule described above, in the event GMAC Real Estate requires Strategic-Partner to use a BRS and/or EFT in accordance with Section 11.B. of this Agreement, then Royalty Fees will be due upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI.

G.    If this Agreement is the first contract between GMAC Real Estate and Strategic-Partner, Strategic-Partner shall not be required to pay the Royalty Fees which are

Standard Contracts

based on GCI earned with respect to transactions under contract or in escrow on the Effective Date, provided, however, that such transactions are closed or settled within thirty (30) days after the Effective Date. As to transactions under contract or in escrow on the date of the termination of this Agreement, Strategic-Partner shall be required to pay those Royalty Fees which are based on GCI earned with respect to such transactions.

IN WITNESS WHEREOF, the parties execute this Amendment, intending it to be effective as of the Effective Date.

**GMAC Real Estate:**

GMAC Real Estate, L.L.C.

By:

Susan Daniel,
**Assistant Vice President**

Dated: 2-20 , 2006

**Strategic-Partner:**

**International Properties Group, Inc.**

By:

Name: George F. Donohue

Title: President

Date: 2/15/2006

By:

Name: Christian M. Deutsch

Title: CEO

Date: 2/15/2006

**William B. May Commercial, Inc.**

By:

Name: George F. Donohue

Standard Contracts

Title: <u>President</u>

Date: <u>2/15/2006</u>

By: _____

Name: <u>Christian M. Deutsch</u>

Title: <u>CEO</u>

Date: <u>2/15/2006</u>

Dated: _____ , 2006

D 0060

**Franchise Agreement, Amendment 2**

As of this 1st day of March, 2007, (the "**Effective Date**"), GMAC Real Estate, LLC ("**GMAC Real Estate**"), having a place of business at 2021 Spring Road, Oak Brook, Illinois 60523, International Properties Group, Inc. ("IPG") and William B. May Commercial, Inc. ("May"), jointly and severally (collectively, "**Strategic-Partner**"), having a place of business at 505 8th Ave., 8th Floor, New York, NY 10018agree that the franchise agreement (the "**Franchise Agreement**") between the parties, dated December 1, 2005, as amended from time to time, be and is further amended as follows:

1.  The Exclusivity Period and the Licensed Territory referenced in Section 6 ("Grant of The License") of the Franchise Agreement are hereby deemed terminated and removed. In addition, the second paragraph in Section 6 which references the 1-year Approval Period following the expiration of the Exclusivity Period is deleted in its entirety.

2.  Provided Strategic-Partner is current in all reports and fees due to GMAC Real Estate pursuant to the Franchise Agreement as of the Effective Date of this Amendment, Subsection D and E, which were added to the amended Exhibit A Royalty & Advertising Fees, subsection (1). Amount, pursuant to the Franchise Agreement, Amendment 1, are deleted in their entirely and replaced with the following:

    D.    Notwithstanding anything in paragraphs A. through C. above to the contrary, if at the end of each Term Year (each, for purposes of this paragraph, a "**Measurement Period**"), the Actual Fees Due is less than the Annual Royalty Fee Minimum (as set forth in the chart below), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the Actual Fees Due. However, the first Measurement Period will be sixteen months following the Effective Date of this Agreement, with each subsequent Measurement Period occurring at the twelve-month anniversary of the Effective Date of this Agreement, per the chart below:

| Measurement Period | Dates | Annual Royalty Fee Minimum |
|---|---|---|
| 1st Measurement Period | 3/1/06 – 6/30/07 | $40,000 |
| 2nd Measurement Period | 3/1/07 – 2/29/08 | $45,000 |
| 3rd Measurement Period | 3/1/08 – 2/28/09 | $55,000 |
| 4th Measurement Period | 3/1/09 – 2/28/10 | $65,000 |
| 5th Measurement Period | 3/1/10 – 2/28/11 | $80,000 |
| 6th Measurement Period | 3/1/11 – 2/29/12 | $95,000 |
| 7th Measurement Period | 3/1/12 – 2/28/13 | $115,000 |
| 8th Measurement Period | 3/1/13 – 2/28/14 | $135,000 |
| 9th through 10th Measurement Period | 3/1/14 – 2/29/16 | $155,000 |

Standard Contracts

IN WITNESS WHEREOF, the parties execute this Amendment, intending it to be effective as of the Effective Date.

**GMAC Real Estate:**

GMAC Real Estate, LLC

By _____
        Susan Daniel,
        Assistant Vice President

Dated: _____, 2007

**Strategic-Partner:**

**International Properties Group, Inc.**

By: _____
        George F. Donohue

Dated: _____, 2007

By: _____
        Christian M. Deutsch

Dated: _____, 2007

**William B. May Commercial, Inc.**

By: _____
        George F. Donohue

Dated: _____, 2007

By: _____
        Christian M. Deutsch

Dated: _____, 2007