UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
AIR CHINA LIMITED,

                                     : Case No.
                                       07 CV 11128
                     Plaintiff,      (LTS)(DFE)
                                       :

          -against-

                                       : **NOTICE OF MOTION**
                                          **TO DISMISS ALL**
NELSON LI (a/k/a SHENG LI),             : **CLAIMS FOR RELIEF**
JOHN A. VARACCHI (a/k/a JOHN A. DAVIS),
GEORGE F. DONOHUE, JAY KOPF            :
(a/k/a JACOB M. KOPF) CHRISTIAN M. DEUTSCH,
WBM-JMK DEVELOPMENT LLC               :
(d/b/a WBM INTERNATIONAL DEVELOPMENT), JMK
CONSTRUCTION GROUP LTD.,               :
TCC INTERIORS, LTD., GMAC REAL ESTATE LLC,
GMAC REAL ESTATE IPG NEW YORK,        :

                         Defendants.    :
---------------------------------------------X

S I R S:

         PLEASE TAKE NOTICE that, upon the annexed Affidavit of
Jay Kopf, duly sworn to July 17, 2008, and the exhibits annexed
thereto, the annexed Affidavit of Susan Daniel, duly sworn to July
21, 2008, and the exhibit annexed thereto, the annexed Affidavit
of Christian M. Deutsch, duly sworn to July 18, 2008, and the
Affidavit of Edward Weissman, duly sworn to July 18, 2008; and
upon all prior papers, pleadings and proceedings heretofore had
herein, defendants shall move this Court, before the Honorable
Laura Taylor Swain, United States District Judge, 500 Pearl
Street, New York, New York 10007, Courtroom 17C, on the 12th day of
August 2008, at 10:00 a.m. in the forenoon of that day or as soon

thereafter as counsel can be heard for an Order, pursuant to Fed. R. Civ. P. 12(b)(6), as follows:

    (a)  Dismissing plaintiff's First through Tenth Claims for Relief as to all defendants for failure to state a claim;

    (b)  Dismissing all claims for relief as to defendants Christian M. Deutsch and GMAC Real Estate LLC on the additional ground that neither defendant had any involvement in the underlying transactions; together with such other, further and different relief as to the Court may seem just and proper.

    PLEASE TAKE FURTHER NOTICE that, opposition papers, if any, shall be served upon the undersigned so as to be received in accordance with the applicable Local Rule and the Rules of this Court.

Dated: New York, New York
      July 21, 2008

               LAW OFFICES OF EDWARD WEISSMAN

               By _____
               Edward Weissman, Esq. (EW-1340)
               Attorney for Defendants
               60 East 42nd Street
               47th Floor
               New York, New York 10165
               (212) 937-1520

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

AIR CHINA LIMITED,

                        Plaintiff,

            - against -

NELSON LI (a/k/a SHENG LI), JOHN A. VARACCHI
(a/k/a JOHN A. DAVIS), GEORGE F. DONOHUE,
JAY KOPF (a/k/a JACOB M. KOPF)
CHRISTIAN M. DEUTSCH,
WBM-JMK DEVELOPMENT LLC (d/b/a WBM
INTERNATIONAL DEVELOPMENT),
JMK CONSTRUTION GROUP LTD.,
TCC INTERIORS, LTD.,
GMAC REAL ESTATE LLC,
GMAC REAL ESTATE IPG NEW YORK,

                        Defendants.
------------------------------------------------------------------x

**Docket No.**

07 **CV.** 11128 (LTS)  (DFE)

ECF CASE

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

Plaintiff, AIR CHINA LIMITED ("plaintiff"), through its undersigned counsel,

THE CATAFAGO LAW FIRM, P.C., as and for its complaint against defendants NELSON LI,

(a/k/a SHENG LI), JOHN A. VARACCHI (a/k/a JOHN A. DAVIS), GEORGE F. DONOHUE,

JAY KOPF (a/k/a JACOB M. KOPF), CHRISTIAN M. DEUTSCH, WBM-JMK

DEVELOPMENT LLC (d/b/a WBM INTERNATIONAL DEVELOPMENT), JMK

CONSTRUTION GROUP LTD., TCC INTERIORS, LTD., GMAC REAL ESTATE LLC and

GMAC REAL ESTATE IPG NEW YORK, respectfully alleges as follows upon information and

belief:

**Preliminary Statement**

1.      This action arises from an ongoing fraudulent scheme carried out by defendants who

have been engaged in an ongoing conspiracy to, amongst other things, convert and

misappropriate over $4 million dollars belonging to plaintiff by fraudulently deceiving plaintiff

and the general public into believing defendants are part of the long esteemed William B. May
Real Estate Company.

2.     As conspirators, defendants were aware of one another's actions and intentions in
connection with a sophisticated plan to deprive plaintiff of its money contrary to established law.
Defendants also attempted to and continue to assert certain sham legal positions as part of an
effort to retain those converted funds, to intimidate plaintiff and to obtain additional funds from
plaintiff.

3.     This case arises specifically out of defendants' violation of § 1962(c) of The Racketeer
Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., as well as their
violations of established common law principles of fraud in the inducement to contract,
conversion, breach of fiduciary duty, unjust enrichment, failure to account, negligence and
violation of NY General Business Law § 349.

4.     The scheme continues to be carried out through the use of the U.S. mails
and wires and involves a pattern of brazen criminal predicate acts committed in this district, as
well as outside of the United States.  As a result of defendants' unlawful actions, plaintiff has
lost more than $4 million stolen by defendants.

**The Plaintiff**

5.     Plaintiff formerly was a corporation duly organized and existing under the laws of The
People's Republic of China with its principal place of business in Beijing, China.

6.     The majority of plaintiff's capital shares previously were owned by a foreign
state, namely The People's Republic of China.  Air China Limited is a provider of air passenger
service, air cargo service and airline related services in China, with headquarters in Beijing.  The
company was incorporated on September 30, 2004 in The People's Republic of China as a joint
stock company as part of the restructuring of China National Aviation Holding Company from a

2

government owned enterprise into an international company. As of December 15, 2004, Air China became an international public company whose stocks are traded on the Hong Kong and London stock exchange.

7.     Plaintiff is not a citizen of the United States as defined in 28 U.S.C., § 1332(c) and (d), nor has it been created under the laws of any third country.

### The Defendants

8.     At all relevant times, defendant Nelson Li (a/k/a Sheng Li) was and is a resident of the State of New Jersey. At various times he has claimed to be "managing director" or real estate "sales agent" of defunct, non-existent and/or inoperative companies including, "WBM International Development LLC", "Sunels International (N.A.) Inc." "WBMI", "WBMID" and "GMAC Real Estate IPG New York", although he is not a New York State licensed real estate broker or salesperson and has never been employed by any such company and has used only one office – 505 8th Avenue, New York, NY (the GMAC office in New York which lists him as amongst GMAC's "sales agents") to engage in his fraud upon the public in general and plaintiff in particular.

9.     At all relevant times, defendant John A. Varacchi was and is a resident of the State, City and County of New York. Although he is actually in the furniture business, he has represented himself to be an officer of "WBM International Development LLC," an entity falsely holding itself out to be a licensed, experienced general contractor with the backing of William B. May Real Estate Company.

10.     At all relevant times, defendant George F. Donohue was and is a resident of the State of New York. Although he has been enjoined by this Court from using the "William B. May" name for commercial purposes, defendant George F. Donohue continues to use that name in connection with a New York State real estate broker's license which he holds.

3

11.    At all relevant times, defendant Jay Kopf (a/k/a Jacob M. Kopf) was and is a
resident of the State of New York.  Defendant Jay Kopf, through the companies he owns
(defendant TCC Interiors, Ltd. and defendant JMK Construction Group, Ltd.), is the only
defendant with any general contractor experience.  In connection with their multi-million dollar
criminal scheme against plaintiff, Jay Kopf, together with defendants Nelson Li, John A.
Varacchi, George F. Donohue, Christian M. Deutsch and WBM-JMK Development LLC (d.b.a.
WBM), defrauded plaintiff into believing:

(a)    that an entity named "WBM International Development LLC" had
existed since the 1800's, was well established and experienced in
the field of general construction and real estate development, and
was an existing subsidiary of, and had the backing of, the
venerable real estate company William B. May; and

(b)    JMK Construction Group Ltd. would simply be a sub-contractor on
a contemplated construction job for plaintiff.  In fact, Jay Kopf,
together with these other individual defendants, secretly created
the entity "WBM-JMK Development LLC" in January 2005 (with
only these individuals as owners and with no history, office,
employees, bank account, experience, license, insurance or
backing of any kind from William B. May, or from anyone else)
and defendant never provided that name to plaintiff but instead
criminally used an unauthorized alias for that entity ("WBM
International Development LLC") so as to continue to deceive
plaintiff into thinking that William B. May was behind the venture.

12.    At all relevant times, defendant Christian M. Deutsch was and is a resident of
the State of Pennsylvania, doing business in the State of New York.  Although he too has been
enjoined by this Court from using the "William B. May" name for commercial purposes, this
self-described "Chairman" of GMAC Real Estate Group IPG New York (which also lists him
amongst its real estate "sales agents" although in fact he has no such New York State license)
continues to allow defendant George F. Donohue and others to report to the GMAC defendants'
New York offices (at 505 8th Avenue, the purported office of "WBM" from which plaintiff was

defrauded) and to use their New York real estate brokerage or sales license relating to William B. May.

13.     Defendant WBM-JMK Development LLC is a New York State limited liability company. This entity has never had any bonafide offices, employees, experience or general contractor license or backing of any kind. This entity, through the conduct of the individual defendants, has made criminal use of an alias (in violation of N.Y.G.B.L. §130) as part of defendants' scheme to defraud plaintiff.

14.     At all relevant times, defendant JMK Construction Group LTD. was and is a New York State corporation. This entity, controlled by Jay Kopf, was an undisclosed general contractor in dealing with plaintiff, and thereby siphoned off millions belong to plaintiff.

15.     At all relevant times, defendant TCC Interiors, Ltd. was and is a New York State corporation. This entity was falsely represented by defendants to be an arms length sub-contractor, but in reality it too belonged to and was controlled by Jay Kopf and siphoned off well over $610,000 belonging to plaintiff.

16.     At all relevant times, GMAC Real Estate LLC was and is a Delaware limited liability company doing business at 505 8th Avenue, New York, New York. GMAC lists Christian M. Deutsch and Nelson Li amongst its sales associates, but neither is licensed by New York State Department of Licensing to sell real estate or to otherwise represent themselves to be sales agents.

17.     At all relevant times, GMAC Real Estate IPF New York was and is an unincorporated association doing business at 505 8th Avenue, New York, New York with George F. Donohue as President, Christian M. Deutsch as Chairman and Nelson Li as Managing Director.

## JURISDICTION AND VENUE

18.     This Court has diversity jurisdiction over this action and of the subject matter of the

5

lawsuit pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

19. Moreover, this Court has jurisdiction over the first and second claims for relief, which arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 and 1964 ("RICO") and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the pendent state law claims of the complaint under 28 U.S.C. § 1367.

20. This Court has personal jurisdiction over defendants under Article 3 of New York's CPLR, which provides for jurisdiction over defendants who are New York citizens or who engage in tortious acts in New York. In this case, defendants are citizens of New York and/or regularly engage in business in this State. Furthermore, as conspirators, defendants acted in concert to commit tortious and fraudulent acts in New York such that exercising personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.

21. Venue is proper in this district pursuant to 28 US.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in New York County.

## ALLEGATIONS COMMON TO ALL CLAIMS

22. In early 2003, plaintiff became interested in developing its property at 485 West Broadway, Long Beach, New York ("the Property") so that it could house its airline workers during their stays in New York.

23. For that purpose, in June of 2003, plaintiff solicited the services of the very well established real estate company, William B. May Company, which had been a fixture in the real estate community in New York since 1866. In June 2003, plaintiff specifically requested that the company submit a proposal for the renovation of plaintiff's Property at 485 West Broadway, Long Beach, New York. In response to plaintiff's request for such a proposal, defendant George

F. Donohue wrote to plaintiff on June 12, 2003 on the letterhead of William B. May Company and as purported "President" of William B. May Company, stating as follows:

> "We are honored to have this opportunity to provide our expertise and service to you. My associates and I are reviewing the information about the property, discussing it with different parties and performing our due diligence. We will send you the proposal when we complete it.
> We look forward to working with you."

By this letter, with which William B. May's glossy brochure was enclosed, defendants' scheme to defraud plaintiff began. Ultimately, as described below, defendants baited plaintiff with the false and material illusion that William B. May Company would be involved and ultimately created a shell company, totally unrelated to William B. May Company, as part of an elaborate criminal bait and switch scheme designed to defraud plaintiff.

24.    As part of their scheme to defraud plaintiff, defendants initially used the name of an inactive, dissolved corporation -- William B. May International Inc., which had not incorporated until September 7, 1999 and which had been dissolved by New York State Proclamation issued by the Secretary of State on June 25, 2003 for non-payment of franchise taxes. That company remained dissolved until defendants George F. Donohue and Christian M. Deutsch sought to annul the dissolution on April 7, 2004. Well before then, however, on June 26, 2003, while William B. May International Inc. still was dissolved, defendants Nelson Li, George F. Donohue and Christian M. Deutsch, as part of their scheme to defraud plaintiff, submitted to plaintiff a written proposal for hotel management of the plaintiff's Property, signed by George F. Donohue as President, falsely and fraudulently claiming that:

> (a)  the company had been incorporated in 1866, and had more than 200 real estate professionals; and
>
> (b)  Christian Deutsch was Chief Executive Officer, George F. Donohue was President and Nelson Li was Managing Director.

Those and other portions of this document were knowingly false when made and were used successfully to deceive plaintiff into doing business with defendants.

25.     Also on or about June 26, 2003, defendant Nelson Li acting on behalf of himself and individual defendants Jay Kopf, John A. Varacchi and George F. Donohue, in an effort to convince plaintiff to hire defendants to develop plaintiff's Property ("the Air China Project") at 485 West Broadway, Long Beach, New York presented plaintiff with a document entitled "Overall Overhaul Plan" ("the Overhaul Plan").

26.     The Overhaul Plan falsely and fraudulently indicated that:

> (a) It was being submitted by an entity named "WBMI" whose President was defendant George F. Donohue;
>
> (b) WBMI was established in 1866 and was a "full service real estate company with the longest history in the United States" and was providing its services and "137 years of real estate experience" and its "credibility and business reputation" were at the service of the Air China Project; and
>
> (c) A second entity known as "WBMID" (which in fact did not even exist) was a "diversified and "full service" "wholly owned subsidiary of WBMI" and WBMID undertake to "work continuously for the Project."

27.     Each and every one of these statements, as well as others in the Overhaul Plan, was knowingly and intentionally false when made and was reasonably and detrimentally relied upon by plaintiff in deciding to do business with defendants, Nelson Li, John A. Varacchi, George F. Donohue and Jay Kopf.

28.     Even as early as 2002, George F. Donohue had represented to the public through the media that he wanted to make William B. May a public company because "I think people would be interested in a 137 year old company with a very good trademark."

8

29.    In his scheme to defraud plaintiff and the public, George F. Donohue partnered with Jay Kopf, John A. Varacchi, Nelson Li, Christian M. Deutsch and GMAC, although none of these other four men were licensed brokers or salespeople.  Upon information and belief, Nelson Li had lost a license and John A. Varacchi, whose field was in the sale of furniture, was an investor with George F. Donohue in working to create an illusion that Donohue controlled William B. May.  The only individual member of the scheme with any actual construction experience was Jay Kopf.

30.    At the initial stages of the conspiracy, defendants relied primarily on Nelson Li and George F. Donohue to defraud plaintiff.  Many of the fraudulent documents described herein were translated from the English language to the Chinese language by Nelson Li, and were thereupon presented to plaintiff.  George F. Donohue has routinely touted himself to the public as "President" of William B. May (e.g., March 2006 function sponsored by Mitsloan Real Estate Club; March 2, 2005 article in Real Estate Weekly).  George F. Donohue also promotes himself as "one of the world's foremost expert in negotiation" who charges up to $15,000 for a 60 minute speech (plus first class air fare, hotel, mileage and other charges) and is "one of the nation's leading real estate and negotiation experts," and he solicits such work from the very same GMAC offices which supposedly housed WBM. (In fact, no William B. May company ever has had any lease or actual employee and is not even listed in the building directory at that address.)

31.    Jay Kopf formed the New York corporation known as JMK Construction Group Ltd. on March 21, 2000 and he has at all times since been its Chairman and Chief Executive Officer.

32.    Jay Kopf's offices are located in the same building (1123 Broadway) where

William B. May Services Corporation and William B. May Advantage Corporation (two New York State corporations) are based. At the early stages of the conspiracy, defendants George F. Donohue and Nelson Li enlisted Jay Kopf and John A. Varacchi in their plan to defraud plaintiff.

33.     In February 2004, Nelson Li, acting on behalf of himself and Jay Kopf, John A. Varacchi and George F. Donohue, presented plaintiff with a document entitled "Professional Assessment Report" ostensibly prepared by "WBMI established 1886".

34.     Defendants Nelson Li and George F. Donohue in February 2004 also misrepresented to plaintiff that Burton Roslyn was a "Senior Vice President of Construction" for William B. May Commercial Real Estate" and would be involved in the Project. In fact, he never held such a post and never was involved in the Project.

35.     By fax transmittal dated September 23, 2004, defendants continued to deceive plaintiff into believing that William B. May Company was involved in the Air China Project, including the Building Department Permit application filed with the City of Long Beach.

36.     Although defendants, on September 13, 2004, submitted the Building Department permit application (no. 0096944) with the City of Long Beach to commence the Project, by January 6, 2005 the application still had not been approved because no defendant was actually licensed to perform general contracting services by the City as required. Defendants knew or should have known of this requirement and, in any event, were notified of their failure on or about January 6, 2005, but still no license was obtained until July 23, 2005.

37.     The February 2004 Professional Assessment Report submitted by defendants (through Nelson Li) to plaintiff, falsely and fraudulently indicated that:

> (a) WBMI (which in reality was dissolved) was offering its
> "best services for optimum interest of Air China";

(b) WBMI was established in 1866 and was a full service real estate company with the largest history in the United States including over 200 real estate specialists;

(c) An entity known as "WMID" (which in fact did not exist) was a "wholly – owned subsidiary of WBMI" and WBMID would undertake to "work continuously for the project;" and

(d) WBMI's principals included Nelson Li as Executive Director, John A. Varacchi as Vice President, Jay Kopf as Senior Vice President and Burton Roslyn as Senior Vice President.

38.   The Professional Assessment Report submitted by defendants (through Nelson Li) to plaintiff ostensibly for "WBMI established 1866" further falsely and fraudulently represented:

(a) "[s]ince the summer of 2002, our professional staff and local building department and other officials have carried out meetings and talks";

(b) "[a]nother important benefit arises from the good relationship between our company and  the Office of the New York Governor";

(c) **"Our commitment to Air China:"** [w]e also have a good cooperative relationship with the local electric power department";

(d) "[w]e guarantee best services for the optimum interests of Air China";

(e) "[w]e have already organized contingents of our best professional people to put their expertise at the service of this Project.  We shall intervene in the Project to ensure its success";

(f) that defendant George F. Donohue had previously been in charge of NY – NY Port Authority's 20 million square feet (in fact he had been forced to resign under allegations of criminal misconduct) and that he had a Ph.D. in "international business" (Pace University has no record of any such alleged degree); and

(g) that Burton Roslyn a registered designer, was Senior Vice President on the Project (in fact he only attended a single meeting at the early stages with plaintiff).

39.   Each and every one of these statements, as well as others in the Professional Assessment Plan, was knowingly and intentionally false when made and was reasonably and detrimentally relied upon by plaintiff in deciding to do business with defendants Nelson Li, John A. Varacchi, George F. Donohue, Jay Kopf and the later-formed defendant WBM.

40.   As part of their scheme to defraud plaintiff, the defendants Nelson Li, George F. Donohue, Jay Kopf and John A. Varacchi misrepresented to plaintiff, orally and in writing, that Burton Roslyn would be part of the WBM team, and that he was a principal of William B. May. In fact, he was never anything other than a consultant and a friend of John A. Varacchi, and he never actually worked on the Air China Project.

41.   On March 4, 2005, in violation of New York General Business Law § 130 (a crime), and as part of their scheme to defraud defendants, submitted a bid for the Air China Project.

42.   The bid (submitted in English and in Chinese language versions) was on letterhead of non-entity "WBM International Development LLC" that used GMAC's address and phone number (WBM never had a separate phone or its own address) and William B. May's email address and fax numbers.  It was signed by George F. Donohue as "President" and falsely advised:

    i.     Our company....started efforts on this project in July 2002. The executives and professionals of our company have been to the site many times....

    ii.    Our company, which was established in 1866, is the oldest real estate company in the United States.  We have been involved in many real estate projects...

    iii.   ....In the past years, we have worked with many Chinese companies.

12

We will provide all of our expertise of 139 years of real estate services in the United States to serve Air China in its Long Beach project.

In fact, the record establishes that at that time:

1. there was no "WBM International Development LLC" in existence; and

2. On January 13, 2005, less than two months before the bid, defendants had only just secretly formed a New York limited liability company "WBM-JMK Development LLC", a name never disclosed to plaintiff (and proceeded to use an unauthorized alias, "WBM International Development LLC").

43.    The defendants' bid breakdown for the Air China Project was faxed on March 31, 2005 by George F. Donohue using the fictitious name "WBM International Development LLC" (when in reality no such company existed) and using the William B. May fax number and name.

44.    By letters dated March 15 and 24, 2005, defendants falsely, by George F. Donohue (using the William B. May email address and the phony "WBM International Development LLC" name at GMAC's address), represented that the Project would be "turn-key" with an all-inclusive price of less than $3,900,000.

45.    By letter dated March 15, 2005, Nelson Li wrote to plaintiff regarding leasing the roof of the building involved in the project, and he did so as purported "managing director" William B. May Commercial Real Estate.

46.    On December 29, 2005, using the GMAC address, and on "William B. May Commercial Real Estate" letterhead, including the William B. May website address, George F. Donohue wrote to plaintiff falsely and fraudulently stating:

"William B. May Commercial Inc. is now GMAC Real Estate IPG

13

\*     \*     \*     \*

Our name will change, <u>but our commitment to serve our customers is as strong as ever</u>."(emphasis in original).

Defendants never retracted or amended this false and fraudulent statement, even after George F. Donohue, GMAC and Christian M. Deutsch each had been sued by the William B. May family in this Court and consequently each had become subject to a Federal Court injunction barring them from any commercial use of the "William B. May" name.

47.     Defendants' announcement of a purported GMAC/William B. May partnership was also published (but never retraced) in the March 15, 2006 edition of the Real Estate Weekly. This was simply part of the fraud defendants were committing on the general public; there was never any such partnership.

48.     As part of their scheme to defraud, the defendants created a purported contract dated May 31, 2005 ("the May 2005 Agreement") listing the fictitious name and entity "WBM International Development LLC" as contractor (so as to deceive plaintiff into believing that a William B. May company stood behind the Project), with George F. Donohue signing, under oath, as "President" of that purported company operating out of 505 Eighth Avenue, New York, New York (which in reality was the address for defendants GMAC and Christian M. Deutsch).

49.     Prior to presenting plaintiff with the fraudulent May 2005 Agreement, defendants met with plaintiff at William B. May's office (575 Madison Avenue, N.Y., N.Y.) on March 28, 2005, in order to continue to fraudulently foster the false impression that that venerable company was behind the Project; and they followed up with a fax from William B. May to plaintiff (signed by George F. Donohue, "President" of WBM, but with GMAC's address) referring to the meeting "at our offices."

50.     Prior to defendants providing plaintiff with the May 2005 Agreement, defendants Nelson Li also gave plaintiff a business card identifying himself as "Managing Director" of "William B. May International – Real Estate since 1866" and "WBM – Real Estate since 1866" with the "corporate headquarters" of 575 Madison Avenue, New York, NY, once again reinforcing the fraudulent impression that that venerable company was behind the Project.

51.     In reasonable reliance upon the fraudulent promises set forth in all the earlier representations, documents and negotiations, as well as those contained in the May 2005 Agreement itself, plaintiff executed the May 2005 Agreement and made the first two (2) payments, set forth therein, by checks dated June 7, 2005 and June 14, 2005, in the amount of $562,875 and $375,250, each payable to the fictitious "WBM International Development LLC."

52.     Even eleven days before the May 2005 Agreement was signed, George F. Donohue fraudulently represented to plaintiff in both English and Chinese (translated by defendant Nelson Li), that "[o]ur reputation has been built on 139 years of keeping our clients happy and satisfied…" He did so on non-entity WBM's letterhead, using the fax number and email address of William B. May and the office address of defendant GMAC.

53.     The May 2005 Agreement was procured by fraud and was signed by defendant George F. Donohue as purported "President" of a non-entity, "WBM Development International LLC."

54.     According to the May 2005 Agreement, George F. Donohue swore that he was then President of "WBM International Development LLC", which in fact was a perjurious statement.

55.     According to the May 2005 Agreement, WBM was to pay for all permits and to perform all work as general contractor.  It was never licensed or qualified to do so and never did so.

56.     According to the May 2005 Agreement, the entire Project was required to be completed

in 8 months and WBM as "contractor" was required to compensate plaintiff up to 3% of the stipulated cost of the work ($3,950,000) for delays in connection with the Project (which to date still has not been completed) but never did so.

57.    After defrauding plaintiff into signing the May 2005 Agreement and collecting almost $1 million, defendants Nelson Li, Jay Kopf, George F. Donohue, John A. Varacchi and WBM-JMK now faced a quandary; they had deceived plaintiff into entering into the May 2005 Agreement based upon the fraudulent representations that the contractor was "WBM International Development LLC", a supposedly well established subsidiary of an 1866 company, William B. May Company. The formation of WBM-JMK in fact did not occur until 2005. The entity known as "WBM-JMK Development LLC" was created by articles of organization filed January 13, 2005 by the law firm of Ballon, Stoll, Bader & Nadler, P.C., which listed no other name for the entity and which placed its sole location for business at the home address of attorney Stephen P. Long in Westchester, New York. (The statutorily required publication did not occur until April 27, 2005.)  Upon information and belief, defendants never intended to do and never did do business at that location or in that county.  It was only as part of their conspiracy to defraud plaintiff, that defendants Jay Kopf, Nelson Li, John A. Varacchi and George F. Donohue caused to be formed a New York limited liability company named "WBM-JMK Development LLC" ("WBM-JMK"). WBM-JMK never had an office, employees, insurance, ties to William B. May or contracting license or experience.

58.    The never-amended articles of organization filed under New York Limited Liability Company Law § 203 for WBM-JMK expressly provided that:

    (a)  the name of the entity was "WBM-JMK Development LLC"; and

    (b)  the office of entity was in Westchester, New York.

59.    In fact, in all their dealings with plaintiff, defendants Nelson Li, George F. Donouhue,

Jay Kopf, John A. Varacchi and WBM-JMK (a) never used or had such an office address and (b) fraudulently and unlawfully never used the name "WBM-JMK Development LLC".

60.     The false statements contained in articles and certificates of WBM-JMK Development LLC give rise to Nelson Li's personal liability to plaintiff for those statements, including for damages incurred in connection with the fraudulent use of the alias "WBM International Development" done criminally in concert with the other individual defendants herein, and in violation of N.Y. G.B.L. § 130.

61.     It must be stressed that defendants never had the legal right to use the "WBM Development LLC" name. That name belonged to a New York limited liability company formed on September 23, 1996 by New York attorney Jules E. Levy, Esq., which is and was totally unrelated to the parties herein and to the Air China Project.

62.     As part of their scheme to defraud, using the same attorney (Stephen B. Long) who had formed WBM-JMK Development LLC in January 2005, defendants filed with the New York Secretary of State a Certificate of Assumed Name for WBM-JMK Development LLC on June 15, 2005 ("the Certificate of Assumed Name").

63.     Any use of an assumed name by a limited liability company must comply with the mandates of N.Y. Limited Liability Company Law, § 204(a) and N.Y. General Business Law §130. It is a crime to fail to comply with these requirements. Here, in direct contravention of these statutory requirements: (a) no filing occurred until June 15, 2005, after the oral and written representations (including the May 2005 "Agreement") and after the collection of $1 million; (b) there was no posting anywhere of any assumed name certificate; and (c) there was no filing for Nassau County, where the Project was based.

64.     The May 2005 Agreement was the vehicle used to convert plaintiff's monies. According

to that document, plaintiff's funds were to be placed in a bank account only in the name of the named general contractor. They were not, <u>and</u> could not, be so placed because that contractor simply did not exist.

65.  As a result of their fraud, defendants thus had obtained almost $1 million in checks they could not cash; there was no legal entity in existence known as "WBM International Development LLC".

66.  Thus, they concocted a plan to file an assumed name certificate for WBM-JMK Development LLC (a name never disclosed to plaintiff) so that plaintiff's payments to "WBM International Development LLC" could be deposited into their bank account.

67.  On the very same day that their alias certificate was filed (permitting defendants to use the "WBM International Development" name, **provided** that the other requirements of N.Y.G.B.L. § 130 were satisfied, and in fact they never have been), defendant George F. Donohue as "President" of the non-entity "WBM International Development LLC" fraudulently wrote to plaintiff claiming that:

> (a)  the construction was "moving forward"; and
>
> (b)  another $7,000 had to be paid (in addition to almost $1 million already paid).

This was followed up by a proposed "contract amendment" in the name of "WBM International Development LLC".

68.  The Certificate of Assumed Name was signed on <u>June 8, 2005</u> (after the May 31, 2005 Agreement had been signed) by Nelson Li as "Manager" of WBM/JMK International LLC (d/b/a/ WBM).

69.  The Certificate of Assumed Name falsely and fraudulently represented that the alias

"WBM International Development" would be used only subsequent to the filing (6/15/05) and in New York County only, although the Air China Project was to take place in Nassau County.

70.    The Certificate of Assumed Name represented that WBM/JMK Development LLC (d/b a WBM) had its principal place of business at an address which was in fact the residential address of attorney Stephen A. Long.

71.    The Certificate of Assumed Name failed to state that defendants had used and would continue using the alias "WBM International Development <u>LLC</u>"; indeed, use of such suffix was expressly prohibited by the Secretary of State.

72.    By so doing, defendants thereby continued to deceive plaintiff into believing that a valid subsidiary of William B. May was behind the Air China Project.

73.    By letter dated September 29, 2005, defendants responded to plaintiff's request for an accounting by providing an incomplete "WBM International Development LLC" document (using GMAC's address and phone and William B. May's email address) signed by "Managing Director" Nelson Li, which included purported payments to fictitious or inactive companies, a notable absence of invoices, invoice dates or other critical details, and clear indications of double payments and (subsequently discovered) payments to entities controlled by principals of WBM.

74.    By July 22, 2005 defendants had already collected almost a million dollars and none were authorized to do the work they had been paid for, as they did not have Workers' Compensation Insurance as required by Long Beach ordinance.

75.    Jay Kopf, through JMK Construction Group Ltd., was WBMID's coventurer on the Project.  The May 2005 Agreement made no mention of any co-venturers.  This concealment was fraudulent.

76.    It was only on April 30, 2005 that Jay Kopf, using "JMK Construction Group" as the

19

general contractor, finally obtained any license to perform work on the Air China Project. No other defendant ever obtained or even applied for such license.

77.     Throughout the course of the parties' dealings, the work performed by defendants was substandard, shoddy, incomplete, unsatisfactory and not in compliance with the terms of the May 2005 Agreement.

78.     As part of their scheme to defraud, defendants filed on November 8, 2005 a Certificate of Capital Improvement with the New York State Department of Taxation and Finance listing the contractor for the Air China Project as "WBM International Development LLC/JMK Construction") (no such entity even existed), using the GMAC address and including Jay Kopf's signature as "Vice President" who certified that he had entered into a contract for the Air China Project.

79.     Using the fictitious name "WBM International Development LLC" defendants issued to plaintiff an October 21, 2005 "Status Report" acknowledging "the continued delay," and the absence of any permit for the sprinklers and demanding yet more funds for permit fees and change orders, all inconsistent with the May 2005 Agreement.

80.     By letters dated September 16, 2005 and September 26, 2005 on the letterhead of non-entity "WBM International Development LLC", using GMAC's address and phone, and the fax and email address of William B. May, defendants through George F. Donohue (as "President") wrote to plaintiff and complained that $928,448 had been requisitioned on August 9, 2005, but not been paid until August 30th and September 12, 2005, demanded another $470,124.00 and further stated that the Project would be delayed for non-payment of governmental fees (an obligation that WBM expressly was responsible for under Article 4 of the May 2005 Agreement).  George F. Donohue asked that Air China countersign the September 16, 2005 letter

20

to indicate its agreement, but this request was refused, and indeed plaintiff orally and by letter dated September 26, 2005, complained about the costly delays.

81.  By email dated August 16, 2005, Nelson Li again fraudulently represented that WBM Development was the General Contractor and demanded yet more money for work on the Air China Project.

82.  By correspondence, dated July 13, 2005 and July 20, 2005, again on the letterhead of non-entity WBM International Development LLC, defendants (using George F. Donohue as "President", with a William B. May email address and fax transmittal, and GMAC's address and phone) again fraudulently misled plaintiff into believing that William B. May was behind the Air China Project and that the construction was "moving on smoothly…moving ahead smoothly, we are on our schedule…."

83.  Further, although the May 2005 Agreement expressly required the named contractor(non-entity "WBM International Development LLC") to provide liability insurance, defendants, even after due demand (including correspondence dated July 1, 2005), failed to do so.

84.  The defendants' "accounting" records relating to the Project revealed payments to a defunct corporation (New Ha Ha Construction Inc.) and payments in excess of $1 million to companies (i.e., TCC Interiors, Ltd. and JMK Construction Group, Ltd.) owned and controlled by Jay Kopf.

85.  Defendants' "accounting" records in connection with the Project:

> (a)  included incomplete checks;
>
> (b)  included no invoices;
>
> (c)  showed duplicate payments to defendants TCC Interiors, Ltd.;
>
> (d)  show what later proved to be defendants' conversion; and

(e) were faxed to plaintiff from "William B. May" on September 29, 2005, again creating the false and fraudulent impression that that company was behind the Project.

86. Defendants further faxed fraudulent bills using the William B. May name and fax on May 22, 2006, August 5, 2005, September 16, 2005, September 21, 2005 and January 4, 2006.

87. By letter dated May 19, 2005, designed again to fraudulently induce plaintiff to do business with defendants, George F. Donohue, on the letterhead of the fictitious "WBM International Development LLC" (still using GMAC's address, phone and fax numbers) made comments to the proposed agreement, at all times referring to the fictitious entity as "the contractor" and falsely claiming that "[o]ur profit for this project is very low."

88. Plaintiff's representatives met with George F. Donohue and Nelson Li in New York City on May 23, 2005 to discuss the proposed May 2005 Agreement and the above misrepresentations were again reiterated at that time.

89. Following a March 28, 2005 at William B. May's offices at 575 Madison Avenue in New York City, by letter dated March 29, 2005 on the letterhead of the fictitious "WBM International Development, LLC" George F. Donohue (as purported "President") and using the email address of William B. May falsely represented to plaintiff as follows:

"Our price will be an all inclusive price. We will deliver a turn-key project to you;" and

"We gave you a very low bid price on March 4, 2005…Now, I further lower our price by taking some money from our fee…However, I promise that we will work with you and your architects to find the ways to save you money and refund the saved money (sic) to you during the construction. Now our new price is $3,960,000."

Included with this letter was a bid breakdown in the name of the fictitious "WBM International LLC, using GMAC's office address (505 8th Avenue, 8th Floor, New York, New York 10018).

90.    Only on September 27, 2005 did defendants finally disclose to plaintiff the existence of WBM-JMK International LLC (d/b/a WBM).  In response, by letter dated November 3, 2005 addressed to George F. Donohue at the office of William B. May, 575 Madison Avenue, New York, NY, plaintiff asserted that the May 2005 Agreement was with WBMID and that "WBM-JMK International LLC" was not a party to the contract.  Defendants never advised that they had secretly filed an Assumed Named Certificate for the company and that they were one and the same.  Instead, they continued to fraudulently conceal that fact from plaintiff.

91.    On May 31, 2005, Jay Kopf signed an application for a building permit for the Air China Project to be submitted to the City of Long Beach, Department of Buildings.  On the application, he listed the contractor as JMK Construction (not WBM International Development LLC, nor WBM-JMK Development LLC (d/b/a WBM) and included JMK Construction Ltd.'s address and phone number.  The application (never amended) stated that the **total cost** for the Air China Project would be **$2,440,000**.  (This was on the very same date that WBM International Development LLC as the purported "contractor", with George F. Donohue as "President", signed the May 2005 Agreement with plaintiff setting an all-inclusive Project cost of over $3,950,000.).

92.    Defendants never provided plaintiff with a Certificate of Insurance as they had promised to do in the May 2005 Agreement (§§ 7.2 and 11.2.1).

93.    It was not until May 31, 2005 that the application for a building permit was correctly filled out by defendants.

94.    By fax transmittal entitled "William B. May Commercial" sent on August 11, 2005,

George F. Donohue using the "WBM International Development LLC" letterhead (with GMAC's address and phone and William B. May's email address) requested that plaintiff pay $928,448.00, a demand plaintiff complied with, again having been defrauded into believing that William B. May was behind the Project.

95.     Even the defendants' September 29, 2005 "accounting" records transmitted by Nelson Li was sent to plaintiff from the William B. May fax number.

96.     When plaintiff complained to George F. Donohue and WBM that Jay Kopf and JMK Construction Ltd., as purported sub-contractor, should not be holding up the Project for more money, defendants failed to respond and continued to fraudulently conceal from plaintiff that that individual and entity in fact was (a) the actual general contractor and (b) had an ownership interest in the nominal "contractor" WBM.

97.     Even after plaintiff had paid for more than defendants had materially warranted would be the entire Project's cost, JMK Construction Group Ltd. and Jay Kopf (all while continuing to fraudulently conceal the facts they were in fact the true general contractor and part owner in WBM-JMK) continued to demand more and more money ("we are not your bank" "so it is up to you" "if there is no money, there is no materials, if no materials there is no man power".).

98.     Defendants negligently allowed the Building Department permit for the Air China Project to lapse, unlawfully continuing to work without any permit in place.  It was only after violations were issued that defendants sought to renew the permit and demanded another $4,000 from plaintiff to do so (in contravention of the express terms of the May 2005 Agreement).

99.     Jay Kopf and JMK Construction Group Ltd. made repeated demands for payment (i.e. emails dated 11/13/06 "we are looking for funding") totally inconsistent with the turn-key cost for the Project that had been guaranteed by defendants.

100.    The defendants also violated numerous provisions of the City of Long Beach Code of

Ordinances, including (a) <u>LICENSING</u>, Chapter 14, Article II §§ 14-31, 14-15, 14-24, 14-35, 14:38 (requiring a contractor to be licensed, rendering the absence of licensed work criminal and making a license nontransferable); (b) <u>BUILDING CODE</u>, Chapter 7, Article I §§ 7.6 and 7-38 (requiring all work be performed only by a licensed contractor and Chapter 7, Article II, Div 3 § 7.34 (requiring that a valid permit be in place).

101.    Defendants at all times fraudulently made it appear to plaintiff that JMK Construction Group Ltd and TCC Interiors, Ltd. were arms length sub-contractors, when in fact they were owned and controlled by Jay Kopf, "the contractor" and principal in WBM ( and in fact the only individual even licensed by the City of Long Beach for this Project).

102.    As a proximate result of reasonably relying upon the defendants' knowingly false representations, plaintiff paid yet more money to defendant WBM, which then shared those ill-gotten proceeds with Nelson Li, John A. Varacchi, George F. Donohue, Jay Kopf and JMK Construction Group Ltd., and TCC Interiors, Ltd.

103.    According to the defendants' own "accounting" records, their alleged subcontractor ("New Generation – Michael") entered into an agreement with "JMK Construction Group and WBM International Development" as general contractor.    Other alleged subcontractors (i.e. "New Ha Ha Construction Inc. – which is a non-entity) signed lien waivers describing their agreement with "tenant WBM International Development", and inexplicably indemnifying "JMK and Owner."

104.    One supposed "subcontractor" (TCC Interiors, Ltd.) has Jay Kopf as its Chairman or Chief executive Officer and his address as its official address in New York.

105.    Throughout the parties' dealings, Jay Kopf falsely and fraudulently referred to "WBMI" as the contractor, even stating in writing that "the boys at WBMI must make a decision how far they are willing to go without additional funding…" when he knew that JMK Construction

Group, Ltd. was in fact the true contractor and he was an undisclosed principal of the nominal contractor.

106. Prior to issuance of the building permit, defendants dealt with the City of Long Beach using the William B. May name, but the City's mail to that entity relating to the permit application (no. 0096944 submitted 9/14/04) was simply returned as undeliverable.

107. Examples of defendants' fraudulent, criminal use of the "WBM International Development LLC" or "WBMID" name and communications with plaintiff without complying with N.Y.G.B.L. § 130 include:

    (a) January 4, 2006 letter from JMK Construction Ltd. and Jay Kopf;

    (b) January 10, 2006 letter from Nelson Li, with copies to George F. Donohue and Jay Kopf;

    (c) June 26, 2003 Overhaul Plan and discussions relating to same;

    (d) February 2004 Professional Assessment Plan and discussions relating to same;

    (e) Discussions and meetings on January 12, 13, 16, 2006 and June 6, 2006 and resultant documents involving plaintiff's officials and defendants WBM-JMK, John A. Varacchi, Jay Kopf, George F. Donohue and Nelson Li and

    (f) Applications for payment submitted to plaintiff listing "WBM International Development LLC" or "WBMI International" as the contractor.

108. Even as late as October 4, 2006, Nelson Li represented in writing that George F. Donohue was "President" of WBMI International Development LLC". In fact, no such entity even existed.

109. Meetings were held at plaintiff's site in Long Beach, New York on January 12 and 13,

2006 and defendants (still using the false "WBM International Development LLC" name) demanded still more money and new economic terms and continued to falsely indicate that WBM was the general contractor on the Air China Project.

110.    On June 6, 2006, at another meeting in plaintiff's New York offices, Nelson Li, John A. Varacchi, Jay Kopf and George F. Donohue appeared (from non-entity "WBM International LLC") and claimed problems with obtaining a Certificate of Occupancy and fraudulently induced plaintiff to sign a June 26, 2006 modification, pursuant to which another almost $300,000 was paid.

111.    Although by October 19, 2006 plaintiff had paid WBM 95% of all amounts set forth in the May 2005 Agreement, only 70% of the work had been completed, and JMK Construction and Jay Kopf were now stating it would not be completed until March 2007.

112.    The failure to timely complete the work was in violation of defendants' written assurances in May 2005 and later on October 4, 2006 that the Air China Project would be completed by November 30, 2006.

113.    The GMAC defendants faxed fraudulent bills for defendants (on "WBM International Development LLC" letterhead) on various dates, including March 2, 2006, March 7, 2006, March 9, 2006, March 13, 2006, March 23, 2006, June 28, 2006, July 31, 2006, August 1, 2006 and October 3, 2006.

114.    On September 7, 2006, defendants Nelson Li, acting on behalf of WMB/JMK International LLC (d/b/a/ WBM), appeared at the New York offices of plaintiff and was questioned regarding WBM. Again, he lied about WBM and its background. (Plaintiff still had never been told of WMB/JMK International LLC or Jay Kopf's involvement in that company or the surreptitious filing of the Certificate of Assumed Name post-May 2005 Agreement.)

115.    On January 4, 2006, defendants Jay Kopf and JMK Construction Group, Ltd. wrote to

plaintiff stating that "We are working closely with the Nassau County Fire Marshall's Office" and "We look forward to securing a new Certificate of Occupancy" and "[t]he Air China Project continues to move forward." This too was false.

116.    Due to defendants' negligence and breach of their obligations, they also allowed the building permit for the Air China Project to lapse on July 22, 2006, resulting in the issuance of Building Code Violations.  Defendants did not even seek to reinstate or renew the expired permit from July 22, 2006 until October, 2006.

117.    George F. Donohue and Nelson Li met with plaintiff's officials on September 7, 2006 and committed to complete the Project within thirty (30) days.  In reasonable reliance upon that false promise, another $100,000 was paid by plaintiff, but defendants against did nothing to complete the Project.

118.    Defendants, by letter mailed October 31, 2006 from Jay Kopf and JMK Construction Group Ltd., waited until November 8, 2006 to pay the $4,000 renewal fee and thereby renew with the City of Long Beach the long-expired permit for the Air China Project.  That negligent failure resulted in a Building Code Violation (§ 7-34A) issued October 11, 2006 by the City of Long Beach.

119.    In other words, defendants unlawfully performed construction without the necessary permit in place from July 23, 2006 until November 8, 2006.

120.    On May 24, 2006, in the United States District Court, Southern District of New York (Case no. 06 CV 3924) (Judge Sprizzo), William B. May Jr. Family Limited Partnership, as plaintiff, sued GMAC Real Estate, LLC, George F. Donohue, Christian M. Deutsch, William B. May Commercial Inc., 1051 Brant Holding Company LLC (named after Deutsch's residential address) and others, all as defendants, claiming that they had used the William B. May name

28

without consent, approval or authorization in violation of the Lanham Act, the parties' contracts, and the common law of false advertising and unfair competition.

121. Plaintiff demanded an injunction. All defendants appeared by the same counsel and an injunction against all defendants, baring their use of the "William B. May" name, quickly was issued as part of a settlement. Prior to the Federal Court injunction, Christian M. Deutsch had used the William B. May trade name and mark, pursuant to a non-exclusive license agreement with trademark owner William B. May, Jr. Family Limited Partnership. That license, later terminated, did not cover real estate development. By License Agreement dated October 1, 2003, those rights were assigned exclusively to another entity in which neither Christian M. Deutsch nor his cohorts (George F. Donohue, Jay Knopf, Nelson Li and John A. Varacchi) were involved.

122. In contravention of the Federal Court injunction, George F. Donohue continues to brazenly advertise himself as a Trump Exp/Real Estate & Wealth Expo exhibitor as "President" of the "distinguished" real estate company, William B. May International who (presumably as an expert) will cover "How to Avoid Scams." He operates out of GMAC's New York offices.

123. By November 2006, defendants had essentially abandoned the Project, as Jay Knopf and JMK Construction, the supposed "sub-contractors", kept holding plaintiff up for more money.

124. On March 1, 2006, defendants through George F. Donohue promised that the Air China Project would be completed by August 31, 2006. It was and still is not. Instead, on March 9, 2006, defendants through George F. Donohue demanded yet more money and change orders.

125. On October 4, 2006, George F. Donohue wrote to plaintiff and did so as "President" of "GMAC Real Estate International Group" at 505 8th Avenue, 8th Floor, New York, NY, stating that "[y]our Project is important to us…" The only thing that was "important" was to try to fleece more money from plaintiff.

126.    Further, Jay Kopf's general contractor's license (no. 2581/07) expired April 30, 2007 (yet he and the other defendants continued demanding payments) and the required Workers' Compensation coverage he obtained (policy EC007088) expired April 1, 2006 and the required general insurance (policy GLW782413-0/000) expired July 23, 2005. Thus, defendants unlawfully acted and were paid as contractors in the City of Long Beach without the required license and insurances.

127.    As part of the scheme to defraud plaintiff and coerce yet more money, defendants created another "agreement" and faxed it from defendants GMAC Real Estate IPG on April 27, 2007 ("the April Agreement") following a February 28, 2007 meeting at Craven Corporation's offices.

128.    In the February 28, 2007 meeting and the April Agreement, signed by George F. Donohue as "President" of WBM International Development LLC, defendants continued their pattern of fraud by:

> (a)  Referring to "WBM International Development LLC" as "general contractor";
>
> (b)  Promising to obtain the required Certificate of Occupancy and complete the Project in its entirety by June 18, 2007; and
>
> (c)  Reiterating the terms and conditions of the fraudulent May 31, 2005 Agreement.

129.    Even as late as March 2007, at that point unlicensed JMK and Jay Kopf demanded a payment of $200,000, but still did not complete the Project.

130.    Defendants' fraud continues to date. By letter dated September 12, 2007 (but delivered two weeks later) George F. Donohue alleged that plaintiff somehow was guilty of "breech" (sic) of agreement with the non-entity "WBM International Development LLC" and demanded $329,411 "immediately". George F. Donohue made this demand on the letterhead of the non-

30

entity, from the office of Christian M. Deutsch and GMAC and copied Nelson Li, John A. Varacchi and Jay Kopf.

131.    By letter, dated July 24, 2007, plaintiff demanded of Nelson Li, George F. Donohue, John A. Varacchi, WBM and GMAC a full accounting. To date, none has been provided.

132.    Defendants failed to adequately respond to written requests made on behalf of plaintiff on July 24 and 25, 2007, August 14, 2007 and October 17, 2007 for copies of invoices, checks and other vital documentation regarding the Project.

133.    By November 22, 2006, defendants had demanded $424,355 over and above the total price $3,950,000 they had set forth in the May 2005 Agreement.

134.    Each payment was made to non-entity "WBM International Development LLC" and then secretly deposited (without endorsement) by defendants. Defendants repeatedly were overpaid: as early January 2007, there had been overpayments in excess of $250,000.

135.    The name "WBM-JMK International LLC (d/b/a/ WBM) was revealed only when Defendants under threat of litigation in July 2007 finally provided to plaintiff partial copies of some checks ostensibly made to subcontractors.

136.    Defendants secretly deposited and disbursed plaintiff's funds into an account entitled "WBM-JMK Development LLC" (which plaintiff first discovered in August 2007). Of course, that entity (secretly formed January 2005) was neither a signatory to any agreement with plaintiff, nor affiliated with William B. May. By written request, dated August 4, 2007, to George F. Donohue, John A. Varacchi, Jay Kopf and GMAC, plaintiff demanded an explanation, but to date has received none.

137.    By letter (copied to John A. Varacchi) dated July 24, 2007, George F. Donohue and

WBM were ordered to stop all work on the Project. Finally, by letter dated August 14, 2007, the relationship was terminated and demand for the return of $282,710.73 belonging to plaintiff was made, which defendants ignored.

138.    Throughout their dealings with plaintiff, each of the individual defendants falsely and fraudulently represented that each was a legitimate representative of William B. May.

139.    Upon information and belief, Jay Kopf is the sole principal of JMK Construction Group, Ltd., as well as a member in WBM-JMK Development LLC (together with George F. Donohue, Nelson Li and John A. Varacchi).

140.    Pursuant to applicable law, plaintiff should be permitted to pierce the veil of a limited liability company such as WBM-JMK Development LLC to pursue claims against Jay Kopf, George F. Donohue, Nelson Li and John A. Varacchi where as here (a) they exercised complete domination of the company with respect to the transaction at issue and (b) such domination was used to commit a fraud or wrong against plaintiff.

141.    The control that these defendants exercised, over the shell limited liability company they had created, included disregard of corporate formalities; undercapitalization; and common office space or telephone number.

142.    Correspondence was addressed by Jay Kopf and JMK Construction Group, Ltd. to Nelson Li and "WBM International Development LLC" to create the false appearance that Jay Kopf and JMK had no interest in that entity and were arms length sub-contractors.

143.    JMK Construction Group Ltd. is a New York corporation formed on March 21, 2000 and Jay Kopf is its Chairman and Chief Executive Officer. Its address for the service of process (156 5th Avenue, Suite 834, New York, NY) is the same as that of TCC Interiors, Ltd.

144.    The defendants failed to complete the Project, with plumbing, electric and fire alarms not

even connected. The cost of completion will likely exceed $400,000, this after defendants were already paid at least $2 million over what the entire Project reasonably should have cost.

145. As a result of defendants' misconduct and unreasonable delays in completing the Project, the Property remained unusable for almost three (3) years, and plaintiff has been forced to house its flight crew in hotels (at a cost of $250,000) all while paying hundreds of thousands of dollars for taxes and utilities for the vacant Property.

146. As a proximate result of the negligence, fraud and breach of contract committed by defendants Jay Kopf, Nelson Li, George F. Donohue, John A. Varacchi, JMK Construction Group Ltd. and WBM-JMK, plaintiff was forced to engage the services of counsel and of Craven Corporation, a construction manager located at 150 East 42nd Street, New York, New York.

147. As a proximate result of defendants' fraud and misconduct, plaintiff was caused to pay Craven Corporation $136,055.46 and attorney Eliot Clauss $57,105.06, plus an additional $74,000 for utility charges and more than $103,000 for security services.

148. As a proximate result of defendants' misconduct, plaintiff paid $200,025 for the architectural services of IA (recommended by George F. Donohue and Nelson Li).

149. The defendants' own "accounting" records revealed payments to a defunct corporation (New Ha Ha Construction Inc.) in excess of $1 million to companies, (i.e., TCC Interiors, Ltd. and JMK Construction Group, Ltd) owned and controlled by Jay Kopf.

150. Throughout the Project, defendants converted plaintiff's funds by repeatedly demanding overpayments, and then siphoning off those funds.

151. The work performed by defendants was substandard and resulted in, amongst other things, a rejection of automatic sprinkler plans as they were in violation of New York State legal requirements.

152. Defendants negligently failed to obtain necessary permits prior to installing sprinklers,

resulting in additional service delays and expense.

153.    Each and every payment request and change order request was fraudulently made in the name of WMB International Development LLC, using the GMAC address.

154.    The City of Long Beach expressly required that the Air China Project be performed by a Long Beach licensed contractor, and none of the defendants (other than JMK Construction Group Ltd.) even has such a license.

155.    Each and every time defendants represented to plaintiff that "WBM International Development LLC" was the general contractor (and they never stopped doing so), it was a material lie.

156.    At no time were defendants even lawfully authorized to use the name "WBM International Development LLC" and nevertheless they criminally used that name in dealing with plaintiff and others in contravention of N.Y. General Business Law § 130.

157.    Throughout the parties' dealings, defendants repeatedly, willfully and materially misrepresented the facts again by falsely advising plaintiff that:

        (a)  WBM   International   Development   LLC   was   a professional U.S. construction company; and

        (b)  Nelson Li somehow was involved in all aspects of the Project.

158.    The defendants materially promised that the "contractor" WBMID would have insurance in its own name, with plaintiff as additional insured.  This requirement was never met.

159.    Defendants unlawfully and repeatedly threatened to stop work unless change orders were executed and they thereby extorted more monies from plaintiff.

160.    Defendants never posted any indication at 505 8th Avenue (or anywhere else) that "WBM International Development LLC" was an alias for WBM-JMK Development LLC.  That failure constituted a crime pursuant to NY General Business Law § 130.

161. In contravention of the Federal Court injunction, George F. Donohue continues to act as a licensed real estate broker (license #31D01025975) under the business of William B. May Commercial Inc. (operating out of GMAC's offices). In contravention of the Federal injunction, GMAC also lists on its website the following licensed real estate salespeople (whose licenses - #40CH1033400 and 40CH1089052 - are under William B. May Commercial Inc.'s control): Chae Hee Seek and Katherin G. Chen.

162. The GMAC website lists George F. Donohue as "President" of "GMAC Real Estate IPG" and lists the same address that George F. Donohue, Nelson Li and defendants WBM used in their dealings with plaintiff.

163. 1051 Brant Company LLC ("Brant") was a domestic limited liability company whose sole owner was Christian M. Deutsch (1051 Brant also is Deutsch's residential address in Pennsylvania). Through Brant, Christian M. Deutsch filed a trademark/service application for "William B. May" with the United States Patent and Trademark Office.

164. Further, according to the New York Secretary of State, Christian M. Deutsch is still listed as Chairman and Chief Executive Officer of an active and existing New York Corporation named "William B. May Commercial, Inc." and George F. Donohue is still listed as its "principal Executive Officer." This too violates an injunction issued by this Court.

165. Defendants Nelson Li and George F. Donohue, working from the offices of and in concert with GMAC and Christian M. Deutsch, continue to deceive members of the public in general and Chinese businessmen in particular.

166. For instance, using the GMAC address and William B. May's old fax number, George F. Donohue and Nelson Li describe themselves as the "executive committee of the general assembly in New York" of something they call "China - United States Conference of Economic Exchanges" and, in violation of a Federal Court Order, they still link themselves to William B.

May and its history dating to 1866 and its 240 offices and they direct the public to GMAC's website.

167.    Defendants Nelson Li, George F. Donohue and Christian M. Deutsch use the "GMAC Real Estate IPG" name on their website (with the 505 8th Avenue address) but there is no such legal entity authorized to do business in this State.  GMAC Real Estate LLC is a Delaware limited liability company, formed February 19, 2002 and has never filed any alias or doing business certificate as required by N.Y. General Business Law § 130.  Thus, once again, the defendants are engaging in criminal misconduct (Id.) in using an unlicensed, unauthorized alias.

168.    GMAC's website lists George F. Donohue as "President" and Nelson Li as "Managing Director".  It lists the same address above and fax that defendants used for WBM in their fraudulent dealings with plaintiff.

169.    GMAC's website, designed to convince the public to engage GMAC, Nelson Li, George F. Donohue and/or Christian M. Deutsch for real estate business has Christian M. Deutsch listed as its CEO.  He is not a licensed real estate broker or salesman.  Upon information and belief, GMAC in New York has no license or assets, but is an entity used by the defendants to defraud the unsuspecting public, including plaintiff.

170.    At all times relevant, defendants each were employed or associated with an enterprise affecting interstate or foreign commerce and conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

171.    That racketeering included mail fraud, which is indictable under 18 U.S.C. § 1341 and wire fraud, indictable under 18 U.S.C. § 1343.

172.    The scheme to defraud involved defendants' knowing and intentional participation and the use of interstate mails or wire transmissions in furtherance of the scheme.

173.    Further, common law fraud exists – the defendants' material, false representations, with

36

an intent to deceive, detrimentally and reasonably relied upon by plaintiff, in connection with a classic bait and switch scheme was employed by defendants.

174.    Defendants also have violated New York General Business Law § 349, by engaging and continuing to engage in practices that are materially deceptive and misleading, causing injury to plaintiff.

175.    By so doing, defendants thereby continued to deceive plaintiff into believing that William B. May was behind the Air China Project.

176.    Defendants' fraud on the public now is based primarily from GMAC's 505 8th Avenue offices, where George F. Donohue also has set up "International Properties Group Inc." and "Real Estate Capital of America, Inc.", two New York corporations designed to mislead the public into believing that GMAC IPG New York is anything other than a shell and that Nelson Li and George F. Donohue are anything other than scam operators.

177.    Today, the message on the answering machine for WBM's supposed telephone number [(212) 620-2611] is answered by "George Donohue, President of GMAC International Property Group."

178.    To this day, calls to the supposed phone number of WBM are answered at GMAC's office by Christian M. Deutsch as follows: "This is Chris" and he then fraudulently directs calls for WMB as follows: "They moved to 575 Madison Avenue a while ago." Upon information and belief, the GMAC defendants and Christopher Deutsch (a) knew or reasonably should have known of defendants' fraudulently activities conducted out of 505 8th Avenue; and (b) were paid, directly or indirectly, for permitting those defendants to use the 505 8th Avenue facility as a base of operations for the fraud.

179.    Meanwhile, the New York Secretary of State still lists as an active corporation "William

37

B. May International Inc.", with Christopher Deutsch as Chairman and George F. Donohue as principal Executive Officer.

## The Enterprise and Predicate Acts

180.    The scheme was carried out by an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), consisting of an ongoing association-in-fact, which included defendants and others. The members of the enterprise were a continuing unit engaged in a particular course of fraudulent conduct by working together to achieve their common goal of defrauding plaintiff of millions of dollar, converting these funds to their own use through sham legal positions, and attempting to obtain additional funds through these legal positions.

181.    Defendants' fraudulent conduct was concerted and its object was to participate in the conduct and affairs of the enterprise through a pattern of racketeering activity that included violations of the federal mail and wire fraud statutes. Defendants' unlawful activities affected interstate and foreign commerce, and plaintiff has been injured by reason of the conduct described in this complaint.

182.    Each of the actions taken by the defendants and others described in the complaint, was taken in furtherance of the fraudulent schemes alleged herein and in concert with other, and gives rise to plaintiff's claims involving violations of federal racketeering laws, securities fraud, common law fraud, conversion, breach of fiduciary duty, unjust enrichment, negligence, negligent misrepresentation and an accounting.

183.    Defendants engaged in repeated acts of mail and wire fraud in connection with the willful misrepresentations contained in the telephone calls, email transmissions and mailings described herein, all in violation of 18 U.S.C. §§1341 and 1343.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (RICO)

184.   The allegations of paragraphs "1" through "183" are repeated and realleged as though fully set forth herein.

185.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) because they are individuals or entities capable of holding legal and beneficial interests in real property. Defendants were at all times material to this action employed by or associated with the enterprise described above, the activities of which affect interstate and foreign commerce.   Although defendants participated in the enterprise and were part of it, defendants also have an existence separate and distinct from the enterprise.   The enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which defendants engaged.

186.   Defendants participated in the fraudulent schemes described above and repeatedly use or caused the use of the mails and interstate wires in furtherance of these schemes in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).   These mailings and wirings include, but are not limited to each and every one of the mailings and writings described above.

187.   Each of the above-described violations by defendants of the mail fraud and wire fraud statues, 18 U.S.C. §§ 1341 and 1342, constituted an instance of racketeering activity as defined in 18 U.S.C. §1961(1).

188.   The multiple acts of racketeering activity which were committed in the course of related fraudulent schemes over a substantial period of time, the last of which occurred within ten years after the commission of a prior act of racketeering activity, constitute a "pattern of racketeering activity", as defined in 18 U.S.C. §1961(5).

189.   Defendants conducted and participated in the conduct of the affairs and the operation and

39

management of the enterprise through the above-described pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

190.    Plaintiff has been injured in its business and property as direct and proximate result of the violations of 18 U.S.C. § 1962. Therefore, plaintiff demands judgment against defendants jointly and severally for threefold the damages suffered (in excess of $6 million), plus interest, costs, reasonable attorneys' fees and such other and further relief as the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### (RICO CONSPIRACY)

191.    The allegations of paragraphs "1" through "183" and "185" through "190" are repeated and realleged as though fully set forth herein.

192.    Defendants willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c); that is, to conduct or participate directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). This racketeering activity consisted of repeated violations of the federal mail fraud and wire fraud statues.

193.    Defendants knew of, agreed to and acted in furtherance of the overall objective of the conspiracy by, among other things, providing false documents and false information to plaintiff to fraudulently obtain $4 million and by asserting sham legal positions to prevent recovery of the funds my plaintiff and to unlawfully obtain additional funds.

194.    Plaintiff has been injured in its business and property as a direct and proximate result of the conspiracy to commit the predicate acts of mail fraud and wire fraud in violation of 18 U.S.C. § 162(d). Therefore plaintiff demands judgment against defendants jointly and severally for threefold the damages suffered (in excess of $6 million), plus interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
## (BREACH OF FIDUCIARY DUTY)

195.    Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "183" as though fully set forth herein.

196.    At all times relevant hereto, defendants had complete control over plaintiff's funds. which had been provided to them for the completing the Project.

197.    Defendants owed plaintiff a fiduciary duty to act in plaintiffs best interest with respect to its fund they held.  Defendants were bound to exercise the utmost good faith and reasonable care in the performance of the duties owed to plaintiff.

198.    By reason of defendants' failure to serve plaintiff in a proper, skillful, prudent and diligent manner as alleged herein and because defendants directly breached their fiduciary duty. plaintiff has been damaged in an amount not yet fully determined.  Therefore, plaintiff demands judgment against defendants jointly and severally for damages exceeding $4 million, plus interest, costs, reasonable attorneys' fees, punitive damages, and such other relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
## (CONVERSION)

199.    Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs "1 " through " 183" as though fully set forth herein.

200.    Plaintiff entrusted defendants with funds that were used in accordance with defendants' representation.

201.    However, defendants did not actually use plaintiff's money in an appropriate manner and converted all or part of plaintiff's funds.

202.    Defendants have each acted wantonly and intentionally.

203.    Defendants have each acted in total violation of plaintiff's rights. As a proximate result of defendants' wrongful and intentional conversion of plaintiff's funds, plaintiff has been damaged. Therefore, plaintiff demands judgment against defendants jointly and severally for damages exceeding $4 million, plus interest, costs, reasonable attorneys' fees, punitive damages and such other relief as the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
## (UNJUST ENRICHMENT)

204.    Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "183" as though fully set forth herein.

205.    Defendants fraudulently obtained funds from plaintiff.

206.    Defendants received and used plaintiff's funds for their personal benefit.

207.    Because defendants fraudulently obtained plaintiff's funds, it is not just, fair, equitable, or conscionable for defendants to benefit from their ill-gotten gains.

208.    As a consequence of the foregoing, defendants have been unjustly enriched in an amount to be determined at trial. Therefore, plaintiff demands judgment against defendants jointly and severally for damages exceeding $4 million, plus interest, costs, reasonable attorneys' fees, punitive damages and such other relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
## (NEGLIGENCE)

209.    Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "183" as though fully set forth herein.

210.    Defendants owed plaintiff, at a minimum, a duty of reasonable and ordinary care in their dealings with plaintiff, including the care and competence of a reasonable general contractor.

211.    Defendants have failed to perform the duties of care imposed upon them when they were

entrusted with plaintiff's funds, thereby resulting in damages to plaintiff.

212.     Plaintiff's funds and account were handled in a negligent manner incompatible with plaintiff's stated objectives..

213.     As a proximate result of defendants' negligence, plaintiff has been damaged.

214.     Therefore, plaintiff demand judgment against  defendants jointly and severally for damages exceeding $4 million plus interest, costs, reasonable attorneys' fees, punitive damages and such other relief as the Court deems just and proper.

### SEVENTH CLAIM FOR RELIEF
### (NEGLIGENCE MISREPRESENTATION)

215.     Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs "1" though "183"as though fully set forth herein.

216.     Defendants were, at a minimum, careless in imparting words upon which plaintiff and others were expected to rely.

217.     Plaintiff, unaware of the misstatements made by defendants, reasonably relied on the statements and representations of defendants.  Defendants were aware of plaintiff's reliance, and plaintiff's reliance caused it to act or fail to act.

218.     Defendants induced plaintiff to invest funds on the basis of false information that defendants supplied to plaintiff.

219.     Defendants, individually, and as agents of one another and others, were the authors of words expressed directly to plaintiff, who was owed a duty to care by defendants, with knowledge that the words would induce reliance or be acted upon by plaintiff.

220.     As a result of defendants' misrepresentations and omissions, plaintiff has suffered economic harm.

221.     Therefore plaintiff demands judgment against defendants jointly and severally for

damages exceeding $4 million plus interest, costs, reasonable attorneys' fees, punitive damages, and such other relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF
### (COMMON LAW FRAUD IN THE INDUCEMENT AND DECEIT)

222.    Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs "1" through " 183 " as though fully set forth herein.

223.    Defendants intentionally made various material misrepresentations to plaintiff concerning the Project and William B. May all as forth above.

224.    Defendants knew of the falsity of their misrepresentations when made, and at the time of making the misrepresentations, made them with the intent of deceiving and defrauding plaintiff and of inducing plaintiff to transfer monies to defendants.

225.    Defendants knew that their lies and omissions to state material facts to make statements concerning the Project, the real contractor and William B. contributed to the deception.

226.    Plaintiff was unaware of the falsity of the misrepresentations, and believed them to be true, and reasonably relied upon them.

227.    Defendants, without plaintiff's informed consent, wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated, converted and stole plaintiff's funds.

228.    Defendants further executed such transactions and obtained control over plaintiff's funds for the purpose of enriching themselves and such conduct was in complete and total disregard for plaintiff's interests.

229.    As a result of defendants' misrepresentations and omissions, plaintiff has suffered economic harm.

230.    In view of the flagrant, wanton and intentionally fraudulent conduct on the part of the defendants, plaintiff is entitled to punitive damages in an amount to be determined at trial.

231.    Therefore, plaintiff demands judgment against defendants jointly and severally for damages exceeding $4 million plus interest, costs, reasonable attorneys' fee, punitive damages and such other relief as the Court deems just and proper.

## NINTH CLAIM FOR RELIEF
### (AN ACCOUNTING)

232.    Plaintiff repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "183" as though fully set forth herein.

233.    Because they were entrusted with plaintiff's funds, defendants owed fiduciary duties to plaintiff.  These duties required defendants at all times to act on behalf of plaintiff in good faith, to exercise the care that an ordinary prudent person in a like position would exercise under similar circumstances, and to conduct themselves in a manner they reasonably believed to be in plaintiff's best interest.  As part of their fiduciary duties, defendants at all times were required to be honest and candid and to make complete disclosure in their dealings with plaintiff.  Moreover, in their communications with plaintiff, defendants were obligated to do so honestly, candidly and completely in all material respects.

234.    Defendants breached their fiduciary and other duties to plaintiff, failed to faithfully execute their services in the various ways as described in the complaint and otherwise profited at plaintiff's expense thereby.

235.    As fiduciaries, defendants must account to their principal, plaintiff, for the funds that they received during the course of their fiduciary relationship with plaintiff.

236.    Therefore, plaintiff demands judgment against defendants requiring an accounting by plaintiff for the funds the defendants received from plaintiff, including an accounting for the interests on the funds they obtained as a result of their wrongful use of plaintiff's funds.

## TENTH CLAIM FOR RELIEF
## (GENERAL BUSINESS LAW § 349)

237.    Plaintiff repeats and realleges each and every allegation contained and set forth in

paragraphs "1" through "183" as though fully set forth herein.

238.    Defendants have violated New York General Business Law § 349, by engaging and

continuing to engage in practices that are materially deceptive and misleading, causing injury to

plaintiff and to the general public.

239.    Further, defendants continue to violate New York General Business Law § 349, and

consequently each should be found jointly and severally liable to the plaintiff for treble damages

(in an amount to be established at trial, but believed to exceed $6 million), plus reasonable

attorney's fees and further, each should be permanently enjoined from continuing to defraud the

general public.

### Wherefore

By reason of the foregoing, plaintiff prays for relief against each defendant jointly and severally

as follows:

     (A)    Rescinding the May 2005 Agreement as having been procured by fraud;

     (B)    Awarding plaintiff treble damages in an amount to be established at trial but believed to be at least $6 million, plus punitive damages in an amount to be established at trial but believed to be $1 million;

     (C)    Awarding plaintiff pre-judgment and post-judgment interest as a result of the wrongs complained of herein;

     (D)    Awarding plaintiff its costs, expenses and reasonable attorneys' fees;

     (E)    Enjoining defendants from further defrauding the public; and

(F)    Awarding plaintiff such other relief as the Court shall
       deem just and proper.

**JURY DEMAND**
**PLAINTIFF HEREBY DEMANDS A TRIAL**
**BY JURY ON ALL ISSUES SO TRIABLE.**

Dated:        New York, New York
              December 5, 2007

                        Yours respectfully,


                        Jacques Catafago (7894)
                        THE CATAFAGO LAW FIRM, P.C.
                        The Empire State Building
                        350 Fifth Avenue, Suite 4810
                        New York, NY 10118
                        (212) 239-9669

Docket No. _____07_____ CV _11128_ (LST) (DFE) ECF CASE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AIR CHINA LIMITED,

Plaintiff,

- against -

NELSON LI (a/k/a SHENG LI), JOHN A. VARACCHI
(a/k/a JOHN A. DAVIS), GEORGE F. DONOHUE,
JAY KOPF (a/k/a JACOB M. KOPF)
CHRISTIAN M. DEUTSCH,
WBM-JMK DEVELOPMENT LLC (d/b/a WBM
INTERNATIONAL DEVELOPMENT),
JMK CONSTRUTION GROUP LTD.,
TCC INTERIORS, LTD.,
GMAC REAL ESTATE LLC,
GMAC REAL ESTATE IPG NEW YORK,

Defendants.

# COMPLAINT

## THE CATAFAGO LAW FIRM, P.C.
Attorneys for Plaintiff
The Empire State Building
350 Fifth Avenue, Suite 4810
New York, New York 10118
212.239.9669 tel
212.239.9688 fax

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
AIR CHINA LIMITED,

                                        : Case No.
                                       07 CV 11128
                   Plaintiff,      (LTS)(DFE)

               -against-        :

                                      : **ANSWER AND**
                                      **COUNTERCLAIM**
NELSON LI (a/k/a SHENG LI),       :
JOHN A. VARACCHI (a/k/a JOHN A. DAVIS),
GEORGE F. DONOHUE, JAY KOPF       **TRIAL BY JURY**
(a/k/a JACOB M. KOPF) CHRISTIAN M. DEUTSCH, : **DEMANDED**
WBM-JMK DEVELOPMENT LLC
(d/b/a WBM INTERNATIONAL DEVELOPMENT), JMK :
CONSTRUCTION GROUP LTD.,
TCC INTERIORS, LTD., GMAC REAL ESTATE LLC,   :
GMAC REAL ESTATE IPG NEW YORK,
                                       :

                       Defendants.  :
------------------------------------------------X

        Defendants, by their attorney, Edward Weissman, Esq., as
and for their Answer to the complaint asserted by plaintiff Air
China Limited ("Air China"), set forth as follows:

### Preliminary Statement

        The plaintiff in this action is an arm or
instrumentality of the repressive Peoples Republic of China which,
through this lawsuit, unfairly has targeted United States citizens
and their businesses in an attempt to blame such individuals and
businesses for the contractual failings and other missteps of Air
China in having a facility in Long Beach, New York renovated. Air
China repeatedly breached the construction contract and its
amendment, all the while placing Air China personnel in charge of

the construction process who had little or no experience in the construction field.

Furthermore, as the facts at trial will demonstrate, Air China not only failed to pay defendant WBM-JMK Development LLC ("WBM-JMK") in full for construction services performed, as agreed, but also failed to pay others, including, upon information and belief, an architect, an engineer and governmental authorities, in an unmistakable pattern which led directly and contributed to the delays and problems which beset construction at the facility.

Despite the obstacles created by Air China, the evidence at trial will show that ninety (90%) percent of the project was successfully completed by WBM-JMK, and approved by Air China. At the time Air China impermissibly "terminated" the construction contract in an attempt to escape its remaining contractual obligations to WBM-JMK, the vast majority of the services had been successfully performed and completed.

Air China, through its attorneys, have attempted to distort the facts in order to transform a garden-variety action for breach of contract - - - in which Air China is, in fact, the breaching party - - - into a massive "conspiracy" against Air China, which is demonstrably untrue. The baseless allegations of Air China violate <u>Fed</u>. <u>R</u>. <u>Civ</u>. <u>P</u>. 11, as the evidence will show.

### ANSWER

1.    Deny each and every allegation set forth in paragraphs 1 through 4 of the complaint.

2

2.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraphs 5 through 7 of the complaint, except aver, upon information and belief, that plaintiff is owned, operated and controlled by the Peoples Republic of China, one of the most oppressive regimes on the face of the earth.

3.    Deny each and every allegation set forth in paragraphs 8 through 17 of the complaint.

4.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraphs 18 through 22 of the complaint.

5.    Deny each and every allegation set forth in paragraphs 23 through 30 of the complaint.

6.    With respect to paragraph 31 of the complaint, admit only that Jay Kopf is the president of JMK Construction Group Limited ("JMK") and deny the balance of the allegations.

7.    Deny each and every allegation set forth in paragraph 32 of the complaint, and admit only that JMK maintains offices at 1123 Broadway, New York, New York.

8.    Deny each and every allegation set forth in paragraphs 33 through 183 of the complaint, expressly aver (i) that any activity taken by any of the defendants, including WBM-JMK, was in furtherance of the contractual obligations of WBM-JMK under the contract for the construction of a facility for the plaintiff in Long Beach, Mew York and (ii) by lumping together the

defendants without distinction it is impossible to determine whether the allegations relate to some or all of the defendants.

9.    With respect to paragraph 184 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

10.    Deny each and every allegation set forth in paragraphs 185 through 190 of the complaint, and further aver that, as pled, it is impossible to determine which defendants, it is claimed, engaged in various activities.

11.    With respect to paragraph 191 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 and 185 through 190 of the complaint, as if more fully set forth herein at length.

12.    Deny each and every allegation set forth in paragraphs 192 through 194 of the complaint.

13.    With respect to paragraph 195 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

14.    Deny each and every allegation set forth in paragraphs 196, 197 and 198 of the complaint.

15.    With respect to paragraph 199 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

16.    Deny each and every allegation set forth in paragraphs 200 through 203 of the complaint.

17.    With respect to paragraph 204 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

18.    Deny each and every allegation set forth in paragraphs 205 through 208 of the complaint.

19.    With respect to paragraph 209 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

20.    Deny each and every allegation set forth in paragraphs 210 through 214 of the complaint.

21.    With respect to paragraph 215 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

22.    Deny each and every allegation set forth in paragraphs 216 through 221 of the complaint.

23.    With respect to paragraph 222 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

24.    Deny each and every allegation set forth in paragraphs 223 through 231 of the complaint.

25.    With respect to paragraph 232 of the complaint, defendants repeat, reiterate and reallege each and every denial, denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

26.    Deny each and every allegation set forth in paragraphs 233 through 236 of the complaint.

27.    With respect to paragraph 237 of the complaint, defendants repeat, reiterate and reallege each and every denial,

denial of knowledge or information sufficient to form a belief or admission heretofore interposed by them with respect to paragraphs 1 through 183 of the complaint, as if more fully set forth herein at length.

28.  Deny each and every allegation set forth in paragraphs 238 and 239 of the complaint.

## FIRST AFFIRMATIVE DEFENSE

29.  Air China's claims are barred by its own misconduct, including, but not limited to breaches by Air China under its construction contract with WBM-JMK, and other defaults and omissions by Air China which delayed and hindered progress at the project.

## SECOND AFFIRMATIVE DEFENSE

30.  Air China's complaint is not well grounded in fact or law, and is predicated upon deliberate falsehoods and misinformation which even the most minimal investigation would have revealed as tainted and untrue.

## THIRD AFFIRMATIVE DEFENSE

31.  In spite of Air China's breaches, WBM-JMK completed ninety (90%) percent of the project when Air China wrongfully terminated the construction contract, without cause or justification, and without payment to WBM-JMK of the remaining amounts owing.

## FOURTH AFFIRMATIVE DEFENSE

32.  During all times relevant herein, Air China had the benefit of on site employees, professionals, including counsel, an

engineer, an architect and a consultant, to oversee compliance by WBM-JMK with the terms of the construction contract.

## FIFTH AFFIRMATIVE DEFENSE

33.    All party defendants, except for WBM-JMK, were not parties to the underlying construction contract and have been named as party defendants in this action solely to burden and harass them and cause them to accede to Air China's unjustified and contrived demands.

## SIXTH AFFIRMATIVE DEFENSE

34.    Air China placed in charge of the subject project employees who were not equipped to be placed in charge of a construction project and who were required to take orders and instruction from the regime in the Peoples Republic of China because such employees lacked any independent, decision-making authority.

## SEVENTH AFFIRMATIVE DEFENSE

35.    Air China's two purported RICO claims (First and Second Claims for Relief) fail, as a matter of law, in that, among other things, they lack specificity and detail, preferring to lump together all defendants without distinction, and do not meet the strict pleading requirements for the assertion of such claims.

## EIGHTH AFFIRMATIVE DEFENSE

36.    Air China seeks impermissibly to turn a garden-variety, albeit meritless, claim of breach of contract into a RICO action where there is no factual or legal basis supporting same. Same is a flagrant misuse of the statute.

8

## NINTH AFFIRMATIVE DEFENSE

37.    Plaintiff's Third through Ninth Claims for Relief are not legally cognizable, and must be dismissed.

## TENTH AFFIRMATIVE DEFENSE

38.    If Air China suffered any damages, as alleged in its complaint, such damages were the direct result of the actions or omissions of Air China itself or the actions or omissions of Air China's employees or agents.

## ELEVENTH AFFIRMATIVE DEFENSE

39.    Air China engaged in a pattern of failing to abide the rules and regulations of local governmental authorities regarding safety issues, failing to make requisite filings for approvals and failing to make payment of fees and taxes, leading to long delays and problems at the project. At times, certain of the defendants actually advanced such fees on behalf of Air China to avoid needless delay.

## TWELFTH AFFIRMATIVE DEFENSE

40.    During the project, Air China retained the services of an outside consultant, Craven Corporation, to oversee progress on the job, and which consultant oversaw and approved the work performed by WBM-JMK.

## THIRTEENTH AFFIRMATIVE DEFENSE

41.    Air China's participation under the construction contract was marked by incompetence, a refusal to comply with contractual obligations and a total disregard for legal requirements and governmental authority.

## FOURTEENTH AFFIRMATIVE DEFENSE

42.    Lack of privity of contract between Air China and all defendants except for WBM-JMK.

## FIFTEENTH AFFIRMATIVE DEFENSE

43.    Pursuant to the terms of the construction contract, Air China was required to pay WBM-JMK in full on all work performed by WBM-JMK before Air China could seek to terminate the contract.  Air China failed to do so.

## SIXTEENTH AFFIRMATIVE DEFENSE

44.    Air China suffered no damages.

## SEVENTEENTH AFFIRMATIVE DEFENSE

45.    Although Air China agreed to make additional payments to WBM-JMK, under an amendment to the contract prepared by Air China's counsel, it failed to make such payments and orchestrated events and excuses so as not to make such payments.

## EIGHTEENTH AFFIRMATIVE DEFENSE

46.    Air China is equitably and legally estopped from asserting its claims.

## NINETEENTH AFFIRMATIVE DEFENSE

47.    Air China's purported Claims for Relief fail to state claims upon which relief can be granted.

## TWENTIETH AFFIRMATIVE DEFENSE

48.    The selection of WBM-JMK as contractor for the project was the result of a bid process controlled by Air China

and an investigation conducted by it and its agents of the bidders.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

49.   Failure to name indispensable and necessary parties as defendants in this action.

**COUNTERCLAIM**

**A.    The Parties**

50.   WBM-JMK Development LLC ("WBM-JMK") is, and at all material times hereinafter mentioned was, a limited liability company duly organized an existing under and by virtue of the laws of the State of New York, and maintain offices within the Southern District of New York.

51.   Upon information and belief, Air China Limited is, and at all material times hereinafter mentioned was, a business entity duly organized and existing under and by virtue of the laws of the Peoples Republic of China, and maintains offices within the Southern District of New York.

**B.    Jurisdiction and Venue**

52.   This Court has jurisdiction over this action, pursuant to 28 U.S.C. § 1332(a), because the counterclaim is between citizens of different states and the amount in controversy, exclusive of interest and costs. And exceeds $75,000.00.

53.   The venue of this action is properly laid in the Southern District of New York, where most of the defendants either

reside or conduct business and where plaintiff maintains a place of business.

## C.  **Counterclaim by WBM-JMK**

54.  On or about May 31, 2005, WBM-JMK and Air China entered into a construction contract pursuant to which WBM-JMK was retained to renovate a facility for Air China, in Long Beach, New York, in accordance with the terms thereof.

55.  Pursuant to the terms of the construction contract, WBM-JMK was to be paid the agreed upon sum of $4,000,000.00, and which amount, was adjusted, from time to time, pursuant to further agreement of the parties, to $4,393.950.00.

56.  WBM-JMK undertook to and did perform the requisite services for Air China, under the terms of the construction contract, until Air China defaulted in meeting its contractual obligations to WBM-JMK, as a result of which work at the project by WBM-JMK ceased.

57.  At the time WBM-JMK ceased work at the project, ninety (90%) percent of all work had been successfully completed.

58.  The defaults by Air China consisted of, among other things, failing to pay WBM-JMK, as required under the construction contract, failing to pay the governmental authorities fees for permits, as well as taxes, failing properly or timely to file or seek approval for drawings with governmental authorities, failing to pay its architect and engineer, and other such conduct which impaired and hindered progress on the job, and, ultimately, brought work to a halt.

59. The serious problems and obstacles faced by WBM-JMK were exacerbated by the fact that personnel assigned by Air China to assist on the job were not trained in the construction field, did not appreciate or understand either the complexity of the work which had to be performed or the interplay between the construction work and local ordinances and rules regarding safety and payment of fees and taxes.

60. Efforts by WBM-JMK to seek payment from Air China for the amounts due and owing to WBM-JMK and/or to ensure that Air China met its other obligations so that progress on the project could proceed were met with resistance by Air China or were simply ignored by Air China.

61. By reason of the foregoing conduct on the part of Air China, which constitutes breach of contract, WBM-JMK has been damaged in the amount of $329,411.00 with interest thereon accrued and accruing.

WHEREFORE, defendants demand judgment against Air China Limited, as follows:

(a) Dismissing Air China Limited's complaint, in its entirety, with prejudice, and with the assessment of attorneys' fees and costs;

(b) Granting judgment to WBM-JMK Development LLC against Air China Limited, in the principal sum of $329,411.00 with interest thereon accrued and accruing;

(c)  Granting judgment to defendants for all legal fees and expenses incurred by defendants in their defense of Air China Limited's legally and factually flawed claims;

(d)  Together with such other, further and different relief as to the Court may seem just and proper.

Dated: New York, New York
       March 24, 2008

LAW OFFICES OF EDWARD WEISSMAN

By _____
   Edward Weissman, Esq. (EW-1340)
   Attorney for Defendants
   60 East 42nd Street
   47th Floor
   New York, New York 10165
   (212) 937-1520

P:\COMPANY SHARED\WEISSMAN\YG\CLIENTS\JMK CONSTRUCTION(KOPF)\AIR CHINA\CHINA.V.KOPF.ET.AL.ANSWER.AND.COUNTERCLAIM.DOC

14

Final – 05-31-05



# GENERAL TERMS AND CONDITIONS
# FOR CONSTRUCTION CONTRACT

**This document constitutes an integral part of the Contract between the Owner and Contractor named below for the Project named below. This document has not been translated into Chinese, and all parties agree this version is binding.**

**PROJECT:**      Air China Crew Residence Building
               485 West Broadway, Long Beach, NY


**OWNER:**        AIR CHINA LIMITED
               c/o Air China New York Office
               152 East 52nd Street
               New York, New York 10022


**CONTRACTOR:**    WBM INTERNATIONAL DEVELOLPMENT LLC
               505 8TH Avenue
               New York, New York 10018


**THE ARCHITECT:** IA – Interior Architects
               335 Madison Avenue
               New York, NY 10017

TABLE OF ARTICLES

1      GENERAL PROVISIONS

2      OWNER

3      CONTRACTOR

4      ADMINISTRATION OF THE CONTRACT

5      SUBCONTRACTORS

6      CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7      CHANGES IN THE WORK

8      TIME

9      PAYMENTS AND COMPLETION

Final – 05-31-05

10    PROTECTION OF PERSONS AND PROPERTY

11    INSURANCE AND BONDS

12    UNCOVERING AND CORRECTION OF WORK

13    MISCELLANEOUS PROVISIONS

14    TERMINATION OR SUSPENSION OF THE CONTRACT

Final – 05-31-05

## ARTICLE 1  GENERAL PROVISIONS

### § 1.1 BASIC DEFINITIONS

#### § 1.1.1 THE CONTRACT DOCUMENTS

See Standard Form of Agreement between Owner and Contractor, executed May        , 2005.

#### § 1.1.2 THE CONTRACT

The Contract Documents specified in the Standard Form of Agreement between the parties form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral.  The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.  The Contract may not be amended or modified except by a writing signed by both Owner and Contractor.  Changes in the Work are governed by Article 7.

#### § 1.1.3 THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

#### § 1.1.4 THE PROJECT

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

#### § 1.1.5 THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

#### § 1.1.6 THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

#### § 1.1.7 THE PROJECT MANUAL

The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

### § 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS

§ 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

§ 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

Final – 05-31-05

**§ 1.2.3** Unless otherwise expressly defined herein, all terms used herein shall have the meaning set forth in the "Glossary of Construction Industries Terms" (1970, the American Institute of Architects).

### § 1.3 CAPITALIZATION
**§ 1.3.1** Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

### § 1.4 INTERPRETATION
**§ 1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

### § 1.5 EXECUTION OF CONTRACT DOCUMENTS
**§ 1.5.1** The Contract Documents shall be signed by the Owner and Contractor.

**§ 1.5.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

### § 1.6 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE
**§ 1.6.1** The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and, in accordance with the provisions of the agreement between the Owner and Architect, the Owner and/or the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of Instruments of Service, except the Contractor's record set, shall be returned by Contractor to the Owner on its request, upon the earlier of the completion of the Work or termination of Contractor's services hereunder. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Owner's and/or Architect's or Architect's consultants' copyrights or other reserved rights.

## ARTICLE 2  OWNER
### § 2.1 GENERAL
**§ 2.1.1** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Section 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative or successor in interest as designated in writing to Architect and Contractor by the Owner.

Final – 05-31-05

§ 2.1.2 The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

## § 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER
§ 2.2.1  INTENTIONALLY DELETED.

§ 2.2.2 Except for permits and fees, including those required under Section 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

§ 2.2.3 The Contractor has obtained and review such surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site, as it has deemed necessary or appropriate for evaluating the project and for the proper and safe performance of the Work.

§ 2.2.4 Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner, when available, after receipt from the Contractor of a written request for such information or services.

§ 2.2.5 Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

## § 2.3 OWNER'S RIGHT TO STOP THE WORK
§ 2.3.1 If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3.

## § 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
§ 2.4.1 If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to correct such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

## ARTICLE 3  CONTRACTOR
§ 3.1 GENERAL
§ 3.1.1 The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

§ 3.1.2 The Contractor shall perform the Work in accordance with the Contract Documents.

Final – 05-31-05

**§ 3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

**§ 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR**

**§ 3.2.1** The Contractor hereby specifically acknowledges and declares that the Contract Documents are full and complete, are sufficient to have enabled the Contractor to determine the cost of the Work in order to enter into the Contract Documents and that the Drawings, the Specifications, and all Addenda are sufficient to enable it to construct the Work in accordance with all applicable laws, statutes, building codes and regulations, and otherwise to fulfill all its obligations hereunder, and to complete the Work and pay all costs thereof, including but not limited to material costs, equipment costs, contractors fees and related expenses of the Work within the Contract Sum. The Contractor further specifically acknowledges and declares that it has visited the site, examined all conditions affecting the Work, and is fully familiar with all of the conditions thereon and affecting the same. In addition, having carefully examined all the Contract Documents, as aforesaid, and having visited the site, the Contractor acknowledges and declares that there are no discrepancies, omissions, ambiguities or conflicts in the Contract Documents.

**§ 3.2.2** It is recognized that the Contractor's review of the Drawings, Specifications and all Addenda is made based on Contractor's knowledge and experience and in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents.

**§ 3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Section 3.2.2, the Contractor shall make Claims as provided in Sections 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Sections 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized or should have recognized such error, inconsistency, omission or difference and failed to report it to the Architect or Owner or acted imprudently.

**§ 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES**

**§ 3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Owner or the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner and/or Architect shall be solely responsible for any resulting loss or damage.

**§ 3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

**§ 3.3.3** The Contractor shall be responsible for inspection of portions of Work already performed (if any) to determine that such portions are in proper condition to receive subsequent Work.

Final – 05-31-05

## § 3.4 LABOR AND MATERIALS

§ 3.4.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

§ 3.4.2 The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order. All costs, including, without limitation, professional fees incurred as a result of the review of such substitutions shall be borne by the Contractor.

§ 3.4.3 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

## § 3.5 WARRANTY

§ 3.5.1 The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## § 3.6 TAXES

§ 3.6.1 The Contractor shall pay all sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## § 3.7 PERMITS, FEES AND NOTICES

§ 3.7.1 Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

§ 3.7.2 The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

§ 3.7.3 INTENTIONALLY DELETED.

§ 3.7.4 If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 3.8 INTENTIONALLY DELETED.

## § 3.9 SUPERINTENDENT

Final – 05-31-05

**§ 3.9.1** The Contractor shall employ a competent and experienced superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case. The Owner may from time to time require the Contractor to replace any member of its Project staff including the key members referenced above or the executive in charge, as the Owner deems necessary or desirable to complete performance of the Work.

## § 3.10 PROGRESS SCHEDULES AND MEETINGS

**§ 3.10.1** Upon commencement of the performance of the Work, the Contractor shall prepare and deliver to the Owner a Project Time Schedule, which shall incorporate sub-schedules for each separate element of, and trade involved in, the Work. The Project Time Schedule shall show a date for Substantial Completion of the Project (the "Substantial Completion Date") which is set forth in Amendment No. 1 and Exhibit C of the Agreement. Time is of the essence for performance of the Work by the Contractor on or before the Substantial Completion Date. The Contractor shall prepare, update and deliver to the Owner on a weekly basis, reporting schedules, in form acceptable to the Owner (the "Update Schedules") reflecting variances in the times (the "Project Times") set forth in the Project Time Schedule; specifically identifying with each Update Schedule (a) actual Project Times to date, and (b) anticipated actual Project Times to Substantial Completion, identifying reasons for changes, with recommendations for procedures which will allow any time additions to the Project Time Schedule to be made up or reduced as performance of the Work progresses, incorporating a detailed schedule for the construction operations of the Project, together with sub-schedules for each separate element of the Work, including realistic activity sequences and durations, allocation of labor and materials, processing of shop drawings and samples, and delivery of products requiring long lead time procurement. The Contractor shall promptly notify Owner of any anticipated delays affecting the Project with explanations thereof and recommendations with respect thereto, which may limit or reverse any adverse impact on the Project.

**§ 3.10.2** The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule as previously approved by the Owner and allows the Architect reasonable time to review submittals. The Contractor shall develop and deliver to Owner at the commencement of performance of Work a "Project Logistical Time Schedule", setting forth specific times for "feeding-the-site" including, but not limited to, time for obtaining building approvals and permits, procurement of and replacement of cranes, hoists and lifts and delivery of materials and equipment to the site.

**§ 3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect. The Contractor shall at the request of the Owner or the Architect attend and cause its subcontractors to attend weekly progress meetings to discuss jointly such matters as procedures, progress, problems and scheduling. At such meetings, Contractor shall, among other things, review the Project Time Schedule and Update Schedules reflecting the progress of the Performance of the Work to date. Such Schedules shall identify with detailed explanations potential variances between dates scheduled on the Project Time Schedule and comparable completion dates and recommend action required to match scheduled completion dates; and they shall review the schedule for Work not started or incomplete and recommend to the Owner any alternate procedures or judgments to meet the scheduled completion dates. All Update Schedules and reports shall be signed by the Contractor and delivered to the Owner or Architect for their records.

## § 3.11 DOCUMENTS AND SAMPLES AT THE SITE

**§ 3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work.

## § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

Final – 05-31-05

**§ 3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**§ 3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**§ 3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**§ 3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Section 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals which are not required by the Contract Documents may be returned by the Architect without action.

**§ 3.12.5** The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.

**§ 3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**§ 3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect.

**§ 3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

**§ 3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice the Architect's approval of a resubmission shall not apply to such revisions.

**§ 3.12.10** The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria

Final – 05-31-05

that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

## § 3.13 USE OF SITE
§ 3.13.1 The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

## § 3.14 CUTTING AND PATCHING
§ 3.14.1 The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

§ 3.14.2 The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter, mar, or deface such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall be responsible for the costs of any restoration, repair, or replacement required as a result of such damages. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

## § 3.15 CLEANING UP
§ 3.15.1 The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. Contractor shall be responsible for removal of Owner's and separate contractors' waste and rubbish. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

§ 3.15.2 If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

## § 3.16 ACCESS TO WORK
§ 3.16.1 The Contractor shall provide the Owner, Owner's Project Manager, and Architect access to the Work in preparation and progress wherever located.

## § 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
§ 3.17.1 The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner, Owner's Project Manager, and Architect harmless from loss on account thereof, including, without limitation, attorneys' fees and expenses, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

Final – 05-31-05

## § 3.18 INDEMNIFICATION (Refer also to Article 11 entitled "Insurance and Bonds")

§ 3.18.1 To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by Project Management Protective Liability insurance or Contractor's Liability Insurance or other insurance purchased by the Contractor in accordance with Section 11.3, the Contractor shall defend, indemnify and hold harmless the Owner, Owner's Project Manager, Architect, Architect's consultants, and agents and employees of any of them from and against claims, law suits, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, law suit, damage, loss or expense is caused by the acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts or omissions they may be liable, regardless of whether or not such claim, law suit, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18.

§ 3.18.2 In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## § 3.19 DAILY LOGS

§ 3.19.1 Contractor shall keep (1) a daily log (signed by the contractor's representative) available to the Owner and the Architect indicating the date, weather, high and low temperatures, subcontractors on the job, problems on the job, detail of claims asserted by individual subcontractors, number of workers by trade at the Project and time periods corresponding therewith and availability of materials and supplies to meet the construction schedules. Such logs shall be available from time to time and at any time to the Owner and the Architect at their request. The Contractor shall notify the Owner of any delays or unusual events or conditions effecting the Project with explanations thereof and recommendations with respect thereto.

## § 3.20 CONTRACTOR'S RECORDS

§ 3.20.1 Contractor shall maintain at the Project site and make available to the Owner at any time, on a current basis of the following: records of all subcontracts, drawings, samples, purchases, materials, equipment, maintenance and operating manuals and instructions, and other construction related documents, including all revisions. The Contractor shall obtain data from the subcontractors and maintain a current set of record drawings, specifications and operating manuals. At the Completion of the Project (or earlier if required by the Owner) Contractor shall deliver all such records to the Owner.

## § 3.21 SECURITY

§ 3.21.1 The Contractor shall fence and otherwise limit access to the site and may engage a security service at Contractor's expense to provide full security to Project site and materials, equipment and work therein. The Contractor shall recommend any additional security measures to the Owner which he deems appropriate and shall carry out any recommendations for further security by the Owner. Contractor shall immediately report to the Owner any damage to persons or property at the Project site and make appropriate reports to the relevant insurance carriers with copies thereof to the Owner. The Contractor shall only affix such signs at the Project site as shall be approved by the Owner and as are permitted or required under any applicable law.

## § 3.22 PUNCH LISTS

§ 3.22.1 Following Substantial Completion of the Project the Contractor shall prepare and continue to monitor punch lists with the Owner with respect to the Work and report weekly to the Owner on any outstanding punch list items.

## § 3.23 STANDARD OF WORKMANSHIP

Final – 05-31-05

§ 3.23.1 The Contractor shall cause the performance of the Work to be supervised, managed, coordinated, erected, inspected and monitored in a competent, professional manner to the highest standards of the construction industry in the City of Long Beach, New York; and it shall continue the performance of the Work so as to complete the Project in the most expeditious and economical manner consistent with the interests of the Owner and in accordance with the Drawings and Specifications and within the time parameters set forth on the Project Time Schedule to the end that the Work performed shall be in each instance of the highest quality of workmanship and materials.

## ARTICLE 4  ADMINISTRATION OF THE CONTRACT
### § 4.1 ARCHITECT
§ 4.1.1 The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative, or such successor architect as Owner may appoint from time to time.

§ 4.1.2 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, and Owner reserves the right to appoint a representative empowered to act for Owner during the Construction Phase and thereafter, to supersede the Architect Construction Phase responsibilities to the extent set forth in written notice to the Architect and Contractor with respect to such superseded responsibilities Architect shall then no longer bear responsibility in those areas, unless and only to the extent from the time that Architect shall be re-directed to resume responsibility by Owner.  In no event shall Architect be responsible for any activities occurring or events resulting from activities occurring during any period of superseded responsibility.  Further, Contractor acknowledges that at all times or from time to time Owner may act through "Owner's Rep" as defined in the Agreement, without affecting any provisions applicable to Architect in the Contract Documents.

§ 4.1.3  If the employment of the Architect is terminated, the Owner shall employ a new Architect against whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the former Architect.

## § 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT
§ 4.2.1 At Owner's option, the Architect will provide administration of the Contract as described in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.

§ 4.2.2 The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to make recommendations to Owner in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.

§ 4.2.3 The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

§ 4.2.4 Communications Facilitating Contract Administration.  Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the

Final – 05-31-05

Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

§ 4.2.5 Based on the Architect's evaluations of the Contractor's Applications for Payment, or at Owner's option the evaluation of payment applications by Owner's Representative, the Owner's Representative or Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts. Any and all payment applications reviewed and approved, in whole or in part, by Owner's representative, may be reviewed by Architect during its periodic visits (approximately every two months) to the job site, and at Owner's option, shall be subject to such adjustments as may be necessary or appropriate in the opinion of the Architect.

§ 4.2.6 The Owner, with the advice of the Architect, will have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

§ 4.2.7 The Architect will review and at Owner's request approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not necessarily indicate approval of an assembly of which the item is a component.

§ 4.2.8 At Owner's request, the Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4.

§ 4.2.9 The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.

§ 4.2.10 If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in the agreement between Owner and Architect.

§ 4.2.11 The Architect will interpret matters concerning performance under and requirements of, the Contract Documents and will make recommendations on performance thereunder, subject to review and approval by Owner. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Section 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

Final – 05-31-05

**§ 4.2.12** Interpretations and recommendations of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or recommendations so rendered in good faith.

**§ 4.2.13** The Owner's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

## § 4.3 CLAIMS AND DISPUTES

**§ 4.3.1** Definition.  A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief in accordance with the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

**§ 4.3.2** Time Limits on Claims. Claims by either party must be initiated within 14 days after occurrence of the event giving rise to such Claim or within 14 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

**§ 4.3.3** Continuing Contract Performance. Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Section 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents, except to the extent that any payment application has not been approved by Owner or Architect or remains in dispute.

**§ 4.3.4** Claims for Concealed or Unknown Conditions. If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than seven (7) days after first observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both, by notice to Owner and Contractor in writing, stating the reasons. If the Architect concludes that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such conclusion must be made within seven (7) days after the Architect has given notice of the conclusion. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Architect for initial determination, subject to further proceedings pursuant to Section 4.4.

**§ 4.3.5** Claims for Additional Cost.  If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.6.

**§ 4.3.6** If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Section 4.3.

Final – 05-31-05

**§ 4.3.7** INTENTIONALLY DELETED.

**§ 4.3.8** Injury or Damage to Person or Property. If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding three (3) days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**§ 4.3.9** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

**§ 4.3.10** Claims for Consequential Damages. The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

.1 damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2 damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

**§ 4.4 RESOLUTION OF CLAIMS AND DISPUTES**

**§ 4.4.1** Decision of Architect. Claims, including those alleging an error or omission by the Architect but excluding those arising under Sections 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.

**§ 4.4.2** The Architect will review Claims and within five business days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's reasonable discretion, it would be inappropriate for the Architect to resolve the Claim.

**§ 4.4.3** In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense, subject to Owner's agreement.

**§ 4.4.4** If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.

Final – 05-31-05

**§ 4.4.5** The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any recommended change in the Contract Sum or Contract Time or both. The approval or rejection or any other disposition of a Claim by the Architect, upon failure of acceptance by either party, subject to arbitration at Owner's sole election, or to litigation.

**§ 4.4.6** INTENTIONALLY DELETED..

**§ 4.4.7** Upon receipt of a Claim against the Contractor or at any time thereafter, the Architect or the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Architect or the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**§ 4.4.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim.

**§ 4.4.9** Nothing contained herein or in the Contract Documents shall preclude Owner's right to immediately avail itself of all equitable rights and remedies, or to proceed directly to any legal action or proceeding.

**§ 4.5** INTENTIONALLY DELETED.

**§ 4.6 ARBITRATION**

**§ 4.6.1** At Owner's option, all claims, disputes and other matters in question between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof, except as provided in Section 2.2.11 with respect to the Architect's decisions on matters relating to artistic effect, and except for claims which have been waived by Section 4.3.10 or by the making or acceptance of final payment as provided by Sections 9.10.4 and 9.10.5, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. Arbitration arising out of or relating to the Contract Documents shall include, by consolidation, joinder or joint filing, any additional person or entity not a party to this Contract to the extent necessary to the final resolution of the matter in controversy. Contractor shall include an arbitration and consolidation provision in its subcontracts and purchase orders. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law.

**§ 4.6.2** At Owner's option, the location for settlement of any and all claims, controversies and disputes arising out of or relating to this Contract or any breach thereof whether by arbitration or litigation shall be in the Borough of Manhattan, City, County, and State of New York.

**ARTICLE 5  SUBCONTRACTORS**
**§ 5.1 DEFINITIONS**
**§ 5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site or to provide materials for performance of the Work. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**§ 5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

**§ 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK**

Final – 05-31-05

**§ 5.2.1** Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection. Notwithstanding the foregoing, Contractor shall have made best efforts to include a complete listing of the candidate Subcontractors with its bid.

**§ 5.2.2** The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**§ 5.2.3** If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. Architect's and/or Owner's objection to said person or entity shall not increase the Contract Price.

**§ 5.2.4** The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitute. After the Owner has approved the Contractor's list of Subcontractors, the Owner may subsequently require the Contractor to change any Subcontractor previously accepted and, if at such time the Contractor is not in default hereunder, the Contract Sum shall be increased or decreased by any difference in cost occasioned by such change.

## § 5.3 SUBCONTRACTUAL RELATIONS

**§ 5.3.1** By appropriate written agreement, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

**§ 5.3.2** Contractor may subcontract part or parts of the Work to Subcontractors only upon the following conditions:

    .1     that the Subcontract document reflecting the agreement between Contractor and Subcontractor shall be on a master form submitted to the Owner prior to its execution;

    .2     the Owner shall have been satisfied that the form of Subcontract contains the following provisions:

        (a)     that the Work to be performed thereunder shall be in accordance with the Contract Documents;

        (b)     that as a condition for payment under the Subcontract there is a requirement for

Final – 05-31-05

submission by the Subcontractor to the Contractor of a request for payment and sworn statements regarding the status of payments within a reasonable time frame which will allow the Contractor to request such payment in due course from the Owner;

(c)    that there be a provision that Subcontractor waives all rights which the contracting parties may have against one another or that the Subcontractor may have against the Owner for damages to equipment used in connection with the Project caused by fire or other perils covered by any property insurance;

(d)    a requirement that Subcontractor carry and maintain liability insurance in accordance with the Contract Documents; and

(e)    a requirement that Subcontractor agree that the subject matter of the Subcontract is confidential in nature and that Subcontractor will not provide any third party with any information contained therein without the prior written consent of the Owner; and

(f)    a requirement that Subcontractor agrees to an arbitration and consolidation provision as referred to in Section 4.5.1 above.

(g)    a requirement that each subcontractor, sub-subcontractor, vendor, supplier, and materialman provides with each of his, hers, or its Application for Payment, as applicable, partial and final full waivers and releases of mechanic's liens, acknowledged and in form satisfactory to Owner and Owner's counsel and that originals of each such waiver and release shall be provided by Contractor to Owner's Project Manager.

### § 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS
§ 5.4.1 Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

.1    assignment is effective only after termination of the Contract by the Owner for cause pursuant to Section 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2    assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

§ 5.4.2 Upon such assignment, if the Work has been suspended for more than 30 days, absent the Subcontractor's negligence or other causing of such suspension and absent outstanding claims against the Subcontractor, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

## ARTICLE 6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

INTENTIONALLY DELETED.

## ARTICLE 7    CHANGES IN THE WORK
### § 7.1 GENERAL
§ 7.1.1 Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

§ 7.1.2 A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Owner or the Architect, with Owner's approval.

Final – 05-31-05

§ 7.1.3 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

## § 7.2 CHANGE ORDERS

§ 7.2.1 A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:

   .1   change in the Work, including the reasons for adjustment of the Contract Sum and/or the Contract Time;

   .2   the amount of the adjustment, if any, in the Contract Sum; and

   .3   the extent of the adjustment, if any, in the Contract Time.

§ 7.2.2 Methods used in determining adjustments to the Contract Sum may include those listed in Section 7.3.3.

## § 7.3 CONSTRUCTION CHANGE DIRECTIVES

§ 7.3.1 A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

§ 7.3.2 A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

§ 7.3.3 If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:

   .1   mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

   .2   unit prices stated in the Contract Documents or subsequently agreed upon;

   .3   cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or

   .4   as provided in Section 7.3.6.

§ 7.3.4 Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

§ 7.3.5 A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

§ 7.3.6 If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Owner based upon the recommendation of the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Section 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.6 shall be limited to the following:

   .1   costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

Final – 05-31-05

    .2    costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

    .3    rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

    .4    costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

    .5    additional costs of supervision and field office personnel directly attributable to the change.

§ 7.3.7 The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

§ 7.3.8 Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, the Architect will make an interim determination for purposes of monthly certification for payment for those costs. That determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a claim in accordance with Article 4.

§ 7.3.9 When the Owner and Contractor agree with the determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

## § 7.4 MINOR CHANGES IN THE WORK
§ 7.4.1 The Owner or the Architect, with Owner's prior approval, will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

## ARTICLE 8   TIME
## § 8.1 DEFINITIONS
§ 8.1.1 Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work in compliance with the Owner's Milestone Dates and/or Construction Schedule as set forth in the Exhibit to the Agreement entitled "Construction Schedule".

§ 8.1.2 The date of commencement of the Work is the date established in the Agreement.

§ 8.1.3 The date of Substantial Completion is the date certified by the Architect in accordance with Section 9.8.

§ 8.1.4 The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

## § 8.2 PROGRESS AND COMPLETION
§ 8.2.1 Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

§ 8.2.2 The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by the Contract Documents or a

Final – 05-31-05

notice to proceed given by the Owner, the Contractor shall notify the Owner in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages, mechanic's liens and other security interests.

**§ 8.2.3** The Contractor shall proceed expeditiously and without interruption with adequate forces and shall achieve Substantial Completion within the Contract Time.

## § 8.3 DELAYS AND EXTENSIONS OF TIME
**§ 8.3.1** Contractor acknowledges and agrees that all schedules and Milestone Dates calculated for performance of the Work have taken into account an adequate number of days to compensate for adverse weather and field conditions and other delays, and Contractor shall have no claim and hereby waives and shall not make any claim for any increased costs or additional or extended time associated with any delays existing or occurring during the performance by Contractor of its obligations under this Contract, including, without limitation: (i) weather, (ii) field conditions, (iii) site logistics, including hoisting, deliveries, site access, interferences, etc., (iv) disputes relating to priorities of any work, (v) delays or causes of delay of which the Owner has or had knowledge but not caused by the Owner, (vi) new or amendments to existing statutes, laws, ordinances, orders, codes, regulations, or interpretation of case law, (vii) discrepancies, conflicts, inconsistencies, or gaps in or between any bid documents and any plans and specifications, or in or between any plans and specifications, it being the intention of the parties that all plans and specifications shall be deemed to cover and include all matters and scope reasonably implied therefrom, and (viii) any submitted or alleged change in or to the Work or other Change Order which is not set forth in a written supplement to this Contract duly executed by Contractor and Owner, except if not executed by Owner because of bad faith. All claims for any increased costs or additional or extended time which are not hereby waived as set forth above, but otherwise based on delay or for any other allowable reason, shall be deemed waived if not submitted by Contractor to the Owner in writing within five (5) business days from the date of the event giving rise to such claim.

## ARTICLE 9   PAYMENTS AND COMPLETION
### § 9.1 CONTRACT SUM
**§ 9.1.1** The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### § 9.2 SCHEDULE OF VALUES
**§ 9.2.1** Before the first Application for Payment, the Contractor shall submit to the Architect a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect and/or Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

### § 9.3 APPLICATIONS FOR PAYMENT
**§ 9.3.1** Contractor shall submit to the Architect and the Owner an itemized Application for Payment for operations completed in accordance with the schedule of values, approximately every two weeks during the time that the Work is being performed. Such application shall be notarized and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents.

**§ 9.3.1.1** As provided in Section 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

**§ 9.3.1.2** Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

Final – 05-31-05

**§ 9.3.2** Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. Payment shall not be made for materials and equipment stored off the site. Payment for materials and equipment stored on the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest.

**§ 9.3.3** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

## § 9.4 CERTIFICATES FOR PAYMENT

**§ 9.4.1** The Architect or Owner's Representative will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect or Owner's Representative determines is properly due, or notify the Contractor and Owner in writing of the reasons for withholding certification in whole or in part as provided in Section 9.5.1. In the event the Owner's Representative approves a payment application in whole or in part, such payment application shall be subject to review and adjustment by the Architect within 10 days of Architects visits to the job site, which are expected to occur approximately every two months.  As provided elsewhere in this document, all payments are subject to final review at the completion of the Work.

**§ 9.4.2** The issuance of a Certificate for Payment by the Architect, and the issuance of an adjustment by the Architect to any Certificate of Payment previously issued by Owner's Representative,  will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified, subject to Owner's approval. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## § 9.5 DECISIONS TO WITHHOLD CERTIFICATION

**§ 9.5.1** The Architect or Owner's Representative may withhold a Certificate for Payment in whole or in part, and the Architect may adjust and demand a credit, in whole or in part, for payments previously approved by the Owner's Representative, to the extent reasonably necessary to protect the Owner, if in the reasonable opinion of the Architect or Owner's representative, the representations to the Owner required by Section 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application,  or issues an adjustment of a payment previously approved by the Owner's Representative, the Architect will notify the Contractor and Owner as provided in Section 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of:

Final – 05-31-05

.1   defective Work not remedied;

.2   third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

.3   failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

.4   reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

.5   damage to the Owner or another contractor;

.6   reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay;

.7   persistent failure to carry out the Work in accordance with the Contract Documents; or

.8   material breach by the Contractor of any provisions of the Contract Documents, in an amount deemed necessary by Owner in its sole judgement to ensure proper completion of the Work.

**§ 9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

## § 9.6 PROGRESS PAYMENTS

**§ 9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

**§ 9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**§ 9.6.3** The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

**§ 9.6.4** Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**§ 9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

**§ 9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

## § 9.6.7 LIEN LAW

.1   Each Application for Payment which shall be made by Contractor shall constitute a representation by Contractor that (i) the partial payment then requested to be disbursed has been incurred by Contractor on account of Work, (ii) the materials, supplies and equipment for which such requisition is being submitted have been installed or incorporated in the Work or the Project, unless, at Owner's sole option and approval, the same have been stored at the Project site or at such off-Project site storage locations as shall have been approved by Owner, provided however, that Owner shall not be obligated hereby to pay or advance monies for such materials, supplies or equipment unless approved in advance and in writing by Owner, (iii) the materials, supplies and equipment are insured in accordance with the provisions of the Contract, (iv) to the best of Contractor's knowledge, the materials, supplies and equipment are not subject to any liens or encumbrances, (v) to the best of Contractor's knowledge, no mechanic's, laborer's, vendor's, materialman's or other liens have been filed in connection with the Work, the Project, or any of the materials, supplies or equipment incorporated therein or purchased in connection therewith,

Final – 05-31-05

(vi) the Work which is the subject of such Applications for Payment has been performed in strict accordance with the Contract and the plans and specifications and the other Contract Documents and all applicable legal requirements, and (vii) that the partial payment then requested to be disbursed, together with all sums previously disbursed under prior Applications for Payment, does not exceed that portion of the Contract Sum which is allocated to the portion of the Work actually completed up to the date of such Requisition and that the remainder of the Contract Sum (as the same may have been adjusted hereunder) will be sufficient to pay in full the costs necessary to perform and complete the Work and is deemed received "in trust" to be held and disbursed by the Contractor for the benefit of all subcontractors and materialmen entitled to payment for all or any portion or such Work. The Contractor shall execute a payment receipt, in a form provided by Architect and approved by Owner, at the time of each payment when requested by Owner.

    .2    Notwithstanding anything contained in the Contract to the contrary, the Owner may elect, by giving written notice of such election to Contractor and Architect within three (3) business days after submission of any Application for Payment by Contractor, to make or cause to be made the payments that are the subject of such Application for Payment directly to the Subcontractor, architect, engineer, materialman or vendors as set forth in such Application for Payment, provided however, that upon making such election, the Owner shall promptly make such payment and shall have, and shall be deemed to have, assumed the full responsibility to comply with the timing requirements for such payment imposed upon Contractor under any applicable subcontract for such payments in respect of the payments covered by such Application for Payment and the obtaining of unconditional lien waivers in respect of such work with Contractor's assistance, and provided further that if solely as a result of any such direct payment by the Owner there shall result additional burdens, costs or expenses in connection with the Work, such additional burdens, costs and expenses shall be deemed to be Change Orders payable to Contractor.

## § 9.7 FAILURE OF PAYMENT

§ 9.7.1 If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

§9.7.2 If the Architect does not issue a Certificate of Payment in whole or in part within the time prescribed due to the Architects good faith belief in some fault of Contractor with the Work, Contractor shall be obligated to continue with the Work and may file a claim as permitted hereunder in order to resolve the issues causing the Architect not to issue the Certificate of Payment.

## § 9.8 SUBSTANTIAL COMPLETION

§ 9.8.1 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use, the mechanical, electrical, and plumbing systems have been commissioned with all controlled inspections completed and required sign-offs received, and all remaining punchlist Work inconsequential in value.

§ 9.8.2 When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

§ 9.8.3 Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not

Final – 05-31-05

included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

§ 9.8.4 When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate, which shall not be more than thirty (30) days from the date of Substantial Completion. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

§ 9.8.5 The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

§ 9.9 PARTIAL OCCUPANCY OR USE
§ 9.9.1 The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect. This Section 9.9.1 shall not be applicable to Owner's use for installation of Owner's furnishings, furniture, and equipment work, except that Owner shall use reasonable efforts not to adversely impact Contractor's ability to perform the Work.

§ 9.9.2 Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

§ 9.9.3 Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute (i) acceptance of Work not complying with the requirements of the Contract Documents, or (ii) a basis or entitlement for a delay claim by Contractor.

§ 9.10 FINAL COMPLETION AND FINAL PAYMENT
§ 9.10.1 Upon receipt of written notice from the Contractor that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor (subject to any retainage) and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled. Such final Crtificate for Payment shall constitute Architect's recommendation to Owner with respect to payments due to Contractor, but final acceptance of the Work shall be made only by Owner.

Final – 05-31-05

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Owner (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner.  The final payment to Contractor, including all remaining retainage, is conditioned upon and subject to delivery of the Work fully completed and free of all liens and encumbrances.

**§ 9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**§ 9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:
  .1    liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
  .2    failure of the Work to comply with the requirements of the Contract Documents;
  .3    terms of special warranties required by the Contract Documents; or
  .4    breach of the Agreement and/or Contract Documents.

**§ 9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY
**§ 10.1 SAFETY PRECAUTIONS AND PROGRAMS**
**§ 10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

**§ 10.2 SAFETY OF PERSONS AND PROPERTY**
**§ 10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:
  .1    employees on the Work and other persons who may be affected thereby;
  .2    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and
  .3    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

Final – 05-31-05

**§ 10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**§ 10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**§ 10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall obtain the prior written permission of the Owner and shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**§ 10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

**§ 10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**§ 10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

## § 10.3 HAZARDOUS MATERIALS

**§ 10.3.1** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing, and thereafter Contractor shall follow and comply with the directives of the Owner regarding Work in the affected area..

**§ 10.3.2** When the material or substance has been rendered harmless, Work in the affected area shall resume upon the direction of the Owner to Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

**§ 10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the negligence of a party seeking indemnity.

**§ 10.4** The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

Final – 05-31-05

§ 10.5 If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents and as directed by Owner, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

### § 10.6 EMERGENCIES
§ 10.6.1 In an emergency affecting safety of persons or property, the Contractor shall act to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Section 4.3 and Article 7.

## ARTICLE 11  INSURANCE AND BONDS
### § 11.1 CONTRACTOR'S LIABILITY INSURANCE
§ 11.1.1 The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1  claims under workers' compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;

.2  claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

.3  claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

.4  claims for damages insured by usual personal injury liability coverage;

.5  claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6  claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

.7  claims for bodily injury or property damage arising out of completed operations; and

.8  claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

§ 11.1.2 The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment. Such insurance shall be written by an insurance company having an A+ rating or better by A.M. Best and shall name the Owner as an additional insured.

§ 11.1.3 Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Section 9.10.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

### § 11.2 OWNER'S LIABILITY INSURANCE
§ 11.2.1 The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance as required pursuant to the Owner's lease or other occupancy agreement for the premises of the Project.

### § 11.3 PROJECT MANAGEMENT PROTECTIVE LIABILITY INSURANCE

Final – 05-31-05

**§ 11.3.1** Optionally, the Owner may require the Contractor to purchase and maintain Project Management Protective Liability insurance from the Contractor's usual sources as primary coverage for the Owner's, Contractor's and Architect's vicarious liability for construction operations under the Contract. Unless otherwise required by the Contract Documents, the Owner shall reimburse the Contractor by increasing the Contract Sum to pay the cost of purchasing and maintaining such optional insurance coverage, and the Contractor shall not be responsible for purchasing any other liability insurance on behalf of the Owner. The minimum limits of liability purchased with such coverage shall be equal to the aggregate of the limits required for Contractor's Liability Insurance under Sections 11.1.1.2 through 11.1.1.5.

**§ 11.3.2** To the extent damages are covered by Project Management Protective Liability insurance or any other insurance of the Contractor, the Owner, Contractor and Architect waive all rights against each other for damages, except such rights as they may have to the proceeds of such insurance. The policy shall provide for such waivers of subrogation by endorsement or otherwise.

**§ 11.3.3** INTENTIONALLY DELETED.

**§ 11.4 WAIVER OF SUBROGATION**
**§ 11.4.1** The Owner and Contractor waive all rights against each other and against subcontractors of the Contractor (so long as such subcontractors have executed similar waivers benefitting the Owner and the Contractor) for damages to the project or to property or equipment located thereon or equipment used in connection therewith caused by fire or other perils covered by insurance except such rights as they may have to the proceeds of such insurance.  The Contractor shall require similar waivers from all its subcontractors.

**§ 11.4.2** The Owner and Contractor waive all rights against each other and against the subcontractors of the Contractor (so long as such subcontractors have executed similar waivers benefitting the Owner and Contractor) for loss or damage to any equipment used in connection with the Project and covered by any property insurance.  The Contractor shall require similar waivers from all its subcontractors.

**§ 11.4.3** If the policies of insurance referred to in this Section require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed at their expense.

**§ 11.4.4** Owner and Contractor shall notify their respective insurance carriers of the waiver of subrogation set forth in this Section 11.4, and if such policies of insurance required to be obtained by the respective parties pursuant to the Contract Documents require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies shall cause them to be so endorsed at their expense. Owner and Contractor shall obtain and deliver to the other party certificates of insurance specifying the insurer's waiver of subrogation as required by this Section 11.4 for such policies required to be obtained by the respective parties pursuant to the Contract Documents.

**§ 11.4.1.4** This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

**§ 11.5 PERFORMANCE BOND AND PAYMENT BOND**
**§ 11.5.1** The Owner shall have the right to require the Contractor and Subcontractors to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

**§ 11.5.2** Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

Final – 05-31-05

## ARTICLE 12  UNCOVERING AND CORRECTION OF WORK

### § 12.1 UNCOVERING OF WORK

§ 12.1.1 If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

§ 12.1.2 If a portion of the Work has been covered which the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### § 12.2 CORRECTION OF WORK

### § 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION

§ 12.2.1.1 The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

### § 12.2.2 AFTER SUBSTANTIAL COMPLETION

§ 12.2.2.1 In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Section 2.4, and in doing so Owner may elect to have the corrective Work performed by others at Contractor's expense.

§ 12.2.2.2 The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

§ 12.2.2.3 The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

§ 12.2.3 The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

§ 12.2.4 The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

§ 12.2.5 Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor

Final – 05-31-05

to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

### § 12.3 ACCEPTANCE OF NONCONFORMING WORK

§ 12.3.1 If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

### ARTICLE 13  MISCELLANEOUS PROVISIONS

### § 13.1 GOVERNING LAW

§ 13.1.1 The Contract shall be governed by the law of the place where the Project is located.

### § 13.2 SUCCESSORS AND ASSIGNS

§ 13.2.1 The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole or in part without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract, and any such attempted assignment shall be null and void.

§ 13.2.2 The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.

### § 13.3 WRITTEN NOTICE

§ 13.3.1 Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

### § 13.4 RIGHTS AND REMEDIES

§ 13.4.1 Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

§ 13.4.2 No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

### § 13.5 TESTS AND INSPECTIONS

§ 13.5.1 Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect and Owner timely notice of when and where tests and inspections are to be made so that the Architect and/or Owner may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which are not required by the Contract Documents or by applicable laws, ordinances, rules, regulations, or orders.

Final – 05-31-05

**§ 13.5.2** If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect and Owner of when and where tests and inspections are to be made so that the Architect and/or Owner may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

**§ 13.5.3** If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of repeated procedures and compensation for the Architect's and Owner's other consultants' services and expenses shall be at the Contractor's expense.

**§ 13.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

**§ 13.5.5** If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

**§ 13.5.6** Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work. The Contractor shall submit to the Owner and Architect the names and addresses of all testing laboratories the Contractor proposes to employ, accompanied by information as to the competency of such testing laboratories. Should any such testing laboratories be disapproved by the Owner, the Contractor shall immediately make substitutions acceptable to the objecting party.

**§ 13.6** INTENTIONALLY DELETED.

**§ 13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD**
**§ 13.7.1** As between the Owner and Contractor:

.1    Before Substantial Completion. As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

.2    Between Substantial Completion and Final Certificate for Payment. As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment; and

.3    After Final Certificate for Payment. As to acts or failures to act occurring after the relevant date of issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Section 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Section 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

**§ 13.8** The invalidity of any part or provision of the Contract Documents shall not impair or affect in any manner whatsoever the validity, enforceability or effect of the remainder of the Contract Documents.

**§ 13.9 COOPERATION WITH CONSTRUCTION AND PERMANENT LENDERS**
**§ 13.9.1** The Contractor shall cooperate and shall cause its subcontractors to cooperate with any financial institution or institutions that provide construction or permanent financing of the Project (hereinafter collectively called the "Lender") Without limiting the generality of the foregoing, the Contractor shall supply or cause to be supplied all

Final – 05-31-05

information and documents requested by the Owner to comply with the requirements of the Lender. Upon Owner's request, the Contractor shall execute and deliver an amendment to this Contract to reflect the Contractor's obligations with respect to the construction or permanent financing after such financing has been arranged and shall make whatever reasonable amendments are requested by the Lender to be made to the Contract and perform the Contractor's obligation hereunder to the benefit of the Lender in the event the Lender takes possession of the Project.

### § 13.10 PARTIAL OCCUPANCY

§ 13.10.1 The Owner shall have the right to occupy or use any portion of the Project prior to Substantial Completion of the entire Project and the Contractor shall cause the entrance areas to the building, the main lobby of the building and the lobby area on the floor to be used by the Owner to be clean, clear and sightly so that the same shall not inhibit ingress and egress and all services with respect to the aforementioned location shall be rendered and maintained in the highest quality, without interruption.

### § 13.11 NO THIRD PARTY BENEFICIARIES

§ 13.11.1 No provisions contained in this Contract shall create or give to third parties any claim or right of action against the Owner or the Contract beyond such as may legally exist in the absence of any such provisions except to the extent expressly agreed upon by the Contractor and the Owner.

### § 13.12 NONDISCLOSURE

§ 13.12.1 The Contractor acknowledges that the provisions of the Contract, except with respect to those portions thereof which cover the actual performance of the Work, are of a confidential nature and Contractor shall not disclose such confidential information, except to those respective Subcontractors to the extent and only to the extent their subcontracts incorporate by reference the terms and conditions of the Contract Documents, without the prior written consent in each instance by the Owner. Contractor shall cause similar nondisclosure provisions to be contained in each of its Subcontracts.

### § 13.13 OWNER'S INTEREST

§ 13.13.1 The Contractor shall look solely to Owner's interest in the Project and to the real property on which the Project is being erected for the satisfaction of any right, remedy, or lien of Contractor or for the collection of any judgment (or other judicial process) or the payment of money by Owner, in the event of any liability by Owner; and no other property or assets of Owner (or of any partner or principal of Owner) shall be subject to levy, execution, attachment or other enforcement procedure to the satisfaction of Contractor's rights or remedies under or with respect to this Contract, the relationship between the Contractor and the Owner, or any other liability of Owner to Contractor.

## ARTICLE 14  TERMINATION OR SUSPENSION OF THE CONTRACT

### § 14.1 TERMINATION BY THE CONTRACTOR

§ 14.1.1 The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:

.1  issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;

.2  an act of government, such as a declaration of national emergency which requires all Work to be stopped; or

.3  because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Section 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents.

Final – 05-31-05

§ 14.1.2 The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

§ 14.1.3 If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages, through the date of termination.

§ 14.1.4 If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

## § 14.2 TERMINATION BY THE OWNER FOR CAUSE

§ 14.2.1 If the Contractor shall institute proceedings or consent to proceedings requesting relief or arrangement under the Federal Bankruptcy Reform Act of 1978, as amended, or any applicable federal or state law, or if a petition under any federal or state insolvency law if filed against the Contractor and such petition is not dismissed within sixty (60) days from the date of said filing, or if the Contractor admits in writing its inability to pay its debts generally as they become due, or if it makes a general assignment for the benefit of its creditors, or if a receiver, liquidator, trustee or assignee is appointed on account of its bankruptcy or insolvency; or if a receiver of all or any substantial portion of the Contractor's properties is appointed; or of the Contractor abandons the Work; or if the Contractor fails, except in cases for which extension of time is provided, to prosecute promptly and diligently the Work or to supply enough properly skilled workmen or proper materials for the Work; or if the Contractor submits an Application for Payment, sworn statement, waiver of lien, affidavit or document of any nature whatsoever which is materially intentionally falsified; or if the Contractor fails, without the Owner's prior written approval, to make prompt payment to Subcontractors for materials or labor or otherwise breaches obligations under any Subcontract with a Subcontractor; or if a mechanic's or materialman's lien or a notice of lien is filed against any part of the Project and is not promptly bonded or insured over by the Contractor in a manner satisfactory to the Owner; or if the Contractor disregards any laws, statutes, ordinances, rules, regulations or orders of any governmental body or public or quasi-public authority having jurisdiction over the Work or the premises; or if the progress of Contractor is its performance of the Work in the opinion of the Owner is substantially behind the Progress Time Schedule; or if the Contractor otherwise violates any provision of the Contract Documents then, without prejudice to any right or remedy available to the Owner under the Contract Documents or at law or in equity, the Owner may, after giving the Contractor seven (7) days' written notice, terminate the employment of the Contractor, accept assignment of subcontracts pursuant to Section 5.4, and take possession of the Project and of all materials, equipment, tools, construction equipment and machinery thereon owned by the Contractor and may complete the Work by whatever method the Owner may deem expedient. If requested by the Owner, the Contractor shall remove any part or all of his equipment, machinery and supplies from the Project within seven (7) days from the date of such request, and in the event of the Contractor's failure to do so, the Owner shall have the right to remove and/or store such equipment, machinery and supplies at the Contractor's expense. In case of such termination, the Contractor shall not be entitled to receive any further payment for Work performed by the Contractor through the date of termination until final completion of the Work.

§ 14.2.2 The Owner's right to terminate the Contract pursuant to Section 14.2 shall be in addition to and not in limitation of its right to stop the Work without terminating the Contract pursuant to Section 2.3.

Final – 05-31-05

**§ 14.2.3** If any event of default described in Section 14.2.1 above occurs, then the Owner, at its option, at any time may:

> 14.2.3.1    Order the Contractor immediately to comply with any term, condition or provision of this Contract or such other Contract Document;

> 14.2.3.2    Order the Contractor, within a specified time, to remove any defective work or materials and to replace such work or materials with satisfactory work or materials;

> 14.2.3.3    Accept any defective work or materials and reduce the Contract Price accordingly;

> 14.2.3.4    Perform or arrange to have performed any of Contractor's duties or obligations hereunder;

> 14.2.3.5    Make any payments to satisfy the Contractor's obligations relating to the Work for labor, materials, equipment, or insurance or other items;

> 14.2.3.6    Refuse to make any payments to the Contractor for work performed until the event of default is cured to the satisfaction of Owner.

> 14.2.3.7    Upon three (3) days' written notice to the Contractor, terminate in whole or in part this Contract on behalf of Owner and take possession of all materials, tools, equipment and appliances of the Contractor and cause all the Work to be finished by whatever means, method or agency which the Owner, in its sole discretion, may choose and take any other steps the Owner, in its sole discretion, may choose to secure any labor, materials, equipment and services and, in any event, the Owner shall have a lien on and may take over all Contractor's equipment, tools, appliances and materials (whether on or off-site) and complete the Work; provided, however, that if the default involves any breach of safety laws, regulations or requirements, only one (1) day's written notice shall be required.

**§ 14.2.4** If the Owner terminates this Agreement, as aforesaid, the Owner shall have no obligation to pay for any work performed after such termination, and will have no obligation to make any further payments to the Contractor for work performed before such termination until the Project has been completed, accepted by the Owner, and the Owner determines to its complete satisfaction that potential expenses, charges and claims relating to the performance of the Work have been satisfied or satisfactorily bonded over. Such payments to the Contractor shall in any event be reduced by all amounts due the Owner under the terms of this Contract.

**§ 14.2.5** The Owner's choice of any remedy shall not operate to waive any other rights or remedies of Owner provided hereunder, or by law, against the Contractor or its surety. The Owner, at its option, may choose more than one remedy or choose one or more particular remedies at different times.

**§ 14.2.6** In the event of a Contractor default, the Contractor shall pay, immediately upon demand therefore, all costs, losses, damages and expenses, including, without limitation, all administrative, management, overhead and other direct or indirect expenses, including reasonable attorneys' fees (collectively, the "Costs") incurred by the Owner in connection with and as a result of any default by Contractor or the exercise of any right or remedy upon Contractor's default. If the Contractor does not pay the Costs immediately, the Owner may withhold and deduct all Costs from any payments of the Contract Price. If payments due to the Contractor for completed portions of the Work are not sufficient to cover the Costs, the Contractor immediately shall pay to Owner the full amount of any such excess with interest thereon at the maximum interest rate permitted by law. The liability of the Contractor hereunder shall extend to and include the full amount of Costs incurred and obligations assumed by the Owner in good faith under the reasonable belief that such Costs or obligations were necessary or required, whether actually necessary or required

Final – 05-31-05

or not, (i) in protecting and completing the Work and providing labor, materials, equipment, supplies and other items in connection therewith or in re-contracting the Work, and (ii) in settlement, discharge or compromise of any claims, demands, suits and judgments pertaining to or arising out of the Work. An itemized statement of such obligations and payments shall be prima facie evidence of the Contractor's liability.

§ 14.2.7 In the event of termination, those provisions of this Agreement which, by their nature continue beyond completion, shall remain in full force and effect after such termination. Notwithstanding anything to the contrary contained herein, no action taken by the Owner shall affect any of the other rights or remedies of the Owner granted by this Agreement or by law, or relieve the Contractor from any consequences or liabilities arising from default or other cause, and the obligations of the Contractor under this Agreement and to complete the Work lien free and in accordance with the working drawings, plans and specifications for the Work shall continue and survive any such termination, and Contractor shall continue liable to the Owner for any additional costs incurred by the Owner as a result of the Contractor's breach of its obligations. If the Owner terminates this Agreement for cause, the obligation of the Contractor for lien free completion of the Work shall survive such termination.

§ 14.2.8 If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

## § 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE

§ 14.3.1 The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

§ 14.3.2 The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:

   .1    that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

   .2    that an equitable adjustment is made or denied under another provision of the Contract.

## § 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE

§ 14.4.1 The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

§ 14.4.2 Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

   .1    cease operations as directed by the Owner in the notice;

   .2    take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

   .3    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

Final – 05-31-05

§ 14.4.3 In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

OWNER (Signature)

AIR CHINA LIMITED

By

Name:

A duly authorized representative

Date 2005 . 5. 37

CONTRACTOR (Signature)

WBM INTERNATIONAL DEVELOPMENT, LLC

By M. T. Smith

Name:

A duly authorized representative

Date   5-31-2005

05/14/2007  11:52  2129357951                    AIRCHINA              TO:001212935 7951    PAGE  02/05
JUL-27-2004 15:19  FROM:

FROM :                              FAX NO. :12129266589          May. 13 2007 11:51PM  P7/11

Received:  4/27/07  8:11AM;                812 286 6751 -> Clauss & Sabatini;   Page 2
From:BMC REAL ESTATE IPB               212 286 6751               04/27/2007 08:01    8528 P.002/014

AGREEMENT, made on the date set forth below, between Air China Limited ("Air China" or "Owner") as Owner and WBM International Development LLC as General Contractor (referred to as "WBMID" or "Contractor"), with respect to the renovation project at 485 West Broadway, Long Beach, New York.

Following their meeting at Carven Corporation, 150 East 42nd Street, New York, NY on February 28, 2007, in order to complete the renovation work on the building as expeditiously as follows, and to resolve issues between the Owner and the Contractor regarding the work, the parties have agreed as follows:

1.  Change Orders # 10 and #19rr are deemed accepted by Air China. (Within 1 month from 4/16/07, Contractor will provide Air China (Beijing) the back-up paperwork which supports the price quotes on each item of change orders #9 and # 10, to establish that the original change order #10 did not include all costs of installation, and to establish that there are no duplicative charges on change order 19rr). The balance due on CO # 10 ($5,000) and #19rr ($10,000) in the total amount due of $15,000 shall be paid upon delivery of both the generator and fuel tank to the job site (scheduled to be delivered by April 26, 2007).

2.  Change Order Number 22 (regarding additional work to install the auxiliary generator for the sprinkler system and all related items) is reduced to $75,000, is accepted by Air China in that amount, and will be paid as follows:

    a) $10,000 upon delivery to Air China of all drawings submitted to the Fire Marshall's office related to the work done or to be done under change orders #s 10, 19rr and 22 and commencement of the demolition work specified in change order #22;

    b) $20,000 upon the completion of the demolition, concrete and work described in sections 22A of Change Order #21, attached hereto as Exhibit A.

    c) $20,000 upon completion of electrical work specified in section 22B of Change order Number 22, attached hereto as Exhibit A (and any other work that may be required to obtain the Fire Marshall's certification that the sprinkler system and fire alarm systems are fully functional and acceptable as required for issuance of a Certificate of Occupancy (unless such work is first requested by the Fire Marshall) after this agreement is signed); any such additional work to be performed by WBMID at no additional charge to Air China); and

    d) $15,000 on completion of the all work specified in Change Order 22 and $7,500 upon receipt by Air China of written certification by the Nassau County Fire Marshal and any other necessary governmental officials, that the

    $17,500

4.23.07                          AC          WBMID                    (2.)

Received: 5/14/07 11:08AM;          2129357951 -> Clauss & Sabatini;   Page 3

05/14/2007  11:52    2129357951              AIRCHINA                    PAGE  03/05
JUL-27-2004 15:19  FROM:                          TO:0012123357951    P:3

FROM :                    FAX NO. :12125860569         May. 13 2007 11:51PM  P8/11

Received: 4/27/07 8:11AM;          212 265 8781 -> Clauss & Sabatini;   Page 8
From:BWAC REAL ESTATE IPR          212 265 8781        04/27/2007 09:01    2629 P.008/014

sprinkler system including back-up generator and the fire alarm system, have
been tested and comply in all respects with all applicable codes and
regulations necessary to obtain the Certificate of Occupancy excluding
approvals related to the kitchen area.

3.      (a) WBMID agrees at no additional cost to Air China to build out the two
corner conference rooms on the second floor replacing the demolished plate
glass walls with sheet rock and glass walls and doorways as depicted on the
drawing annexed hereto as Exhibit B, which includes all additional walls,
painting, floor base, re-circuiting of lighting, switches and additional outlets
as per code.

(b) WBMID further agrees to furnish and install base-board heater covers in all
rooms where such covers are damaged or missing, such work to be completed
by June 18, 2007 and to be performed by Contractor on the following terms:
WBMID has determined the cost of this item for materials and labor to be
$25,000. WBMID will provide Air China with copies of invoices for the
actual costs incurred, and will pay the first $15,000 for this work and all
materials and labor in excess of $25,000. Subject to receipt by Air China of
invoices for labor and materials equal to or in excess of $25,000 for the
completion of this work by WBMID, Air China shall pay $10,000 to
WBMID. If the actual cost of this work (labor and materials) is less than
$25,000, Air China shall only pay the actual cost in excess of $15,000 but less
than $25,000.

4.      (a) Of the remaining $50,000 to be paid by Air China under Change Order
14z, Air China agrees to pay $25,000 within 5 business days of the execution
of this document by all parties, provided Contractor has resumed work on the
job and fully staffs it as of April 24, 2007. Air China agrees to pay the
remaining $25,000 upon substantial completion by WBMID of the work set
forth on Exhibit C hereto up to the standard established under subparagraph
(b) immediately below, as well as any and all other work required by the
original contract. John Vezanchi, Stephen Chapman, and Elliot Clarens will
determine whether or not the job is "substantially complete".

(b) Within two weeks from April 23, 2007, contractor shall finish one room
(5th floor, southeast corner "Captain's" room) in its entirety, with all items
fully installed, so that Owner can inspect and approve the workmanship and
candor) to which all remaining rooms shall be finished by contractor,
including the closet installation. Contractor agrees to complete all residential
rooms up to the same standard as the Captain's room as approved by Owner.

(c) Within one week from April 23, 2007, WBMID will provide a written
schedule of the work contractor intends to complete each week from April 23,
2007 to June 18, 2007, and shall provide Air China with the name address and
telephone numbers of the architect/engineer used by WBMID in connection

4.23.07             AC              WBMID              (3)

Received:  5/14/07 11:08AM;          2129357951 -> Clauss & Sabatini;  Page 4

05/14/2007  11:52    2129357951          AIRCHINA          TO:0012129357951          PAGE  04/05
JUL-27-2004 15:19  FROM:

FROM :                    FAX NO. :12125860569        May. 13 2007 11:52PM  P9/11

Received: 4/27/07  9:11AM;          812 266 8781 -> Clauss & Sabatini;  Page 4
From:BMAC REAL ESTATE IPG          212 266 8781          04/27/2007 09:02          #528 P.004/014

with work on the jobsite, as well as copies of all drawings and any other written documents prepared by WBMID or its architect with respect to any work on the job site related to change orders or any other modifications from the drawings on which the original contract was agreed to.

5.  (a) Air China, and/or its kitchen consultant/contractor and Jay Kopf or WBMID shall meet at the job site within five business days of 4/23/07 to discuss the removal of all kitchen equipment, and for Air China to mark with paint all items it wants removed, such removed to be completed by Air China. Contractor shall immediately commence work in the kitchen, and shall clean and repair the kitchen (specified as "included" in Exhibit A to the contract dated May 31, 2005 – "kitchen cleaning, minor repairs" and "kitchen exhaust ductwork which must be repaired and cleaned of all grease"), such work to be completed within two weeks from 4/23/07, so that Air China's kitchen contractor can begin work on the kitchen installation. Air China and its kitchen contractor shall use their best efforts to complete the kitchen renovation.

(b) WBMID shall use its best efforts to coordinate its work with any other Air China contractor on the job site so as not to interfere with such other work (such as the kitchen work) and any other Air China contractor shall endeavor to complete its work without interfering in any way with the work of WBMID.

6.  All work required by the contract between the parties dated May 31, 2005, and required by all change orders, including all work specified herein, shall be certified by the Contractor as "substantially complete" (as that term is defined in the contract), in mid to late May, 2007, and the entire job (excluding the kitchen) will be complete by June 18, 2007. WBMID agrees to complete all their work on this job within the time periods specified herein, regardless of the progress of the kitchen work being performed by Air China's kitchen contractor.

7.  WBMID shall file all documents necessary to obtain the Certificate of Occupancy with the appropriate authorities and provide a copy to Air China no later than June 18, 2007, excluding any documents related to the kitchen. Based on all information currently available to WBMID, the contractor believes it has or will be able to provide by June 18, 2007, all documents necessary for obtaining the Certificate of Occupancy, excluding documents related to the kitchen.

8.  This agreement is entered into as a good faith effort by the Owner and the Contractor to expedite the completion of the contract work and additional work specified in the change orders and herein, in such a way as to assure the completion of this project by June 18, 2007, without further dispute, and without further additional charge to Air China except as specified herein. The

4.23.07                    AC_____    WBMID_____        (4)

05/14/2007 11:52   2129357951              AIRCHINA              TO:+12129357951      PAGE  05/05
JUL-27-2004 15:20  FROM:                                                              P:5

FROM :                        FAX NO. :12125860569        May. 13 2007 11:52PM  P10/11

Received:  4/27/07  9:12AM;       212 266 8751 -> Clauss & Sabatini;  Page 8
From:GMAC REAL ESTATE IPG        212 266 8751       04/27/2007 09:02     #828 P.005/014

Contractor has represented to the Owner in good faith that the Contractor can and will complete most of the work as specified above, as well as all of the work specified in the contract and in all change orders by mid May, 2007, and that the Contractor will be able to complete all punch list items and finish the job completely and make the building (including the kitchen) ready for inspection by the Nassau County and / or Long Beach municipal authorities for the issuance of the Certificate of Occupancy, by June 18, 2007. The Contractor knows of no additional work that will be necessary to complete the job, and agrees not to seek any additional funding to complete the job. WBMID has reviewed this document with Jay Kopf of JMK Construction, WBMID's principal subcontractor on the job, and JMK has agreed to use its best efforts to complete this job as outlined herein. WBMID and JMK have signed an agreement (copy annexed hereto as Exhibit D) pursuant to which JMK has agreed to complete the work for WBMID as outlined herein.

This agreement does not modify the terms and conditions set forth in the contract between the parties dated May 31, 2005, or the substantive rights of the parties thereunder.

In witness whereof the parties have signed this agreement as of this _____ day of April, 2007. Facsimile signatures and initials shall be as effective as original ink signatures and initials on this document and the attached exhibits.

AIR CHINA LIMITED                    WBM INTERNATIONAL DEVELOPMENT LLC

By                                   By
   BaoQing Chen                         George Dunkins
   Deputy General Manager                President

4.23.07                    AC              WBMID          (5.)